UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ANTHONY COX,<br>Petitioner,<br>v.<br>EDDIE YLST,<br>Respondent. | No. 2:04-cv-00065-DC-CKD<br><br>FINDINGS & RECOMMENDATIONS (ECF Nos. 192, 208, 219) |

Petitioner is a state prisoner under sentence of death. Pending before the Court are the parties' briefs on the application of 28 U.S.C. § 2254(d) to the claims in the operative petition for writ of habeas corpus. (ECF Nos. 192, 208, 219.) After careful consideration of the parties' briefs and of the state court record, the undersigned concludes that petitioner has demonstrated that the state court's merits denials of Claim 14 and portions of Claim 1 do not deserve deference under 28 U.S.C. § 2254(d). For the reasons stated herein, the undersigned recommends that Claims 1, 3, 12, 15, 16, 17, 18, 19, 20, 21, 22 (except insofar as it alleges violations of petitioner's Fifth Amendment rights), 23, 24, 25, 26, 27, 28, 29, 30, 31, 33, 34, 35, 36, 37, 38, 39, 42, 43, 44, 45, 46, 47, and 48 be dismissed from the operative petition.

**FACTS**

The following facts are derived from the California Supreme Court's June 9, 2003, opinion affirming the judgment. See People v. Cox, 30 Cal.4th 916, 926-46 (2003). The state court's factual recitation is entitled to deference absent clear and convincing evidence to the

contrary. Mejia v. Garcia, 534 F.3d 1036, 1039 n.1 (9th Cir. 2008). Here, neither party disputes the factual accuracy of the record of evidence presented at trial, as described in the California Supreme Court's direct appeal opinion. (See ECF No. 192 at 13-19, 42; ECF No. 208 at 4.)

> I. Guilt Phase
>
> A. *Overview*
>
> Nona Chapman ran a foster home for teenage girls on Weswin Court in Placerville. Darlene S. (Darlene), age 17, moved into the home on December 14, 1983. Debbie Galston (Debbie), age 14, moved in on May 11, 1984, left two weeks later, and returned on July 10, 1984. Her sister, Denise Galston (Denise), also age 14 (they were two of a set of triplets), moved in on May 23, 1984. Joanna N. (Joanna), age 17, moved in on May 25, 1984.
>
> Joanna testified that she saw defendant stab Denise to death on June 12, 1984. Denise's body was found in the El Dorado National Forest on July 31, 1984. Her clothes were found on April 30, 1985, near the location where her body had been found.
>
> Lynda Burrill (Lynda), age 18, lived with roommates in Placerville and was acquainted with the girls who lived in the foster home. She disappeared on June 29, 1984, and was last seen with defendant. Her body was found in the El Dorado National Forest on August 4, 1984. A week later, her clothes were recovered near the location where the body was found.
>
> Debbie disappeared from the foster home on August 8, 1984. Joanna, who was Debbie's roommate at the home, found her clothes in the El Dorado National Forest on August 10, 1984. Debbie's body was found on October 27, 1984, not far from where her clothes were found.
>
> Defendant, then age 27, worked at a convalescent hospital in Placerville. Although employed, he often slept in his car, which he would park in downtown Placerville. He met Darlene in January 1984 and immediately began dating her. They would often go camping in the areas where the victims' bodies were later recovered. They married in September 1984, but defendant left Darlene in November of that year. Defendant knew all of the murdered girls, as he frequented an arcade called The Oz in downtown Placerville where they congregated, and he often picked up Darlene at the foster home. Testimony showed he had a low regard for the three victims.
>
> Darlene testified that defendant told her shortly after Debbie disappeared that he had killed all three girls. Defendant was arrested on November 10, 1984 for the three murders.
>
> B. *Defendant's Attitude Toward the Victims*
>
> Several teenage girls testified that prior to Denise's murder on June 12, 1984, defendant had made rude and threatening comments toward the three victims. For

example, Michele D. (Michele), age 15, testified that she met defendant in April of 1984 and that defendant called Denise a slut, stated that Debbie was “turning out real bad,” and called Lynda a “hoser.” Michele further stated that defendant’s whole attitude changed in the spring and summer of 1984. “He became obscene and started listing people, labeling them, what they were and stuff.” Defendant told Michele that she “shouldn't be like them.”

Lynette H., age 16, testified that in early April of 1984 she was riding in defendant’s car when he told her “that some of the girls downtown had a bad reputation to him,” and that they were “sluts.”

Lynne A., a high school student, testified that she knew Debbie, Denise, and Lynda from downtown Placerville. In May of 1984, she was with the three victims and two other girls near The Oz when defendant came by, called the girls “sluts,” and made a vulgar sexual reference toward them. On another occasion, Lynne A. testified that Lynda and two other girls were seated on a bench and defendant yelled from his car, “Does your mama know where you sluts are at?” Darlene testified that defendant called Denise a slut. She stated that in the spring of 1984, she and defendant were in his car and they saw Denise smoking a cigarette outside the foster home. Defendant told Darlene “three would be eliminated from the foster home and three more.” On cross-examination, however, Darlene stated that “eliminate” was her word.

C. *Murder of Denise Galston*

Denise was last seen on June 12, 1984, the day she was murdered. Joanna witnessed her murder, but did not come forward with this information until late October of 1984.

On July 31, 1984, Denise's remains were found. Loggers John Keyser and Todd Story were working off Ferrari Mill Road. They testified that they reached that spot by driving down Iron Mountain Road, also known as Mormon Emigrant Trail, crossing two dams and making a right turn onto Ferrari Mill Road. On Ferrari Mill Road, they traveled approximately three-quarters of a mile to an intersection known as “Four Corners,” turned right and traveled about one-half to three-quarters of a mile. There they found a human skull and other bones. They found no clothing. Through dental records, including X-rays, it was determined that the bones were the remains of Denise. The pathologist was unable to determine the cause of death; all she could state was that there was no observable trauma to any of the bones.

On the evening of June 12, Joanna went to a church parking lot and began drinking. Thereafter, she went to downtown Placerville. She witnessed a commotion, during which Ron Burelco threw a cement block through the windshield of a patrol car. This incident took place between 9:10 and 9:30 p.m. At this time, she saw defendant by the Bell Tower (a local downtown landmark) in his car. He told Joanna that he wanted to talk to her. She got in his car and they drove to the city park. Defendant made a sexual overture to Joanna and grabbed her breast. Joanna returned downtown, where she saw Denise arguing with police

officers. She pulled Denise aside and spoke with her. She then walked over to the Stancil's Toyota dealership, where she again saw Denise, and the two spoke briefly. Denise left, and Joanna watched her walk under an overpass, toward the foster home.[1]

> FN 1: Placerville Police Officer Phillip Dannaker testified that on August 12, 1984, Joanna told him that on June 12, 1984, the night Denise disappeared, she watched as Denise walked through the Locust Street underpass, which was located approximately 200 yards from the foster home. Officer Dannaker added that Joanna told him that this was the last time she saw Denise. Outside of the jury's presence, Officer Dannaker stated that Joanna also told him that on June 12, she and Denise were drinking and that defendant dropped off Darlene at the foster home approximately the same time that she, Joanna, saw Denise walking through the underpass.

Joanna then saw defendant drive by and she made a rude gesture using her third finger, in response to the earlier incident in his car. Defendant stopped where Denise was walking. Joanna stated that it looked like they were arguing and Denise got into his car. The car turned around, approached Joanna, and stopped. Denise asked Joanna to get in the car. Joanna agreed, and sat in the front seat next to Denise. The three left Placerville and headed onto Highway 50. Defendant said they were going to a party. They got off at the Sly Park exit and drove onto Sly Park Road, and then onto Mormon Emigrant Trail. Soon thereafter, the car then turned onto a dirt road, which was Ferrari Mill Road. Joanna saw yellow letters on a tree stump and asked to stop to go to the bathroom. The car eventually stopped and Joanna got out, walked about 100 yards away from the car and vomited. She climbed up a wooded area and washed her face in a "little trickle of water, a stream," which was "just barely enough to wash [her] face." She could see by moonlight. She then heard Denise screaming her (Joanna's) name, and went to the area where she heard Denise's voice. She saw Denise running in the nude with defendant chasing her. It looked like Denise's hands were tied behind her back. Defendant pushed Denise down, put a knife to her throat, and stabbed her. Joanna stated she ran away while Denise was still screaming.

Joanna reached the road from which they had turned off to get onto Ferrari Mill Road (Mormon Emigrant Trail), saw a car coming, and hid. A second car drove toward her, and when she realized that it was not defendant's, she ran out in front of the car. The driver turned out to be a person named Joe whom she previously had met at a place called Happy Trails. She got in his car, told him nothing, and he dropped her off at the Burger King in Placerville.

Once in town, Joanna said she met Bruce Nesthus and stayed over at his house. Nesthus confirmed that he saw Joanna by the Bell Tower at approximately 3:30 a.m. Nesthus stated that Joanna was very jumpy and her mind seemed elsewhere; she would look over her shoulder and, when a car came by, she would try to hide; and, when she walked into his house, she sighed with relief. Nesthus stated that they had sexual relations and Joanna left the next morning, telling him she was

going water-skiing.

Adele Nelson, Joanna's social worker, met with Joanna on June 13, 1984. She had spoken with her on seven to 10 occasions prior to that date. She said Joanna's demeanor was substantially different on June 13. Nelson stated that it seemed that what they had discussed two days earlier "was completely out of her mind, and [Nelson] wondered what had happened to obliterate what had been important to her from her mind."

Joanna testified that she told no one of the murder, including the police, Nesthus, Chapman, her boyfriend Larry Wright, or Darlene because she thought she would get in trouble and be arrested for the murder. She added that she was ashamed that she had not helped Denise. Thereafter, she avoided defendant and the foster home, and often stayed with her boyfriend's grandparents. She left Placerville the last week of August 1984 and moved to Renton, Washington, to live with her brother.

Joanna "couldn't live with herself" and returned to Placerville by train on October 29, 1994 because "she had to come back and tell somebody." The evening of her return, Joanna talked to Placerville Police Officer Phillip Dannaker. She was visibly shaking and crying at times. She said she knew something about the murders but was afraid the police might think she was involved.

The next day, October 30, 1984, Joanna chanced upon Fay Harnage, the wife of El Dorado County Sheriff's Detective Erol Harnage. Fay Harnage testified that she and Joanna began talking after her dog barked at Joanna. It was the first time she had ever met Joanna. Joanna, she said, started talking about the murders and was on the verge of becoming hysterical. Fay Harnage informed her that she was a sheriff's wife and suggested that Joanna accompany her home and meet with her husband, Detective Harnage. Joanna agreed. Once at the residence, Joanna met Detective Harnage and agreed to speak with him and El Dorado County Sheriff Sergeant Bill Wilson about the murders.

Joanna told the two sheriff's deputies that she had information about the case they were investigating and wanted to talk to them, but was hesitant because she was afraid she had done something wrong and would be arrested. She explained that she had gone to Washington to try to get away from "it," but found she could not live with "it" and had returned to talk to them. She also said she was ashamed of herself. It was ultimately agreed that Joanna would talk with a psychologist, Dr. Frank Dougherty, who might be able to help her overcome her reluctance to tell the deputies what she knew about the case.

On November 1, 1984, Joanna had her first session with Dr. Dougherty. She met with him again on November 2. She told him that on June 12, she went to Sly Park with defendant and Denise, and that defendant murdered Denise, but she offered no other information. She later testified that, at this juncture, she had just wanted defendant to get arrested, she was not yet ready to tell the whole truth about what she had witnessed, and that she had lied to Dr. Dougherty about

certain details.

On November 2, Dr. Dougherty and Sergeant Wilson conducted an interview with Joanna that was tape-recorded. That same evening, Sergeant Wilson suggested they "take Joanna in a vehicle to the location." Joanna agreed to direct Detective Harnage, Sergeant Wilson and Dr. Dougherty along the route she took the night of the murder. They left at 9:00 p.m. Joanna directed them to Highway 50, then to the Sly Park Road turnoff. From Sly Park Road, they drove to the intersection of Mormon Emigrant Trail, crossing two dams. Whenever she told them to make a turn, they would stop after the turn. Joanna would tell them that she did not wish to go any further; she wanted to go back home. They kept reassuring her that everything was all right. As they passed the second dam, Joanna told them to drive slowly. After crossing the dam, they turned right on Ferrari Mill Road, finally reaching the intersection known as Four Corners. They stopped. Joanna "was sunk way down low" in her seat and did not respond when Sergeant Wilson suggested she get out of the car. They turned around and headed back to the sheriff's office.

On November 5, 1984, Joanna and Dr. Dougherty had another session. The following day, November 6, Dr. Dougherty, Detective Harnage and Sergeant Wilson took Joanna in a vehicle and returned to Four Corners to see if Joanna could direct them any further. The closer they got to that location, the more fearful and reluctant Joanna became. Once on Ferrari Mill Road, as they approached Four Corners, Joanna said she remembered going further and started crying. At Four Corners, there was a stump with some yellow paint on it. Joanna told them to continue straight ahead, on Ferrari Mill Road. After about a half-mile, she told them to turn around because they were on the wrong road. Back at Four Corners, Joanna said, "We went further down that road," pointing to the road where Denise's remains had been located. Joanna became very quiet and sat there crying. They returned to Placerville.

On November 7, Joanna had another session with Dr. Dougherty. After that session, Joanna gave a complete tape-recorded statement to the deputies describing the events of June 12. She said that when she saw the yellow paint on the stump she finally decided to tell the truth and leave out nothing.

On cross-examination, Joanna admitted having told a different story on November 7, compared to what she had said on the 10-minute tape prepared on November 2. The November 2 tape was played to the jury. She also admitted drinking a pint of rum and a six-pack of beer the night Denise was murdered. She stated that she applied for a reward in this case, but there was no evidence that Joanna was aware of the reward when she came forward. Joanna stated she thought the moon was full that night. In fact, it was one night before a full moon. Joanna stated that she previously recalled saying that there was a "stream" in the area where she had washed her face.

Whether water was actually present in the area where Joanna claimed she had washed her face was the subject of much testimony. Susan and Charles

Greenwood, who lived at the end of the road where Denise's remains were located, stated there was no standing water anywhere near where Denise's body was found.

However, Ronald Jones, Director of the El Dorado County Irrigation District, testified that he maintained the rainfall records at Sly Park Dam. He stated that in 1984, it rained .19 inches on June 4, .74 inches on June 5, .24 inches on June 6, and .15 inches on June 7. Prior to June 4, the previous rainfall had occurred on May 3, 1984.

Brian Morris, a registered professional forester with the United States Forest Service who studied soil hydrology and watershed management, testified that he viewed Denise's remains on July 31, 1984, the day they were discovered. The body was on the uphill side of a log, 200 feet up the slope of the roadway, about 100 feet east of an ephemeral draw. He described such a draw as a swale with a rounded bottom that occasionally collected water. He also found culverts that would form shallow puddles during the time of a runoff. He stated that, given the rainfall in that first week of June 1984, he would reasonably expect that on June 12, 1984, water would pool and go down into the culvert.

John Cleever, a logger, testified that he went to Four Corners on June 9, 1984 (three days before the murder) to report for work. He said that he drove up Ferrari Mill Road to Four Corners and wanted to make a right turn (onto the road where Denise's remains were found), but there was a big mudhole with standing water, so he parked elsewhere.

The Greenwoods testified that the yellow-painted stump that was identified by Joanna first appeared in August 1984, after the murder was committed.
But Dennis Ringnes, a timber sale administrator with the United States Forest Service, testified that in a timber sale, trees to be cut are painted with a special "tracer" paint that is kept under lock and key in order to prevent individuals from painting additional trees not included in the timber sale. He stated that the yellow stump identified by Joanna was painted with that yellow tracer paint in 1979. John Cleever also testified that the trees in that area were painted yellow prior to June 1984.

Darlene testified that she was with defendant the night Denise was murdered, and they had driven to Sports Kingdom Hall and McDonald's in Placerville. She said defendant kept a knife above the car's sun visor and handcuffs in the backseat. She stated that defendant was "cleaning his gun and sharpening his knife" and told her he was "going to take care of business." On cross-examination she admitted that at the preliminary hearing, she said that petitioner had said, "Tonight is going to be a good night for business." She said that defendant took her back to the foster home at 10:00 p.m. She ate a banana and went to the "top of the hill" near the foster home to smoke a cigarette. From that vantage point, she saw defendant pick up Denise underneath the overpass, turn around and stop. She never saw Denise again. She did not see defendant the following day.[2]

> FN 2: Outside the jury's presence, Darlene testified that she did not disclose to anyone that she saw Denise get into petitioner's car until Friday, June 7, 1985, three days before she began her jury trial testimony on Monday, June 10, 1985.

On April 30, 1985, James Stalford was scouting for wood 100 yards off Ferrari Mill Road by the Four Corners intersection when he came across a "reversible [jacket] either dark blue or black on one side and orange on the other." He stated that underneath the coat was a purple sweatshirt, bra, tennis shoes, and denim pants. There was no blood on the clothes. Bruce Nesthus stated that the reversible jacket belonged to him, and that he had loaned this jacket to Denise while they were standing by the Sports Kingdom Hall on June 12, the night Denise was murdered. Nesthus testified that he saw Joanna at that time as well, standing by the fence at the Stancil's Toyota dealership.

On June 22, 1985, during trial, Sergeant Wilson directed Joanna to take him to the spot where Denise had been killed. Joanna did not want to go, but Sergeant Wilson insisted. Once at Four Corners, he told her to direct him. Joanna said to drive straight ahead. After about 75 yards, Joanna said that this was not the road, and to turn around. Once back at Four Corners, at Joanna's direction, they next took the road to their right. After about 150 yards, she said that this was "not the road either," and they returned to the intersection. When he asked her which was the correct road, Joanna pointed to the road to the west. They drove down that road. Joanna told Sergeant Wilson that it was the correct road but that it looked different. Wilson said it was possible it looked different because it had been logged. At the first landing, or wide spot in the road, Joanna said she did not recall this location, but to keep going. They next went directly into some trees and Joanna stated, "Now I remember this being this way." At the second wide spot, Joanna said she remembered going this way, and said to keep driving. At the third wide spot in the road she asked Wilson to stop. He asked her why. "This is the spot," she said, and she became very quiet and began to cry. Wilson stated that this was "almost the same spot" where the jury's bus had stopped when the jurors viewed the area where Denise's remains had been located.

D. *Disappearance of Lynda Burrill*

Lynda, Shane Daniels, Sher L. (Sher), Todd Baxter, and Bob Jacobs shared a home on Benham Street in Placerville. Lynda lived at this location until she disappeared on June 29, 1984. On August 4, 1984, William Hurley and his wife were camping just off Four Corners on Ferrari Mill Road. While walking through the woods with his dog, he and his wife found a human skull and other skeletal remains scattered over an area of about 25 square yards. Through dental records, including X-rays, it was determined that the bones were Lynda's. The pathologist was unable to determine the cause of death; she could state only that there was no observable trauma to any of the bones.

A week later, Hurley and his wife returned to the area where they found the skull. They were looking for clothes. About 150 yards from where they had found the skull, the Hurleys found clothing on the ground, including a bra, panties, a

lavender knit top and a yellow shirt. The four pieces of clothing were in close proximity. Sher identified those items as the clothing Lynda was wearing the night she disappeared. Lynda's mother, Sharon Burrill, also identified the clothing as belonging to Lynda.

On June 29, Sher, Baxter, Jacobs, Daniels, and Lynda had dinner at their Benham Street house. Sher testified that after Daniels and Jacobs left, she and Lynda walked downtown. They met a friend, Darin McArthur, at the furniture store, and the three sat on a bench in front of the bakery. Sher saw Lynda go into The Oz. Lynda left The Oz with defendant and they headed toward the downtown parking lot. Sher knew defendant from The Oz and from around town. She testified that defendant and Lynda were talking. Sher asked Lynda where she and defendant were going, and Lynda told her she was going to the downtown parking lot and would be "right back." McArthur also stated he saw Lynda pass by with defendant and that Lynda said she would be right back. Lynda never returned.

Cheryl Hall, who worked for the Placerville News Company, a downtown newsstand, testified that she saw Lynda and defendant walk past her newsstand on a Friday or Saturday in late June, talking to each other. Hall recounted that Sher was across the street on a bench and Lynda crossed to talk to her while defendant waited. Hall did not see what happened thereafter. Hall stated that the following day, Sher told her that Lynda had not come home and Sher "was really worried about her."

On Saturday, June 30, at 10:00 a.m., defendant went to Joe and Linda Crespin's house. He spoke to Linda Crespin. She remembered the date because it was her 17th wedding anniversary. She asked defendant if he was dating anyone. He replied, "Yes, I'm seeing a girl named Lynda." She was not sure if he used the word "seeing" or "dating." Crespin remarked on the coincidence that her own name was Linda. Defendant replied, "Yes, but she's not like you." He added, "girls like that should be eliminated." Crespin was sure defendant used the word "eliminated." Crespin stated that defendant had a scratch on his forehead and when she pointed it out, he said he got the scratch "cutting wood." She later observed him put some medicine on the scratch.

A few days after Lynda's disappearance, Sher was using a pay telephone in the downtown parking lot, talking to Lynda's father, Donald Burrill. Sher saw defendant park his car, exit the vehicle, and walk with Darlene out of the parking lot. As they passed her, Sher asked defendant where Lynda had gone "that night." Defendant replied, "Lynda who?" Sher then specified to defendant Lynda's last name (Burrill). When defendant said he "didn't know if he knew her," Sher described Lynda. Defendant then said he did not know Lynda and he was not in town that night. Sher told defendant she had seen him with Lynda that night. Defendant replied, "Well, whatever."

Upon learning that his daughter was last seen with defendant, Donald Burrill called defendant's place of employment, the El Dorado Convalescent Hospital, and spoke to defendant on July 5 by telephone. He asked defendant: "What did

you do with my daughter?" Defendant replied, "Darlene and I do not know your daughter." Burrill described Lynda to defendant as a young girl acting as a counselor, helping people downtown who were on drugs. Defendant replied, "Darlene and I are not on drugs. We don't take drugs." Defendant stated that he would talk to Darlene when he got off work and he would call Burrill back. About 15 to 20 minutes later, defendant telephoned Burrill and said: "Darlene and I do not know Lynda. Besides, I wasn't even in town that night." Burrill testified that he had specifically told defendant the night he was concerned about was the Friday before July 5, which was June 29.

On July 20, 1984, El Dorado County Sheriff's Detective William White interviewed defendant about Lynda. At the time, all Detective White knew was that Lynda was missing under suspicious circumstances, and that defendant had been seen with her on June 29. Detective White showed him a photograph of Lynda and asked him if he knew her. Defendant said "that he may have seen her, may have known her, but his girlfriend Darlene knew her better." When asked if he had been with Lynda on the night of June 29, defendant said that "he could have but he didn't recall, wasn't sure." When asked if he might have accompanied Lynda to the downtown parking lot, defendant replied that "he may have seen her at The Oz, or may have seen her at the Bell Tower, but he didn't recall walking with her to the parking lot." Defendant then said he might have walked her to the parking lot, but he was not sure.

Darlene testified that on one occasion at the downtown parking lot, Lynda was on the phone and defendant told Darlene that "he knew her parents." In addition, in early November 1984, defendant told Linda Crespin that "[he] and Darlene gave Lynda a ride from one corner to the next ... close to where Lynda lives, and then [defendant] went in and told Lynda's mother that he did just that." But Lynda's mother, Sharon Burrill, testified that she did not know defendant, had never met defendant, and had never spoken to him in person or by telephone.

Lynette H. testified that she was friends with Lynda, and that she knew defendant. Lynette H. stated she would often see him at the downtown parking lot, The Oz, and the Bell Tower. In the spring of 1984, she observed Lynda and defendant together "five or six times." They would be walking together or talking, and they were usually alone. They frequented the area between the downtown parking lot and The Oz.

E. *Disappearance of Debbie Galston*

Debbie disappeared on August 8, 1984. On October 27, 1984, Thomas Whisenhunt was deer hunting in the area of Baltic Ridge Road and North South Road. About a quarter-mile from the intersection of North South Road and Baltic Ridge Road and about 150 feet off the road, Whisenhunt found the remains of a young girl. The body was about 10 feet from an oil spot and looked as if it had been dragged. No other items were found at the location. Through dental records, including X-rays, it was determined that the remains were those of Debbie. The pathologist was unable to determine the cause of death because the decomposition of the mummified remains destroyed all such evidence. The pathologist further

stated that she was unable to find trauma to any of the bones.

Brenda Hartman worked with defendant at the El Dorado Convalescent Hospital. She believed that he was a judgmental person who would label young women as "loose." In the middle of July of 1984, defendant offered Hartman a ride home after her car had broken down. On the way, defendant drove to the foster home to pick up Darlene. Hartman stated that Debbie was sitting on an open windowsill and said, "Darlene, better watch out, Mike has a girl in the car, and he's going out on you again." Darlene came outside and called Debbie a "bitch." Hartman testified that defendant told Darlene, "Well, you don't have to worry about her much longer."

Joanna testified that several days before Debbie's disappearance, while inside the foster home, Darlene and Debbie were having an ongoing argument about defendant. When the argument moved outside, Joanna followed Darlene and Debbie because defendant was there. Joanna testified that defendant told Debbie, "I'm going to get you." Joanna further stated that after June 12, the date Denise disappeared, Debbie became afraid of defendant. Whenever he was around, she would leave. As Joanna explained, "Wherever he was at, we were not there." Shawn Philpott also testified that Debbie was afraid of defendant. He stated that he had been acquainted with Debbie and had struck up a friendship with her in the weeks prior to her disappearance. On one occasion, while driving with Debbie in his truck, they saw defendant driving towards them from the opposite direction and Debbie "tucked down below the front dash" until defendant passed. On a second occasion, Debbie was with Philpott in front of The Oz when defendant approached in an automobile and Debbie, said Philpott, "pushed me in front of her and then she proceeded to walk behind the rest of the crowd of people." On a third occasion, by the Bell Tower, defendant approached in his car and Debbie, said Philpott, "tucked behind me."

On August 8, 1984, while at a birthday party for Larry Vorce at Benham Park that Debbie attended, Michael Nuss saw defendant's car drive by the park. The driver "drove by real slow looking through the park." All Nuss could see was that the window was down, the driver was a male with short hair and the car was traveling "five miles an hour, or slower." No one else was in the car. Nuss thought the time was about 8:00 or 8:30 p.m. Nuss had seen defendant's car earlier in the day at the AM-PM Mini-Market, when they were getting ready for the party.

About 8:30 p.m., Debbie mentioned to Vorce that she had to leave the party as she had to be back at the foster home by 9:00 p.m. Debbie asked Keith B., Katrina M., and a third person, identified only as Logan, to walk "her some of the way." The three walked with her for a short distance and returned.

Darlene testified that on August 8, she and defendant spent the early evening drinking with defendant's mother and his mother's boyfriend at the mother's trailer on Big Cut Road. Upon leaving, they drove to Benham Park where Darlene used the restroom. They stayed at the park for about 15 minutes. Darlene saw Debbie at the park drinking with other people. Defendant then took Darlene

home. Darlene testified that during that evening, defendant pulled a knife from his car's sun visor, put it in his pants and told Darlene "he had to take care of business."

Barbara Rugg, who worked at Nona Chapman's foster home, testified that Darlene was the first foster child to arrive home that evening. Rugg believed that Darlene returned between 7:45 and 8:00 p.m. Rugg testified that she recalled thinking this was unusual, because Darlene usually did not return home until 11:00 p.m. or midnight.

That same day, August 8, Joanna and her boyfriend, Larry Wright, were together. They returned to the foster home about 8:30 p.m. They wanted to talk to Debbie, but she was not there. They waited until 9:00 p.m., Debbie's curfew, and then went out looking for her. They did not find her. Debbie did not return home.

On August 10, 1984, Joanna and Wright went on a picnic, intending to drive to Anderson Ridge in Wright's grandparents' truck. They took Wright's dog with them. Wright stated the purpose of the picnic was to calm Joanna down and get her away from town because Debbie was still missing and Joanna was upset. They eventually reached North South Road and the "bridge to nowhere." Wright insisted that Joanna did not give him any directions as to where to drive. At the bridge, Joanna noticed a tennis shoe lying by the creek and pointed it out to Wright. They also saw some clothing in a bush on a small island in the creek. They found pants, a shirt, undergarments, another shoe and a sock. Joanna recognized the clothes as belonging to Debbie and became hysterical; she began to cry "and just became unglued."

They gathered the clothes and put them in the back of the truck. On the way to the sheriff's office, they met Deputy Sheriff Paul Odlin at the Sly Park Dam. They led Odlin back to the "bridge to nowhere," and showed him where they had found the clothing. Odlin noted that Joanna was shaky and nervous, with tears in her eyes. She kept talking about "how it was Debbie's clothes and [she] was hoping [Odlin] would find her."

F. *Defendant's Statements to Darlene*

Darlene testified under a grant of immunity. She stated that a day or two after Debbie disappeared, she was at the Exxon station in Placerville with defendant, cleaning defendant's car, when she discovered a unicorn key chain. She recognized the key chain as Debbie's. She stated that defendant asked her to "put it back into Debbie's belongings." However, on two other occasions during her testimony, she said the key chain belonged to Denise. Then she corrected herself and said the key chain was Debbie's and that she put the key chain into Debbie's drawer at the foster home.

Darlene claimed that at the Exxon station, defendant told her "[h]e had strangled [Denise], stabbed her [and] had sexual intercourse with her." She said defendant told her "[h]e had strangled [Lynda], stabbed her and had sexual intercourse with her." She said defendant told her "[h]e strangled [Debbie], stabbed her and had

sexual intercourse with her." She responded, "I don't know" when asked whether defendant had sexual relations before or after he killed the girls. She said defendant was able to do this to the girls because he "handcuffed their hands and tied their feet." She was not asked, nor did she offer any further details about the murders other than to say that defendant's statements "kind of upset [her] [a]n awful lot."

On cross-examination, she stated that prior to testifying, she had spoken to Ron Tepper, the trial prosecutor, and Sergeant Wilson each about 50 times. She asserted that the only time defendant talked to her about the murders was that one time at the Exxon station. She said defendant told her he stabbed Denise "in the stomach." Shortly thereafter, however, she changed her testimony and stated defendant stabbed Denise "in the chest." She reiterated that defendant told her he tied Denise's feet, but when confronted with the fact that Denise ran away, she immediately said, "No, he didn't have time to tie up her feet." She insisted that defendant told her both Denise and Lynda were killed near North South Road. Both girls' bodies, however, were found near Ferrari Mill Road.

Defendant married Darlene on September 15, 1984, but he ended the relationship less than two months later, on November 7 or 8, 1984. Darlene admitted that she and defendant were no longer together as of November 7, 1984, and that defendant left her for another woman. On November 9, 1984, Joanna and Darlene were together at the sheriff's station. Sergeant Wilson and Joanna told Darlene that Joanna witnessed Denise's murder. Sergeant Wilson provided Darlene with the details of Denise's murder. Defendant was arrested for the murders on November 10, 1984. Darlene admitted she first told police about the Exxon conversation after her conversation with Joanna and about two weeks after defendant was arrested.

G. *Darlene's Behavior After August 8, 1984*

Immediately after Debbie's disappearance and the conversation at the Exxon station, Darlene began to act strangely. She also began to accuse defendant of committing the murders. For example, Barbara Rugg, who was in charge of the foster home during Nona Chapman's vacation, testified that on August 11, 1984, Darlene "started talking about guts and whatnot" and was acting "strange." Darlene, stated Rugg, had a knife and was "singing a chant." Rugg called the police at 4:00 a.m. on Sunday, August 12.

Placerville Police Officer Dannaker arrived. Darlene told him she thought Denise and Debbie were dead. She added, "I have visions about them being murdered. I see Denise being strangled and Debbie having her head bashed in." Officer Dannaker asked Darlene if defendant had anything to do with the disappearance of Denise or Debbie. She replied, "I don't know, he might have." When he asked her why, Darlene said, "I have these feelings. That's all I know." Darlene "was afraid that if [defendant] found out she had been talking to the Placerville Police about him that she might be hurt by him."

On August 12, Darlene directed Officer Dannaker and other police officers to

North South Road by Camps Crossing. They were "going to search for graves." Darlene told Rugg before she went out to look for the bodies, "It's all going to be over with, Mike's going to be arrested." Darlene directed them to the Camp Creek Bridge. Once there, however, Darlene stated she had no idea where any bodies were buried. At that point, Officer Dannaker drove her back to the foster home. Shirley W., Darlene's mother, testified that when Debbie was missing, she received several calls from her daughter, who was "very upset, crying." She told her mother, "Momma, I did not kill Debbie, Mike killed Debbie." She would not tell her mother how she knew the information.

Nona Chapman testified that when she returned to the foster home from her vacation on August 13, Darlene was an "entirely different person." For example, Darlene was chopping a piece of binder paper with scissors. After Chapman told her to put down the scissors, Darlene took out her knife and jabbed another piece of paper. When Chapman asked her to put the knife down, Darlene said, "What's the matter, are you afraid I'll stab you?" On August 14, because Darlene was acting so strangely, she was taken from the foster home and spent 48 hours in a psychiatric facility.

H. *Defendant's August 12, 1984, Encounter with Police*

On August 12, 1984, Officer Dannaker located defendant asleep in his car. He observed a gun handle protruding from under the driver's seat and recovered from the vehicle a fully loaded .357-caliber Smith and Wesson revolver, a small, fully loaded Ruger 10/22 rifle, and a .380-caliber Armi Tanfoglio semiautomatic pistol and matching ammunition. Handcuffs were also located in the rear floorboard area. A knife and scabbard were found in the trunk.

That same day, Placerville Police Sergeant William Scholtz took a tape-recorded statement from defendant. The tape was transcribed and most parts were read verbatim to the jury. Sergeant Scholtz told defendant he wanted to talk about the disappearance of Darlene's roommate. Defendant stated: "I knew her. She used to live with Darlene. Her name was Debbie. I don't know her last name." Defendant was asked when he last saw Debbie. He replied: "Well, when I went to pick up Darlene the other day—I don't remember what day it was. If you ask Darlene, she will tell you." When asked if this was the day she disappeared, defendant stated: "I didn't even know she was missing until a couple of days ago when she said—when Darlene said that the girl didn't come home. I don't have anything to do with the girls there period."

Later in the interview, defendant again was asked about his activities on Wednesday, August 8. He stated, "Yeah, Darlene told me the girl was missing that day. We went to my mother's." He claimed not to have seen Debbie at Benham Park. Other than visiting his mother, defendant had no specific recollection of Wednesday night, August 8, four days earlier. When asked if he stayed at the park for a while, defendant stated: "We usually stay [at my mother's] until dark or just before dark." "Then we go down just by Stancil's Toyota for maybe an hour unless I'm tired and take her home." After finding out that defendant usually slept in his car in one of two places, the officer asked: "Do you

recall what you did on Wednesday night?" Defendant replied, "I just told you." The officer said, "No, I mean after you dropped off Darlene." Defendant said, "Yes, I went to the church parking lot and went to sleep. I don't remember that night specifically—before I was sleeping more at the gym."

Defendant also admitted that he was familiar with Sly Park and North South Roads. He stated that he went camping there with Darlene "as often as we can." When asked if he knew the Sly Park area very well, defendant stated, "Well, I know the lake and I know the campground I've camped at." The officer asked, "What about other than Sly Park?" Defendant replied, "North South Road .... There's a place called Camp Creek which I don't know is how many miles out but it was full so we came back and parked at the bridge where Darlene said that they found the girl's clothes."

I. *Other Evidence*

In early September 1984, Patricia Kelly worked at the front desk and was a salesperson for Diamond Springs Racquet Fitness Center. Defendant was a member and would be there "just about every single morning" when the club opened. Kelly suspected her husband of seeing another woman who was only 18 years old and discussed her suspicions with defendant. She stated she was upset because she was much older than the girl and the situation "really bothered her." Defendant replied, "Whores like that should be eliminated."

Shirley W. testified that in late September 1984, Darlene and defendant were visiting, and Darlene wanted to show her newspaper clippings about Debbie and Denise. Shirley W. stated that she told Darlene that she did not want to read the articles. Defendant then volunteered that they "were whores and tramps and they should have been killed."

Joe Crespin met defendant through cutting his hair at his barbershop. He stated they were good friends. He would see defendant with some regularity and they would talk. Crespin testified that on a Sunday in late August 1984, he and defendant were driving south on North South Road by the Camp Creek Bridge, and defendant, pointing to the left-hand side of the bridge, told Crespin that was where Debbie's clothes were found. (That was the side of the bridge underneath which Debbie's clothes were located.) Because it "kind of shocked [him] a little bit," Crespin asked defendant how he knew this information, and defendant replied that Darlene told him.

In early November 1984, defendant spoke with Joe and Linda Crespin and the subject of how the girls were killed came up. Defendant said, "If I had stabbed the three girls would I be sitting here talking to you now?" It never occurred to Linda Crespin to ask defendant how he knew the three girls had met their deaths by stabbing. Joe Crespin also remembered the stabbing reference.

On November 21, 1984, Sergeant Wilson obtained a search warrant to search defendant's car, which had been impounded on the day of his arrest, November 10. Inside the car, Sergeant Wilson found a hunting knife and sheath "up in the

passenger side sun visor," and a buck knife and sheath on the backseat. He found a pair of handcuffs underneath the driver's seat and some nylon rope and rock pitons in the trunk area. There was no blood on either the knife or the sheath. However, a blood expert testified that if a knife had been wiped clean before being placed in the sheath, it would not be expected that blood would be found inside the sheath.

It was stipulated that no human blood was found on Debbie's or Lynda's clothing. No fingerprints of any of the victims were found in defendant's car or on items recovered as part of the investigation. No blood evidence linking defendant to the victims was introduced during the trial. The jury visited the various locations about which witnesses testified.

The black jacket found on April 30, 1985, with Denise's clothes was originally thought to be defendant's. Testimony was elicited to that effect from defendant's mother, Joe Crespin, and Sergeant Wilson. However, during trial, Bruce Nesthus positively identified the jacket as his, saying he lent it to Denise the night she was murdered. This disclosure prompted Sergeant Wilson to insist that Joanna take him to the location of Denise's murder on June 22, 1985, while the jury trial was in progress.

J. *Joanna's and Defendant's Knowledge of Undisclosed Facts*

Sergeant Wilson testified that in a homicide investigation, he did not release to the public all the information in his possession "just in case someone came forward to give information, [he] would use that piece of [withheld] information and check their story." To his knowledge, there was no specific newspaper article that stated that the spot where Denise's body was found was reached by driving down Ferrari Mill Road to Four Corners and turning right.

The prosecutor brought in representatives from the relevant newspapers (the Mountain Democrat, the Sacramento Bee, the El Dorado Gazette and Foothill Times), radio stations (KAHI/KHYL), and television stations (channels 3, 10, 13, 31 and 40) to prove that the media had never disclosed (1) the precise location where Debbie's clothes were found; (2) the location where Denise's remains were found; or (3) that Denise was stabbed to death.

For example, an article in the Sacramento Bee, dated August 21, 1984, stated, "Galton's [*sic*: Galston's] 14-year-old sister, Debbie, is missing and some other clothing has been found in a forest at Camp Creek where the two girls' bodies were found." An article dated August 30, 1984 stated, "[Debbie's] clothes were found August 10th, at North South Road at Camp Creek about 10 miles west of where the two dead girls were found."

An October 30, 1984 article in the Sacramento Union stated: "The remains of the three teenagers have been found since July 31st in a forest near Camp Creek off North South Road east of Placerville. Skeletal remains found in the El Dorado National Forest were identified Monday as those of 14-year-old Debbie Galston." The article continued: "Two days later, her roommate and her boyfriend found

Debbie's folded clothing, underwear, shoes and socks by a Camp Creek bridge while on a picnic, sheriff's deputies said."

One radio broadcast, airing August 4, 1984, stated only that Denise Galston's body was found "approximately one-half mile west of Ferrari Mill Road." And an article in the Mountain Democrat, dated August 22, 1984, quoted Lieutenant Howard Wilson as saying: "'Whether the victims were strangled, poisoned, stabbed ... may never be known unless someone decides to talk about it.'"

II. Penalty Phase

A. *The Prosecution Case*

The People put on no new evidence, relying solely on the circumstances of the three murders of which defendant was found guilty.

B. *The Defense Case*

Lloyd Kelley supervised defendant's forestry work for five months in 1978. Defendant took charge of the crew and acted as the leader in Kelley's absence. Defendant was a "very, very dependable" worker, and Kelley would hire him again. Defendant never used abusive language toward the female members of the crew.

Godfried German supervised defendant on a youth forestry conservation crew for three terms of 90 days each around 1975. Defendant was lead man for the crew part of the time. He was trustworthy and dependable. German stated he would hire defendant again.

Defendant worked for Marjorie Comer as a student aide in the library at El Dorado High School in 1974 or 1975. Defendant's picture was hung on the library's bulletin board as a "special kid" because of his good work. Comer stated that she gave defendant an A-plus for his work, which is unusual for her.
Jean Stokes, defendant's mother, stated that she did not live with or marry his father. When defendant was about one year old, she married Forest Jayne. From the time defendant was 14 months old until he left home at age 16, defendant would often be disciplined and beaten by Jayne. Defendant was the oldest of six children. When he was about six years old, he swallowed gasoline and became ill. He shook all over. He was put in the hospital for a week. Phenobarbital was administered to calm him. He was not taken off this medication until he was about 10 years old.

Stokes suspected Jayne was molesting defendant. On one occasion, Jayne and defendant, then age 14, were alone together in Carmel (at Jayne's home/office). Stokes said she drove to Carmel, and tried to enter the location but the door was locked. When Jayne and defendant finally opened the door, she felt "something very bad was going on." When defendant was 12, the family had to move because Jayne got three neighborhood boys drunk and molested one of them.

Defendant, she said, took care of his younger siblings. He got them up for school,

helped fix their dinners and tried to keep his family together. Once, during a snowstorm, Jayne drove the family car off a cliff and the car rolled over four or five times. Defendant rescued the baby and his mother, fearing the car would roll over again. He ran two miles in the snow to get help for his mother, who had broken her ribs. When she got home from the hospital, defendant helped and took care of the children.

Defendant had been married and had three children. He helped deliver his son. Stokes testified that this period occurred four or five years prior to the trial. Defendant, at the time, was very happy. Then, while he was back east in the Army, defendant learned from his grandfather that his wife had moved another man into their home. Defendant was upset. He was able to get out of the Army to address this situation. Defendant changed after he came home and his family was broken up. He was "hurting very badly." He would take long walks. He drank. He was quiet. He seemed unable to "get it together," and wanted to be alone. This is when he began to judge and classify people.

On cross-examination, Stokes said that after divorcing Jayne, she remarried and had a sixth child at age 40, when defendant was over 18. Defendant did not like his new sister and thought she was a "brat." When she was about two and a half to three years old, the child fell into some water. Defendant, who had been drinking, made no effort to save her, and another person pulled her out of the water.

Carolyn Jayne, defendant's half-sister, testified on his behalf. She corroborated prior testimony that her father beat defendant and sexually abused him, and that defendant was instrumental in raising the other children. She corroborated prior testimony that they had to move one time because their father had molested some young boys in the area.

Albert Globus, a psychiatrist, testified on defendant's behalf. He first examined defendant on December 12, 1984. He had read all the police and sheriff's reports about the case. He reviewed a neurological evaluation by Dr. A.T. Vogt, a clinical psychologist; the medical records of defendant's physician, Dr. Talcott Bates; the records of two electroencephalograms conducted on defendant in May 1963 and June 1962; the progress notes Dr. Bates made when treating defendant for a seizure disorder; a telephone conversation with defendant's attorney about defendant's biological father; psychological tests of defendant performed on July 19, 1985, by Dr. Edwards, a psychologist; an electroencephalographic report on defendant dated July 19, 1985; and a psychological evaluation by Dr. William G. Danton. Dr. Globus diagnosed defendant as having alcohol abuse in remission and organic brain syndrome, which he described as "some damage or deficit in function of nerve cells of the brain," which he characterized, in defendant's case, as mild.

It was stipulated that defendant had suffered no prior felony convictions.

C. *Rebuttal*

Joseph Chandler said that defendant was his foreman during the nine months he

> worked for the forestry service in 1979 or 1980. Defendant generally supervised nine people, including three women. Chandler stated that defendant "enjoyed the power he had as foreman and really tended to push it around quite heavily. He would make work extremely hard for some of the people he didn't like and made it great for those that he did, preferably the women." In the absence of the women, he talked about specific body parts and told the men "what he would like to do [to the women], and when he would offer to do that to them and they would turn him down, and he joked around about it to us." Most of the crew found defendant's behavior highly offensive.
>
> Wayne Rice, like Chandler, worked under defendant for about nine months in 1977 or 1978. With women, defendant "would mention sexual things he would like to do to [the women members of the crew] and what he would like to have them do to him." Rice, who was 16 years old at the time, was so angered by defendant's words that he hit defendant with a tire iron in the presence of the other crew members. Rice admitted that he had suffered a prior felony conviction.

Cox, 30 Cal. 4th at 926-46.

## PROCEDURAL HISTORY

The court has previously described the procedural history in this case in the state courts, in its April 25, 2012 Findings and Recommendations. (ECF No. 114; see ECF No. 118 (adopting same).) Petitioner initiated the instant proceeding in this court, on January 5, 2004, and filed a petition for writ of habeas corpus under 28 U.S.C. § 2254, on June 28, 2005. (ECF Nos. 1, 32.) Shortly thereafter, he moved to stay and hold in abeyance the proceedings in order to exhaust state remedies, which the court granted. (ECF Nos. 37, 40, 41, 56, 58.) In 2010, petitioner moved to lift the stay in the instant proceeding, which was granted. (ECF Nos. 79, 80.) On July 1, 2011, respondent filed an Answer to the petition (ECF No. 96), and petitioner filed a Traverse on October 31, 2011. (ECF No. 102.)

In January 2012, the court ordered the parties to file a joint statement addressing exhaustion. (ECF No. 110.) Based on that statement (ECF No. 113), the undersigned found that portions of the petition were unexhausted. (ECF No. 114.) Over the objections of petitioner (ECF No. 115), the district court adopted the findings and recommendations. (ECF No. 118.) Petitioner then withdrew the unexhausted claims from the petition and filed a conformed copy of the petition reflecting those withdrawals (hereafter, "petition"). (ECF Nos. 127, 138.)

On July 10, 2014, the undersigned directed plaintiff to submit a brief "addressing the application of 28 U.S.C. § 2254(d) to each claim in the petition," and respondent to file a responsive brief. (ECF No. 141.) Petitioner filed his brief on April 6, 2017 (ECF No. 192); respondent filed a responsive brief on January 29, 2019 (ECF No. 208); and petitioner filed a reply on March 9, 2020. (ECF No. 219.)

**LEGAL STANDARD UNDER 28 U.S.C. § 2254(d)**

Title 28 U.S.C. § 2254 confers upon a federal district court the jurisdiction to consider a petition for writ of habeas corpus challenging a state court conviction. A writ of habeas corpus is available under section 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.

Where a state court resolves a federal constitutional claim on the merits, the petitioner in federal court may not succeed on that claim absent a showing that the state court resolution of the claim was contrary to law or unreasonable. 28 U.S.C. § 2254(d). Congress adopted this standard when it revised the habeas statutes in 1996 as part of the Anti-terrorism and Effective Death Penalty Act ("AEDPA"). To meet the standards, a petitioner must establish that the state court's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Section 2254(d) is a gateway. If a petitioner satisfies either subsection (1) or (2) for a claim, then the federal court considers that claim de novo. See Panetti v. Quarterman, 551 U.S. 930, 953 (2007); Frantz v. Hazey, 533 F.3d 724, 737 (9th Cir. 2008).

Under AEDPA, the state court's determination is given a high degree of deference and, in considering whether either subsection of 2254(d) is met, the focus of the federal court's inquiry is only the record that had been before the state court at the time of its adjudication. Cullen v.

Pinholster, 563 U.S. 170, 180-82 (2011). In order to satisfy section 2254(d), the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011); see also Amado v. Gonzalez, 758 F.3d 1119, 1131-32 (9th Cir. 2014). Thus, federal habeas relief is precluded if "'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 562 U.S. at 101 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). This objective standard of reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d). See Hibbler v. Benedetti, 693 F.3d 1140, 1146-47 (9th Cir. 2012). The federal court must engage in the deferential review even where the state court has not provided a reasoned decision. Richter, 562 U.S. at 99-100.

In the present case, some of petitioner's claims were rejected in reasoned decision by the state court and some claims were summarily denied. A summary denial is presumed to be a denial on the merits of the petitioner's claims and, in assessing those claims summarily denied by the state court, the federal court must defer to the state court's denial if review of the state court record shows any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. The federal court "must determine what arguments or theories . . . could have supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When reviewing the California Supreme Court's summary denial of a petition for writ of habeas corpus that had been brought in state court, this court must consider that

> the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that "the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief." It appears that the court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, and will also "review the record of the trial . . . to assess the merits of the petitioner's claims."

Pinholster, 563 U.S. at 188 n.12 (quoting In re Clark, 5 Cal. 4th 750, 770 (1993), and citing People v. Duvall, 9 Cal. 4th 464, 474 (1995)). Accordingly, in these instances, the absence of a prima facie case is the state-court determination that this court reviews under section 2254(d) and that determination is considered a denial "on the merits" for the purposes of AEDPA. See Pinholster, 563 U.S. at 190; Ochoa v. Davis, 50 F.4th 865, 888 (9th Cir. 2022); Nunes v. Mueller, 350 F.3d 1045, 1054-55 (9th Cir. 2003). A petitioner establishes a prima facie case of a constitutional violation if he made allegations sufficient to support the claim and demonstrated that "he ha[s] sufficient evidence for a reasonable fact finder to conclude" that he has proved his claim. Nunes, 350 F.3d at 1054-55. If this court finds petitioner had unarguably presented a prima facie case for relief on a claim to the state court, the state court's summary rejection of that claim was unreasonable. Id.

Under section 2254(d), the state court decision is not entitled to deference if either subsection (d)(1) or (d)(2) is met. See 28 U.S.C. § 2254(d) (listing subsections in the disjunctive). Subsection (d)(1) states that no deference is owed if the state court decision reflects "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). "Clearly established Federal law" is that which was set forth in the United States Supreme Court's "applicable holdings," Carey v. Musladin, 549 U.S. 70, 74 (2006), rather than dicta, at the time the state court decided the issue. Cannedy v. Adams, 706 F.3d 1148, 1157 (9th Cir. 2013); see also Stanley v. Schriro, 598 F.3d 612, 617 (9th Cir. 2010)), amended on other grounds, 733 F.3d 794 (9th Cir. 2013). While "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably," Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010), circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37, 48-49 (2012) (per curiam)). Additionally, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey, 549 U.S. at 77.

A state court decision is "contrary to . . . clearly established Federal law" under subsection

(d)(1) if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). A state court decision is an "unreasonable application" of clearly established federal law if "the state court correctly identifies the governing legal principle . . . but unreasonably applies it to the facts of the particular case." Bell v. Cone, 535 U.S. 685, 694 (2002) (citing Williams v. Taylor, 529 U.S. 362, 407-08 (2000)). When the federal court reviews the summary denial of a habeas corpus petition by the state court—where, by virtue of it having been a summary denial, the state court made no factual findings—the federal court analyzes the state-court decision under 2254(d)(1), because the state court's determination that petitioner's allegations if true did not state a prima facie case for relief is a legal determination, rather than a factual one. Prescott v. Santoro, 53 F.4th 470, 479 (9th Cir. 2022).

Subsection 2254(d)(2) provides that an unreasonable factual determination by the state court is not entitled to deference. See 28 U.S.C. § 2254(d)(2). There are two ways a petitioner may satisfy subsection (d)(2): he may show the state court's findings of fact "were not supported by substantial evidence in the state court record" or he may "challenge the fact-finding process itself on the ground it was deficient in some material way." Hibbler, 693 F.3d at 1146 (citing Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), abrogated on other grounds by Murray v. Schriro, 745 F.3d 984, 1000 (9th Cir. 2014)); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir. 2014) (if a state court makes factual findings without an opportunity for the petitioner to present evidence, the fact-finding process is deficient and the state court opinion is not entitled to deference), cert. denied, 574 U.S. 1071 (2014). The standard for determining whether the state court's fact-finding process is insufficient requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)). This standard is satisfied, for example, where the state court denied the petitioner an evidentiary hearing when the petitioner's proffered evidence satisfied the state-law standard for granting one. Brumfield v. Cain, 576 U.S. 305, 320-22 (2015). In contrast, the state court's failure

to have held an evidentiary hearing is not unreasonable if the state court may have reasonably concluded that the evidence already on the record sufficed to resolve the relevant factual question. Hibbler, 693 F.3d at 1147; Earp, 431 F.3d at 1167-70. Thus, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459 F.3d 943, 951 (9th Cir. 2006) (citing Nunes, 350 F.3d at 1055); cf. Landrigan v. Schriro, 550 U.S. 465, 474 (2007) (in federal habeas corpus proceedings, a district court may decline to hold an evidentiary hearing "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief").

If a petitioner shows that section 2254(d)(1) or (d)(2) is satisfied, this court may review the merits of the claim de novo. 28 U.S.C. § 2254(d); see Panetti, 551 U.S. at 953; Frantz, 533 F.3d at 737. For the claims upon which petitioner seeks to present evidence, petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas corpus proceeding. See Pinholster, 563 U.S. at 185-86.

**APPLICABILITY OF 28 U.S.C. § 2254(d)**

As a threshold matter, certain claims raised in the petition are excluded from the seriatim claim analysis under § 2254(d), which follows post. First, petitioner has abandoned some claims by making no argument on their behalf in his § 2254(d) briefing. (See ECF No. 141.) Under 28 U.S.C. § 2254(d), petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker, 709 F.3d at 939 (quoting Richter, 562 U.S. at 98). Petitioner has made no such showing for claims 12, 20, 24, 33, 34, 35, or 39 of the petition (see ECF No. 192), nor has petitioner advanced any other reason why this court should not defer to the state court's denial of these claims. (See ECF Nos. 102, 192.)[1] Additionally, in his § 2254(d)

[1] Respondent argues that petitioner has additionally abandoned claim 5 of the petition. (ECF No. 208 at 79.) That is not accurate; although petitioner did not address it in his § 2254 brief (see ECF No. 192), in the Answer, respondent had asserted the claim was procedurally defaulted (ECF No. 96 at 78-81) and, in his Traverse, petitioner disputed this. (ECF No. 102 at 11-12). The

brief, petitioner states his intention to abandon subclaims (F) and (G) of claim 1. (ECF No. 192 at 54 n.26.) Accordingly, the undersigned recommends dismissal of subclaims (F) and (G) of claim 1; and claims 12, 20, 24, 33, 34, 35, and 39 of the petition.

Second, in his Answer, respondent argued that certain of petitioner's claims and subclaims are procedurally barred, which petitioner disputed in his Traverse. (See ECF Nos. 96, 102.) Specifically, respondent argued in his Answer that portions of claim 2; claim 4; claim 5; subclaims (B)(2) and (C) of claim 6; subclaims (B)(2) and (C)(1)-(2) of claim 7; portions of claim 8; claim 9; portions of claim 10; claim 11; all allegations comprising claim 13, except those of subclaim (C)(6); the Fifth Amendment allegations of claim 22; claim 32; subclaims (B)(7), (B)(21)-(24), (B)(25), (B)(27), (B)(29)-(31), (B)(33)-(36), and portions of B(16) of claim 40; claim 41; claim 49; claim 50; claim 51; claim 52; and claim 53, of the operative petition were properly dismissed on state procedural grounds by the California Supreme Court, and that this court should defer to those dismissals. (ECF No. 96 at 10-23, 67-74, 78-81, 82, 88-91, 100, 110, 114, 126, 131-33, 156, 194-95, 216-17, 231, 242-44.) Nonetheless, because the parties represent that California Supreme Court denied these claims and subclaims in the alternative on the merits, the parties have also briefed the application of section 2254(d) to the merits denial of these claims and subclaims, with the exception of claim 5. (See ECF Nos. 192, 208, 219.)

The undersigned defers resolution of whether 2254(d) is satisfied for these claims and subclaims until after the court resolves the question of whether the court should defer to the state court's dismissal of these claims and subclaims on state-law procedural grounds. Generally, when a state court has denied relief on a habeas claim on state law grounds that are adequate and independent of federal law, the federal court must defer to that denial. See Coleman v. Thompson, 501 U.S. 722, 729 (1991), superseded on other grounds by 28 U.S.C. § 2254(b) and overruled on other grounds by Martinez v. Ryan, 566 U.S. 1 (2012). When the state court has denied relief on the claim by invoking a state-law procedural bar and, in the alternative, by denying the claim on the merits, the federal court should defer to the state-law grounds if the state court "'clearly and

---

undersigned therefore defers resolution of claim 5, for the reasons explained post.

expressly' states that its judgment rests on a state procedural bar," even if as an alternative holding. Harris v. Reed, 489 U.S. 255, 263-64 & n.10 (1989) (quoting Michigan v. Long, 463 U.S. 1032, 1041 (1983)); see Coleman, 501 U.S. at 729-33; Long, 463 U.S. at 1041 ("If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision."); see generally Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935) (collecting cases recognizing "the settled rule that where the judgment of a state court rests upon two grounds, one of which is federal and the other nonfederal in character, our jurisdiction fails if the nonfederal ground is independent of the federal ground and adequate to support the judgment").

Here, petitioner does not dispute that most of the claims and subclaims identified by respondent were, as a matter of historical fact, dismissed on procedural grounds by the California Supreme Court in its June 9, 2010 order, in the alternative to that court denying each claim and subclaim at issue on the merits. (See ECF No. 102 at 7, 9, 11, 13, 14, 20-22, 29-31, 38, 43-46, 58-59, 64, 66, 68, 70.)[2] Instead, petitioner argues that this court should not defer to the state court's application of the procedural bar because the court applied it in error, the procedural bar was not independent and adequate, and/or because there is cause and prejudice for non-compliance with the procedural rule. (See id.) These issues have been neither fully briefed nor resolved.

Because the question of whether the state court's dismissal of these claims and subclaims on state-law procedural grounds is dispositive and must be resolved before reaching the state court's alternative denial of these claims and subclaims on the merits, see Harris, 489 U.S. at 263-66 & n.10; Coleman, 501 U.S. at 733-35; Long, 463 U.S. at 1041, the court defers determining the latter question until it resolves the former. If the court determines that any of these claims or subclaims were denied on state procedural grounds deserving of deference, then the claim or subclaim should be dismissed without any consideration of whether the state court's alternative denial on the merits also might deserve deference. See Harris, 489 U.S. at 263-66 & n.10; Long,

[2] Relative to the Fifth Amendment allegations of claim 22, petitioner argues that these allegations were not defaulted by the state court, but acknowledges that they might be defaulted under the rule set forth in Wainwright v. Sykes, 433 U.S. 72 (1977). (ECF No. 102 at 43-46.)

463 U.S. at 1041. If the court determines that the state court's invocation of a procedural bar does not deserve deference for any of the claims or subclaims at issue, then the court will then turn to the question of whether the state court's alternative holding denying relief on the merits deserves deference under § 2254(d), relying on the briefing the parties have already submitted on this issue relative to these claims and subclaims (ECF Nos. 192, 208, 219). See Clabourne v. Ryan, 745 F.3d 362, 383 (9th Cir. 2014), overruled on other grounds by McKinney v. Ryan, 813 F.3d 798 (9th Cir. 2015) ("AEDPA deference applies to [the state court's] alternative holding on the merits.")

Accordingly, the undersigned defers resolution of whether claim 2; claim 4; claim 5; claim 6; claim 7; claim 8; claim 9; claim 10; claim 11; claim 13; the Fifth Amendment allegations of claim 22; claim 32; claim 40; claim 41; claim 49; claim 50; claim 51; claim 52; and claim 53[3] should be dismissed pursuant to 28 U.S.C. § 2254(d) until after the court resolves the question of whether deference is owed to the state court's denial of these claims and subclaims, or portions thereof, as procedurally barred.

## ANALYSIS

**Claim 1**

In Claim 1, petitioner alleges that his trial counsel had an actual or potential conflict of interest relative to prosecution witnesses Shirley Winn and Lisa Delashaw. (ECF No. 138 at 41-47; ECF No. 192 at 54 n.26.) Petitioner raised this claim on direct appeal (Appellant's Opening Brief on Appeal ("AOB") at 28-42),[4] which the California Supreme Court denied on the merits.

---

[3] Respondent asserts that only portions of claim 2, claim 6, claim 7, claim 8, claim 10, claim 13, and claim 40 were procedurally defaulted (see ECF No. 96 at 11, 88-90, 100, 114, 131-33, 217), but because those portions are factually interdependent on the remaining allegations (see ECF No. 138 at 63-72, 75-80, 85-90, 145-51), the undersigned defers resolution of the 2254(d) issues for each of these claims until the court resolves the question of whether certain allegations comprising the claims are procedurally defaulted.

[4] Respondent lodged most of the state court record on December 7, 2004. (ECF No. 28.) On June 30, 2005, petitioner initiated a new petition for writ of habeas corpus in the California Supreme Court (see ECF No. 44), and, on January 30, 2006, petitioner lodged in this court that petition and ten volumes of exhibits thereto (ECF No. 44). The same day, respondent lodged the informal response to that petition (ECF No. 46), and, on April 3, 2006, petitioner lodged his informal reply to that informal response (ECF No. 47).

Cox, 30 Cal. 4th at 949-51. The undersigned concludes that the state court's denial is entitled to deference as to the subclaim relating to Ms. Winn (subclaim D), and is not entitled to deference as to the subclaim relating to Ms. Delashaw (subclaim E), although recommends the latter be dismissed as meritless in the interest of judicial economy.

**1. Governing Legal Standard**

A criminal defendant's Sixth Amendment right to counsel includes the right "to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981); see Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005) (en banc); Lewis v. Mayle, 391 F.3d 989, 995 (9th Cir. 2004). To prove an ineffective assistance of counsel claim premised on an alleged conflict of interest, the petitioner must "establish that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 350 (1980); see Stenson v. Lambert, 504 F.3d 873, 886 (9th Cir.2007); Washington v. Lampert, 422 F.3d 864, 872 (9th Cir. 2005); Mickens v. Taylor, 535 U.S. 162, 172 n. 5 (2002); Rich, 187 F.3d at 1069. If a defendant shows his counsel labored under an actual conflict of interest, prejudice is presumed. Cuyler, 446 U.S. at 349-50.

**2. Subclaim D**

In subclaim D of Claim 1, petitioner alleges that trial counsel labored under an actual conflict of interest regarding prosecution witness Shirley Winn, prejudicing petitioner. (ECF No. 138 at 41-44.) The state court's merits denial of this claim is entitled to deference.

---

Additionally, petitioner objected to some of the contents of the state court record that respondent had initially lodged. (ECF No. 29.) In response, respondent lodged supplementary portions of the state court record, on June 5, 2006 (ECF No. 53), to which petitioner also objected. (ECF No. 54.) The parties then stipulated to corrections and amendments to the lodged record (ECF No. 85), which the previously assigned magistrate entered as an order on October 7, 2010. (ECF No. 86.) Pursuant to that order, petitioner lodged additional and corrected portions of the state court record in 2010. (See ECF No. 114 at 4 n.3)

Herein, the lodged documents are cited consistently with the court's citation form utilized in its April 25, 2012 Findings and Recommendations. (ECF No. 114.) When citing the trial record, the Clerk's Transcript on Appeal is abbreviated as "CT", and the Reporter's Transcript on Appeal is abbreviated as "RT" and the volume title is preceded by volume number and followed by a page number.

**a. Relevant Background**

Shirley Winn was the mother of Darlene Sindle. Prior to the preliminary hearing in petitioner's case, defense counsel Forester alerted the court that one of his colleagues at the El Dorado County Public Defender's Office had represented Ms. Winn in 1983 and 1984 in an action under California Welfare and Institutions Code section 300, in which the state sought to have Ms. Sindle made a ward of the court. (1 CT 48-52.) The basis for that action was the allegation that Ms. Winn's husband had sexually molested Ms. Sindle, and Ms. Winn had been appointed counsel as a prospective witness in the case. (1 CT 48-49.) The petition was found true in January 1984 and Ms. Sindle was made a ward of the court. (1 CT 49.) In October 1984, the Public Defender's Office ceased its representation of Ms. Sindle. (1 CT 50-51.)

When petitioner's defense counsel alerted the trial court of the potential conflict, the trial court appointed separate counsel for Ms. Winn to advise her of her attorney-client privileges arising from the earlier representation. (CT 52-54.) After consulting with that counsel, Ms. Winn in open court waived any privileges she may have had, and agreed that she could be cross-examined as to any discussions she had had with her attorney at the Public Defender's Office. (Id.)

Ms. Winn was called as a prosecution witness against petitioner. (13 RT 3573-3589; 14 RT 3596-3626.) She testified primarily about Ms. Sindle's statements and behavior after Debbie Galston went missing, including her statement that petitioner had killed Debbie. (Id.) In defense counsel's cross-examination of Ms. Winn, he elicited her testimony that Ms. Sindle had accused Mr. Winn of molesting her; that petitioner disliked the Winns because of Ms. Sindle's sexual abuse accusations; that petitioner had once fought Mr. Winn, after which Mr. Winn was arrested; and that Ms. Winn disliked petitioner. (13 RT 3606-26.)

On direct appeal, petitioner argued that his Sixth Amendment rights were violated by the trial court having failed to obtain a valid waiver from petitioner for the conflict. (AOB at 35-37, 39-40.) Petitioner also argued that he was deprived of effective assistance of counsel due to counsel's failure to cross-examine Ms. Winn on her "assessments of her relationship with Darlene, Darlene's emotional state, the credibility of any allegations made by Darlene of such

sexual molestation, and the extent to which either Shirley or Gerald Winn were also able to assert a 'domineering' influence over Darlene," as a result of the conflict of interest. (AOB at 39.)

The California Supreme Court rejected these arguments. The court held that because Ms. Winn had waived in open court any attorney-client privilege for her communications with counsel in Ms. Sindle's wardship case, defense counsel were not forbidden from using those communications as a basis for cross-examination in petitioner's case and therefore there was no actual or potential conflict of interest. Cox, 30 Cal.4th at 947-51.

**b. The State Court's Denial Was a Reasonable Application of Clearly Established Federal Law**

The state court was reasonable, under clearly established federal law, in concluding that the record did not demonstrate that there existed an actual conflict of interest for counsel, relative to the Public Defender's Office's past representation of Ms. Winn, which adversely affected counsel's representation of petitioner. At the time of the state court adjudication, several courts had held that, in similar circumstances, the prior client's waiver of the attorney-client privilege obviates any actual conflict of interest for the defendant under the Sixth Amendment. For instance, in United States v. Partin, 601 F.2d 1000 (9th Cir. 1979),[5] the Court of Appeals considered a claim that the defendant's Sixth Amendment right to conflict-free counsel had been violated by his counsel's prior representation of a prosecution witness. There, the prosecution witness at issue was advised by the trial court, prior to his testifying, of the nature of the attorney-client privilege; he then waived his attorney-client privilege and testified against the defendant. Partin, 601 F.2d at 1006. After the defendant was convicted, he claimed on appeal that his Sixth Amendment right to conflict-free counsel had been violated. Id. at 1006-08. The Court of Appeals rejected the argument, holding that the testimony from the witness at issue did not create a conflict for defense counsel, because "[o]nce [the witness] waived his attorney-client privilege the conflict which concerned [defense counsel] was eliminated." Id. at 1008-09 (citing Holloway v. Arkansas, 435 U.S. 475 (1978)). In other cases, the Courts of Appeal have reached similar

[5] Abrogated on other grounds by Wheat v. United States, 586 U.S. 153 (1988), as recognized in United States v. Rewald, 889 F.2d 836, n.16 (9th Cir. 1989).

conclusions under the Supreme Court's Sixth Amendment jurisprudence. See United States v. Vargas-Martinez, 569 F.2d 1102, 1104 (9th Cir. 1978) ("Absent any waiver by [the witness], the only possible method of adequately resolving the problem was to order substitution of counsel for [the defendant]," to ensure the defendant's right to conflict-free counsel under the Sixth Amendment); United States v. Leslie, 103 F.3d 1093, 1098 (2d Cir. 1997) (holding that potential conflict of interest was obviated by the witness having waived attorney-client privilege with defense counsel). Although the opinions of the Courts of Appeals do not define what constitutes clearly-established federal law under 28 U.S.C. § 2254(d)(1), these opinions demonstrate the reasonableness of the state court's interpretation and application of governing federal precedent on this issue. See Fauber v. Davis, 43 F.4th 987, 1009 (9th Cir. 2022) ("We do not cite these out-of-circuit lower court cases as reflective of clearly established law under § 2254(d)(1), but rather as demonstrating that fairminded jurists could reach the same conclusion that these many courts have."); Kessee v. Mendoza-Powers, 574 F.3d 675, 679 (9th Cir. 2009) ("Because the Supreme Court has not given explicit direction and because the state court's interpretation is consistent with many other courts' interpretations, we cannot hold that the state court's interpretation was contrary to, or involved an unreasonable application of, Supreme Court precedent."). Accordingly, the state court's denial on the merits of subclaim D of Claim 1 is entitled to deference. See 28 U.S.C. § 2254(d)(1).

**3. Subclaim E**

In subclaim E of Claim 1, petitioner alleges that defense counsel labored under a conflict of interest relative to prosecution witness Lisa Delashaw, depriving petitioner of his Sixth Amendment rights. (ECF No. 138 at 44-45.) The California Supreme Court denied this claim on the merits on direct appeal, Cox, 30 Cal.4th at 948-50, which the undersigned concludes was based on an unreasonable determination of the facts undeserving of deference under 28 U.S.C. § 2254(d)(2). Nonetheless, in the interest of judicial economy the undersigned recommends this subclaim be denied as meritless.

**a. Relevant Background**

At the guilt phase of the trial, the prosecution called Lisa Delashaw as a witness. (14 RT

3857-3865; 15 RT 3884-3897.) Prior to her testifying, defense counsel Tapson informed the court that Ms. Delashaw had been previously represented by another member of his firm in a juvenile proceeding and he was unsure if this constituted a conflict of interest. (14 RT 3857-58.) Defense counsel Forester informed the court that the defense would seek to impeach Ms. Delashaw with her juvenile criminal conviction. (14 RT 3861-63.) The prosecutor then offered to raise this issue on direct examination, and the court ruled there was no conflict of interest. (14 RT 3863.) Ms. Delashaw subsequently testified for the prosecution concerning communications she observed between petitioner and Lynda Burrill, and was cross-examined by defense counsel Tapson. (15 RT 3884-97.)

On direct appeal petitioner argued that his Sixth Amendment rights were violated by counsel's conflict of interest relative to Ms. Delashaw and that petitioner had not waived that conflict. (AOB at 36-42.) The California Supreme Court denied the claim on the merits, stating, in relevant part,

> This is not a case in which defense counsel has undertaken multiple representation of defendants with competing interests. (See, e.g., *Holloway v. Arkansas*, *supra*, 435 U.S. 475.) Nor is it a case in which a former client was called as a witness, and was alleged to have "masterminded" the crime in which the current client was presently on trial. (*Leversen v. Superior Court* (1983) 34 Cal.3d 530 [194 Cal.Rptr. 448, 668 P.2d 755].) Instead, this is a case where three of four witnesses were previously represented by other attorneys in counsel's firm in matters that were unrelated to the current trial. . . . (See, e.g., *Belmontes*, *supra*, 45 Cal.3d at p. 776.)
>
> A conflict *may* arise if a former client is a witness in a new case because the attorney is forbidden to use against a former client any confidential information acquired during that attorney-client relationship. (*Bonin*, *supra*, 47 Cal.3d at p. 835; *Leversen v. Superior Court*, *supra*, 34 Cal.3d at p. 538.)
>
> But if the attorney possesses no such confidential information, courts have routinely held that no actual or potential conflict of interest exists. For example, in *People v. Lawley* (2002) 27 Cal.4th 102, 145-146 [115 Cal.Rptr.2d 614, 38 P.3d 461], we upheld the trial court's ruling that no conflict existed, given that advisory counsel possessed no confidential information stemming from his prior representation of a prosecution witness in several factually unrelated cases. Similarly, in *People v. Clark* (1993) 5 Cal.4th 950, 1001-1002 [22 Cal.Rptr.2d 689, 857 P.2d 1099] (*Clark*), we held that no actual or potential conflict existed where the public defender possessed no confidential information stemming from his prior representation of three prosecution witnesses.
>
> In *Belmontes*, *supra*, 45 Cal.3d at pages 774-777, we held that the record did not

> establish that counsel had an actual or potential conflict of interest stemming from his firm's prior representation of the codefendant, because the attorney possessed no confidential information stemming from that earlier representation. (See also *Vangsness v. Superior Court* (1984) 159 Cal.App.3d 1087, 1089-1092 [206 Cal.Rptr. 45] [same].)
>
> In the present matter, defendant has made no showing that an actual or potential conflict existed that adversely affected counsel's performance. Instead, defendant makes only the conclusory assertion that defense counsel could not effectively cross-examine witnesses Lisa D., McArthur, and Carter as to the "circumstances of the charges upon which counsel formerly represented them." Defendant makes no claim that defense counsel could not effectively cross-examine these witnesses as to their testimony in the current case, nor does he assert that defense counsel even possessed confidential information acquired during the former representation. Defendant's assertion falls far short of an informed speculation grounded in a factual basis that can be found in the record. (*Belmontes*, *supra*, 45 Cal.3d at p. 776.)
>
> For example, Lisa D. testified that while she was with Lynda and two other girls, defendant asked them: "Hey sluts, does your mama know where you are?" She also stated she saw defendant and Lynda together in the downtown parking lot. Forester, not Tapson, vigorously cross-examined Lisa D. This last fact is relevant because any alleged conflict as to Lisa D. arose from her relationship with Tapson, not Forester. We have held that it is appropriate for a cocounsel who has no conflict with a witness to conduct cross-examination. (See, e.g., *Clark*, *supra*, 5 Cal.4th at p. 1002 [no conflict where cocounsel, who had not represented witness, conducted cross-examination].) We hold that no actual or potential conflict existed as to witness Lisa. D.

Cox, 30 Cal. 4th at 949-50.

**b. The State Court's Denial Was Based on an Unreasonable Determination of the Facts**

Petitioner argues that the state court's denial of this claim does not deserve deference because it is based on a misstatement of the trial record, which constitutes an unreasonable factual determination under 28 U.S.C. § 2254(d)(2). (ECF No. 192 at 64.) The undersigned agrees.

Under 28 U.S.C. section 2254(d)(2), a state court's merits denial of a claim is not entitled to deference if it was based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d)(2). Where a state court errs in its description of the trial record, it has made an unreasonable determination of the facts within the meaning of this

subsection. Wiggins v. Smith, 539 U.S. 510, 528 (2003); see also Andrews v. Davis, 944 F.3d 1092, 1110-12 (9th Cir. 2019); Taylor v. Maddox, 366 F.3d 992, 1001 (9th Cir. 2004), overruled on other grounds by Murray v. Schriro, 745 F.3d 984, 999 (9th Cir. 2014); Hall v. Dir. of Corr., 343 F.3d 976, 983 (9th Cir. 2003); Campos v. Stone, 201 F. Supp. 3d 1083, 1093 (N.D. Cal. 2016). If the state court then based its denial of the claim, in material part, on the unreasonable factual determination, the petitioner is entitled to de novo review of the claim under § 2254(d)(2). See Taylor, 366 F.3d at 1001; see also Wiggins, 539 U.S. at 528.

Here, the California Supreme Court misstated the record in its analysis of this subclaim when it stated that it was defense counsel Forester, not defense counsel Tapson, who had cross-examined Ms. Delashaw at trial. See Cox, 30 Cal. 4th at 949-50. (See ECF No. 192 at 64.) In fact, it was defense counsel Tapson who cross-examined Ms. Delashaw. (15 RT 3894-96.) Respondent argues that the state court's statement was not error, because defense counsel Forester had cross-examined Ms. Delashaw when conducting voir dire of her outside of the presence of the jury. (ECF No. 208 at 62-63.) This interpretation of the state court's discussion is not plausible—there is nothing in the text of the state court's discussion suggesting that the statement alluded to defense counsel's performance in conducting voir dire of Ms. Delashaw. More generally, there is nothing in the court's analysis suggesting that it viewed defense counsel's adequate performance in hearings outside of the jury to be a suitable replacement for constitutionally-sound performance in the taking of evidence during trial proceedings, for the purposes of a Sixth Amendment analysis, and such a position finds no basis in the Sixth Amendment conflict-of-interest jurisprudence the California Supreme Court was purporting to apply. See Cox, 30 Cal. 4th at 949-50. Plainly, when the state court discussed the defense's cross-examination of Ms. Delashaw, it was referencing the cross-examination that occurred during trial proceedings before the jury.

Respondent alternatively argues that the state court's error was immaterial to its decision, and therefore the standard of § 2254(d)(2) has not been met. (ECF No. 208 at 62-63.) This, too, is unpersuasive. Respondent characterizes the state court's misstatement concerning who conducted cross-examination as irrelevant to the court's denial of the claim, because, at the point at which it made the statement "the state court had already determined that Cox's claim failed due to the

lack of an adverse effect upon performance." (Id. at 62.) This misstates the state court's analysis. In concluding that petitioner had failed to make a showing of conflict, including that he had failed to show that defense counsel had been hamstrung in the cross-examination of Ms. Delashaw, the court stated that it was "relevant" to its conclusion that Mr. Forester had cross-examined Ms. Delashaw. The state court also cited Mr. Forester having cross-examined Ms. Delashaw as an "example" of the record failing to suggest the existence of a conflict. See Cox, 30 Cal. 4th at 950. By utilizing this language, the court indicated that the fact of which defense counsel conducted the cross-examination of Ms. Delashaw was material to its conclusion that the claim was unmeritorious based on the facts before it in the trial record. See generally Nunes v. Miller, 350 F.3d 1045, 1054 (9th Cir. 2003), abrogated on other grounds as stated in Ochoa v. Davis, 50 F.4th 865, 888 (9th Cir. 2022) (in § 2254 cases, the federal court generally accepts as true the state court's reasons for its conclusions, unless the record reveals a reason not to do so).

This conclusion is further bolstered by the state court's reliance on People v. Clark, 5 Cal.4th 950, 1002 (1993), in its discussion of this point. The court explained that, in Clark, it had held that there had been no showing of a conflict of interest "where cocounsel, who had not represented witness, conducted cross-examination." Cox, 30 Cal. 4th at 950. While this is an accurate description of Clark's holding, at the page of that decision cited by the Cox court, the court in Clark had opined that the defense counsel who had previously represented the prosecution witness "likely would have been in a situation of divided professional duties if he had cross-examined [the prosecution witness] or assisted in that cross-examination." Clark, 5 Cal. 4th at 1002. It was only because that counsel was not the person who cross-examined the witness, and because both counsel averred to the court that no privileged or confidential information had been shared with the attorney who conducted the cross-examination, that the court found that petitioner had not shown his Sixth Amendment rights were violated by his attorney's conflict of interest. Id. In light of this analysis, and the state court's express reliance on it in reaching its decision on petitioner's claim, the issue of who conducted the cross-examination of Ms. Delashaw was plainly material to its denial of the claim, if not dispositive to it. As such, the state court's misapprehension that it was Mr. Forester who had cross-examined Ms. Delashaw at the guilt

phase, and the court having based its denial of the subclaim at least in part on that misapprehension, renders the state court's denial of this subclaim unentitled to deference, per 28 U.S.C. § 2254(d)(2).

**c. Subclaim E Should Be Denied As Meritless**

Despite petitioner having satisfied § 2254(d) for subclaim E of Claim 1, the undersigned recommends the subclaim nevertheless be dismissed at this stage, in the interest of judicial economy, because it is meritless. See generally Shinn v. Ramirez, 596 U.S. 366, 390 (2022) ("a federal habeas court may *never* 'needlessly prolong' a habeas case") (quoting Pinholster, 563 U.S. at 209 (Sotomayor, J., dissenting) (italics in original)).

Subclaim E fails, first, as unduly speculative. In his petition, petitioner alleges that Ms. Delashaw's prior defense counsel—i.e., Mr. Tapson's colleague—"possessed, knew of, or reasonably should have known of information regarding Ms. Delashaw's bias and lack of credibility." ECF No. 138 at 45. On this basis, per petitioner, he can demonstrate that Mr. Tapson labored under an actual or potential conflict of interest. Id. at 41, 45, 47. Petitioner makes no specific allegations as to what relevant, impeaching information prior counsel had learned about Ms. Delashaw, however, so as to enable respondent to meaningfully respond to the allegations. See Hendricks v. Vasquez, 974 F.2d 1099, 1103 (9th Cir. 1992), as amended on denial of reh'g (Oct. 29, 1992); Boehme v. Maxwell, 423 F.2d 1056, 1058 (9th Cir. 1970). Although petitioner requests evidentiary development on this claim, see ECF No. 138 at 41 n.53, the process of discovery does not enable a petitioner to "explore [his] case in search of its existence." See Rich v. Calderon, 187 F.3d 1064, 1067 (9th Cir. 1999). Without more definite factual allegations identifying the nature of the purported conflict, petitioner fails to have met his pleading burden to demonstrate that this claim is colorable. See Morris v. State of Cal., 966 F.2d 448, 455-56 (9th Cir. 1991) (holding that, to be entitled to evidentiary development on a conflict of interest claim, habeas corpus petitioner must make specific factual allegations about the circumstances giving rise to the conflict); see generally Boehme, 423 F.2d at 1058.

Second, the record belies petitioner's allegations that his counsel's performance was adversely affected by any conflict of interest. See Mickens, 535 U.S. at 172 n. 5; Hovey, 458 F.3d

at 908. To make this showing, petitioner must demonstrate "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." Hovey v. Ayers, 458 F.3d 892, 908 (9th Cir. 2006) (quoting United States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005)). Here, petitioner fails to specify what line of impeachment was available as a "plausible alternative defense strategy," which counsel forewent as a result of their conflict. See ECF No. 138 at 44-45. To the extent that petitioner's allegations are that counsel should have used impeachment information to assail Ms. Delashaw's credibility generally, to urge the jury to disbelieve all of her testimony, petitioner fails to show that constituted a plausible alternative strategy given the totality of the evidence before the jury.

On direct examination, Ms. Delashaw testified, very briefly, that at some time in the late spring or early summer of 1984, petitioner yelled a sexualized epithet to Ms. Delashaw, Ms. Burrill, and three other girls who were sitting together on a bench in Placerville. (15 RT 3887-89.) She also testified on direct examination that, at some point in 1984, she saw petitioner and Lynda Burrill enter a parking structure together, in downtown Placerville. (15 RT 3889-91.) Finally, the prosecutor elicited on direct examination that Ms. Delashaw was presently incarcerated in juvenile hall, serving a sentence for having stolen from her mother. (15 RT 3891-92.)

On cross-examination, defense counsel elicited testimony from Ms. Delashaw confirming that she could not recall when she saw petitioner and Ms. Burrill enter the parking structure together, and probing her on her ability to have observed them from her vantage point. (15 RT 3895.) Additionally, defense counsel elicited from Ms. Delashaw testimony that Ms. Napoletano had reported to her having found clothes of one of the decedents, but did not report to her having seen petitioner stab anyone. (15 RT 3894.)

Given the nature of Ms. Delashaw's testimony on direct examination, and the prosecution case generally, the record does not support the conclusion that defense counsel's performance was adversely affected by any conflict. Rather than assail Ms. Delashaw's testimony broadly, defense counsel utilized cross-examination in a more nuanced manner, highlighting for the jury the vague nature of her testimony concerning her reported observation of petitioner and

examining her pointedly on her ability to have observed him, but otherwise eliciting from her testimony that provided the jury another reason to be skeptical of Ms. Napoletano's testimony. This latter purpose, however, relied on the jury finding Ms. Delashaw credible, contrary to petitioner's present argument. Such an approach is often tactically sound. See generally Noel C. Stevenson, Successful Cross Examination Strategy, 204 (1971) ("The possibility of destroying a witness is remote. Therefore, the most effective objective of cross examination is to secure admissions from a witness. These admissions, usually wrung out of a witness piecemeal, may well corroborate the cross examiner's later arguments to the jury. This technique is much preferred to exposing the witness as a liar and a fraud."); Thomas A. Mauet, Fundamentals of Trial Techniques, 214 (3d ed. 1992) ("If you have been successful in obtaining significant admissions, you may well decide to omit any discrediting cross at all. . . . Juries will be understandably skeptical if you argue that a witness' favorable testimony should be believed, while that part of the testimony you attempted to discredit should be disbelieved. Accordingly, where the witness' admissions have been helpful, thereafter conducting a destructive cross-examination will only undermine the admissions. Discretion is often the better part of valor in such situations."); Albert J. Moore, Inferential Streams: The Articulation and Illustration of the Trial Advocate's Evidentiary Intuitions, 34 UCLA L. Rev. 611, 681 (1987) ("Current texts typically bifurcate cross-examination into constructive and destructive cross. When conducting constructive cross, the advocate elicits affirmative evidence tending to support her theory of the case. During destructive cross, one attempts to call into question the personal veracity of the witness or to establish that for some excusable reason the witness' testimony is inaccurate."). In this case, this approach was particularly apt, given that Ms. Delashaw's testimony on direct examination was largely duplicative of similar testimony the jury had already heard, thus there appears little strategic advantage to have been gained by the defense impeaching her testimony wholesale. In contrast, Ms. Napoletano's testimony was much more critical to the prosecution's case, see generally Cox, 30 Cal.4th at 926-44, and the defense's elicitation of testimony from Ms. Delashaw concerning Ms. Napoletano's past statements coincided with defense efforts throughout the trial to give the jury reasons to question the reliability of Ms. Napoletano's testimony. (See,

e.g., 15 RT 4050-55, 4062-73, 4089-95, 4106-60; 18 RT 4740-4787.) Given the totality of the prosecution's case and the theory of defense that the jury heard, petitioner fails to show in this proceeding that defense counsel was unreasonable in utilizing the cross-examination of Ms. Delashaw in the manner that they did, and that reasonable defense counsel would have instead assailed her credibility more broadly. See Hovey, 458 F.3d at 908. Simply, petitioner fails to show that there is merit to his claim that defense counsel was burdened by an actual conflict of interest, relative to Ms. Delashaw, that adversely affected the representation that petitioner received so as to have deprived him of his Sixth Amendment right to counsel. See id. The undersigned therefore recommends this claim be denied in its entirety.

**Claim 3**

In Claim 3, petitioner alleges that his Sixth, Eighth, and Fourteenth Amendment rights were violated by the prosecutor's suppression of material impeachment evidence concerning Joanna Napoletano's credibility, namely, evidence that she had falsely reported a sexual assault prior to her testimony in the instant case. (ECF No. 138 at 52-54.) Petitioner raised this claim in his 2005 petition for writ of habeas corpus in the California Supreme Court (June 30, 2005 Pet. at 60-63), which denied it on the merits, in a summary order. (ECF No. 79-1; see ECF No. 192 at 80; ECF No. 208 at 73.) The undersigned finds that denial deserving of deference.

At trial, Ms. Napoletano testified that the night that petitioner killed Denise Galston, he had also sexually assaulted Ms. Napoletano by grabbing her breast. (10 RT 2512-13.) After trial, petitioner learned that, on May 29, 1984, Ms. Napoletano had reported to the El Dorado Sheriff's Department that she had been forcibly sexually assaulted by three men. (June 30, 2005 Pet. at 60-61.) The El Dorado Sheriff's Department investigated this report, including interviewing Ms. Napoletano, and ultimately the purported assailants were not prosecuted. (Id. at 60-63) At petitioner's trial, the prosecution did not discover to the defense the fact of Ms. Napoletano having reported this earlier, unrelated sexual assault, nor any details concerning it, including that the claimed perpetrators were not prosecuted. (Id.)

In his state habeas corpus proceedings, petitioner alleged that the nondisclosure of this information had violated his due process rights under Brady, and, had the report been disclosed to

the defense, defense counsel could have impeached Ms. Napoletano with evidence that her sexual assault report had been false, including with testimony from the three men she had accused, who denied the assault. (June 30, 2005 Pet. at 62-63.) He also alleged that the report could be a source of impeachment information by showing her "drug and alcohol abuse" and that she "had a reputation among law enforcement officers for leveling false accusations of sexual assault and a reputation among law enforcement officers for deception and unreliability." (Id.) Petitioner also theorized that the sexual assault report contained impeachment information because it contradicted Ms. Napoletano's testimony that she "left Placerville because she did not wish to stay after the disappearances." (Id. at 63; see also March 31, 2006 Reply to Inf. Resp. at 15-16.) In his reply brief in state court, petitioner additionally alleged that the report impeached Ms. Napoletano's testimony that she had not come forward with her report concerning petitioner earlier because she did not like police officers; per petitioner, her sexual assault report indicated her "willingness to discuss intimate and traumatic incidents with Officer Ewing," specifically. (March 31, 2006 Reply to Inf. Resp. at 15-16.)

The state court may have reasonably denied this claim on the merits, consistent with clearly established federal law, if it concluded that petitioner had not made a prima facie showing that the facts surrounding Ms. Napoletano's sexual assault report were impeaching or, if they were, that they were material to the question of petitioner's guilt. See Brady, 373 U.S. at 87. The state court could have reasonably rejected petitioner's assertion that Ms. Napoletano's testimony that she had been sexually assaulted by petitioner was impeachable with her prior report of an unrelated sexual assault, on the basis that the latter was false, because the state court could have reasonably concluded that petitioner failed to show that the earlier report was, in fact, false. To demonstrate the report's falsity, petitioner solely relied on the statements of the perpetrators, in which they denied having sexually assaulted Ms. Napoletano, and the fact that the sexual assault report was investigated but not ultimately prosecuted. (See June 30, 2005 Pet. at 60-62 & Exs. 5-8; ECF No. 192 at 83-84.) These minimal facts, however, do not suffice to demonstrate that the sexual assault report was false, and the state court could have reasonably reached the same conclusion based on the record before it. See, e.g., Nevada v. Jackson, 569 U.S. 505, 511 (2013)

(holding state court was reasonable in upholding trial court's limitation on impeachment of witness's past reports of sexual assault, which defendant had theorized were false reports, because this evidence "had little impeachment value because at most it showed simply that the victim's reports could not be corroborated" by the police to whom she had reported them); Hughes v. Raines, 641 F.2d 790, 792 (9th Cir. 1981) (finding it "very doubtful" that a court would find a sexual assault allegation false merely because the accused denied it and the prosecutor did not prosecute it); Quinn v. Haynes, 234 F.3d 837, 850 (4th Cir. 2000) (holding state court was reasonable in concluding that alleged perpetrator's denial of a sexual assault accusation was insufficient to demonstrate the accusation's falsity); United States v. Bartlett, 856 F.2d 1071, 1088 (8th Cir. 1988) (upholding trial court's determination that "it was very doubtful" that defendant could show complaining witness's past accusations of sexual assault were false, where the evidence of their falsity was merely that the witness had not pursued charges against the accused perpetrator); see generally Rose Corrigan, The New Trial by Ordeal: Rape Kits, Police Practices, and the Unintended Effects of Policy Innovation, 38 Law & Soc. Inquiry 920, 922-23 (2013) (detailing the prevalence, in the early-1980s throughout the United States, of under-investigation of credible allegations of sexual assault); Deborah Tuerkheimer, Incredible Women: Sexual Violence and the Credibility Discount, 166 U. Pa. L. Rev. 1, 28-36 (2017) (same, in 1980s and beyond).

The state court could have also reasonably concluded that petitioner had failed to show that the sexual assault report contained other information that could have impeached Ms. Napoletano's trial testimony, such that its nondisclosure violated his due process rights. In his state habeas corpus proceedings, petitioner alleged that the report could have been a source of impeaching Ms. Napoletano about her drug and alcohol use (see June 30, 2005 Pet. at 60-61), but the jury in petitioner's case was made aware, through Ms. Napoletano's own testimony, that she had drunk a pint of rum and multiple beers, and had used an eighth of a gram of cocaine, of the day of Ms. Galston's death, which had rendered her "drunk" and "numb[]" and left her recollection of some of the events of that day "cloudy." (10 RT 2699-2700, 2711; see also 9 RT 2450-52 (testifying about her frequent drug and alcohol use during this period).) Petitioner offers

no theory as to how Ms. Napoletano's level of intoxication on a different day would impeach her testimony about her level of intoxication, including her ability to relate and perceive events, on the date of the events about which she testified. (See June 30, 2005 Pet. at 60-63; ECF No. 192 at 83.) Petitioner's underlying premise—that Ms. Napoletano must have been similarly impaired on both dates (see id.)—appears to have no support in the record that was before the state court. (See generally June 30, 2005 Pet. at 60-63.)

Petitioner also alleged in state court that the information contained in the report contradicted Ms. Napoletano's testimony insofar as her testimony indicated a dislike of law enforcement officers, because the report indicated her "willingness to discuss intimate and traumatic incidents with" officers, including Officer Ewing specifically. (March 31, 2006 Reply to Inf. Resp. at 15-16.) Again, the state court could have reasonably concluded that Ms. Napoletano's having reported a previous rape does not impeach her trial testimony, as her prior rape report does not imply she was testifying falsely when she testified that she "didn't trust cops" (10 RT 2597) and she "didn't think they would believe" her if she reported having observed Ms. Galston's homicide. (10 RT 2558.) Moreover, Ms. Napoletano's testimony at trial was that she "didn't trust cops" due to, in the prosecutor's words, her "life's experience to that time with policemen," (10 RT 2597-98), which is entirely harmonious with the evidence petitioner presented, in habeas corpus, that Ms. Napoletano had previously reported a multi-offender, forcible rape to police officers, who disbelieved her, shared amongst each other their perceptions of her as a deceitful and unreliable person, and did not pursue the prosecution of the accused perpetrators. (See June 30, 2005 Pet. at 63.) The state court was reasonable, therefore, if it concluded that the evidence tendered in habeas corpus was not impeaching of this aspect of Ms. Napoletano's testimony.

Similarly, the state court would have been reasonable if it concluded that Ms. Napoletano's sexual assault report did not impeach her trial testimony describing her reasons for leaving Placerville. Petitioner argues that Ms. Napoletano's testimony indicated that she moved away from Placerville because she was afraid of petitioner. (ECF No. 192 at 83, citing 10 RT 2560, 2592.) This argument, however, misrepresents the record; Ms. Napoletano did not testify

she moved from Placerville out of fear of petitioner. Rather, she testified that that after the homicide of Ms. Galston, she avoided petitioner because she was afraid of him (10 RT 2560) and, at a different portion of her testimony, she testified that she moved to Washington a few months after the homicide because she "didn't want to stay in Placerville no more." (10 RT 2592.) The state court was reasonable if it relied on the record of Ms. Napoletano's testimony in lieu of petitioner's counterfactual description of it, in concluding that petitioner had failed to make a prima facie showing of a deprivation of his constitutional rights. See Landrigan, 550 U.S. at 474.

The California Supreme Court may also have reasonably denied relief on the basis that petitioner failed to make a prima facie showing of materiality. It would have been reasonable for the state court to conclude that, to show materiality, petitioner had to show that the suppressed information was admissible, could lead to admissible evidence, or could lead to information that could be used for impeachment, even if not independently admissible. See United States v. Kohring, 637 F.3d 895, 903 (9th Cir. 2011); Paradis v. Arave, 240 F.3d 1169, 1179 (9th Cir. 2001); see generally Giglio v. United States, 405 U.S. 150, 154 (1972). Because petitioner could not show that Ms. Napoletano's prior report had, in fact, been false, the state court could have reasonably concluded that the trial court would have been unlikely to have permitted this avenue of impeachment under California Evidence Code § 352, as it would have required a time-consuming "mini-trial" of the veracity of the past report, which itself related only collaterally to the charges in the instant case given that the past sexual assault had not reportedly involved petitioner. See, e.g., People v. Bittaker, 48 Cal.3d 1046, 1097 (1989) (holding trial court did not abuse its discretion by excluding under Evidence Code § 352 evidence that a witness had reportedly previously made false reports of sexual assault, as its admission "would in effect force the parties to present evidence concerning two long-past sexual incidents which never reached the point of formal charges[,] . . . [which] would consume considerable time, and divert the attention of the jury from the case at hand."); People v. Tidwell, 163 Cal. App. 4th 1447, 1458 (2008) (holding that, without "conclusive evidence that [a witness's] prior rape complaints were false," the trial court did not abuse its discretion in excluding under Evidence Code § 352 evidence that complaining witness had made prior false reports of sexual assault, given "the weak nature of the

evidence of falsity of the complaints and the confusion of the jury and consumption of time it would have engendered for the parties to embark on the task of litigating the truthfulness of [the] prior complaints"); see also People v. Vargas, 91 Cal. App. 4th 506, 544 (2001), as modified on denial of reh'g (Sept. 4, 2001) (holding trial court did not abuse its discretion under Evidence Code § 352 in ruling that defense could not cross-examine prosecution witness on his purported role in an unrelated homicide, because it "would be a mini trial on a crime with which defendant was not charged, resulting in jury confusion and inordinate consumption of time").

For all of these reasons, petitioner fails to show that the state court's summary denial of this claim was contrary to, or an unreasonable application of, clearly established federal law. (See ECF No. 192 at 81-84.) The undersigned therefore recommends this claim be dismissed. See 28 U.S.C. § 2254(d).

**Claim 14**

In Claim 14, petitioner alleges that his rights under the First, Fifth, Sixth, Eighth and Fourteenth Amendments were violated by a juror initiating communications with her priest about the case during penalty phase deliberations. (ECF No. 138 at 91-93.) Petitioner raised this claim in his July 8, 1993 supplemental petition for writ of habeas corpus ("July 8, 1993 Supp. Pet."), which the California Supreme Court summarily denied. (Order, In re Cox, Case No. S033824 (Cal. Sup. Ct. Aug. 11, 1993).) The undersigned concludes that denial is not entitled to deference under 28 U.S.C. § 2254(d)(1).

**1. Relevant Background**

During the trial, the court instructed the jurors not to discuss the case with anyone except the other jurors, see 5 RT 1265, 1269-70; see also 1 RT 70, 139-40, 197-98; 5 RT 1323, 1444; 18 RT 4836; 19 RT 5113, 5256, 5329, and, at the close of the penalty phase, instructed the jurors that they were to reach their verdict based only on the evidence presented at trial and their deliberations with the other jurors. 20 RT 5319, 5321, 5323. In state habeas corpus proceedings, petitioner presented evidence that, despite these instructions, one of the jurors had contacted her priest during the penalty phase deliberations because she "felt uncomfortable with the prospect of voting for the death penalty" and discussed with him her concerns. (July 8, 1993 Supp. Pet. at 7-

11, 20-21, 25-31 & Ex. Q.) Her priest "advised [her] to follow [her] conscience, and that [she] would not be judging the man, Michael Cox, but rather [she] was only judging his actions." (Id., Ex. Q.) During jury deliberations the following day, the juror "told the other jurors about [her] discussion with Father Joe and stated that [she] was now ready to cast [her] vote for the death penalty." (Id.) At least six other jurors recalled this conversation. (Id., Exs. R, S, T, U, V, W.) Subsequently, the jurors voted unanimously for a death verdict. (See id.)

Petitioner raised this claim in his 1993 state habeas petition (July 8, 1993 Supp. Pet. at 7-11, 20-21, 25-31), which the California Supreme Court denied on the merits in a summary order, over the dissent of Justice Mosk. (Order, In re Cox, Case No. S033824 (Cal. Sup. Ct. Aug. 11, 1993).)

**2. Governing Legal Standard**

The Sixth Amendment and Fourteenth Amendment guarantee a criminal defendant right to trial by an impartial jury, who are "capable and willing to decide the case solely on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217 (1982); Duncan v. Louisiana, 391 U.S. 145, 149 (1968). This guarantee is particularly "vital" in a capital case. Mattox v. United States, 146 U.S. 140, 149 (1892). Where a juror has engaged in a "[p]rivate communication[]" with a third person that is "possibly prejudicial," the verdict must be vacated unless the State can show that the communication was harmless. Id. at 149-50; see also Remmer v. United States, 350 U.S. 377, 382 (1956); Remmer v. United States, 347 U.S. 227, 229 (1954); Godoy v. Spearman, 861 F.3d 956, 959 (9th Cir. 2017). The State's burden to show harmlessness is a "heav[y]" one. Remmer, 347 U.S. at 229. If the extrinsic communication was possibly prejudicial, but the record does not supply enough information to determine whether the communication was harmless, the reviewing court should hold an evidentiary hearing. Remmer, 347 U.S. at 229-30; Godoy, 861 F.3d at 959.

**3. The State Court's Decision Is Not Entitled to Deference**

Under clearly established federal law, the state court may have denied petitioner's claim on the merits, without an evidentiary hearing, by having determined either that the juror's contact with her priest during the penalty phase was not presumptively prejudicial or that the State had

proven that such contact had been harmless. See Remmer, 347 U.S. at 229; Mattox, 146 U.S. at 149; Godoy, 861 F.3d at 959. Given the record before the state court, however, either conclusion reflected an unreasonable application of clearly established federal law.

The state court was unreasonable if it concluded that petitioner had not shown that a juror had engaged with presumptively prejudicial communications with a third party during the trial. Under clearly established federal law, third-party communications with jurors are presumptively prejudicial where the communication had a "tendency" to be "injurious to the defendant." Mattox, 146 U.S. at 150. This is a "low threshold." Tarango v. McDaniel, 837 F.3d 936, 949 (9th Cir. 2016); see also Godoy, 861 F.3d at 967. To determine whether it has been met, the reviewing court considers the contents of the communication and totality of circumstances surrounding the contact. See Mattox, 146 U.S. at 150; see also Clark v. Chappell, 936 F.3d 944, 971 (9th Cir. 2019); Caliendo v. Warden of Cal. Men's Colony, 365 F.3d 691, 697-98 (9th Cir. 2004). Thus, in Remmer, the Supreme Court held this standard was met where an unknown person had contacted a juror during trial and suggested he could profit if he returned a verdict favorable to the petitioner. 347 U.S. at 228-29. The Court explained that, notwithstanding the third party being a stranger to the juror, "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." Id. at 229. In Mattox, the Court reached a similar conclusion where the court's bailiff had informed the jury during trial that the defendant had committed other crimes. Mattox, 146 U.S. at 150-51. There, the fact that the third party was an officer of the court who was in charge of the jury contributed to his comments being presumptively prejudicial. Id.; see also Parker v. Gladden, 385 U.S. 363, 365 (1966) (per curiam) ("[T]he official character of the bailiff—as an officer of the court as well as the State—beyond question carries great weight with a [sequestered] jury which he had been shepherding for eight days and nights.").

Here, the state court unreasonably applied these precedents if it concluded that the communications between the juror and her priest, during the penalty phase deliberations, were not presumptively prejudicial. The undisputed allegations before the state court, supported by

declarations, were that the juror at issue sought out the counsel of her priest to discuss with him her thoughts as she grappled with her penalty-phase verdict. This contact was not accidental; rather, the juror initiated it for the purpose of discussing the case. The discussion occurred during the trial, at the very stage of the trial in which the juror was charged with deciding on her verdict. See Remmer, 347 U.S. at 228-29. The subject matter of their conversation, initiated by the juror, concerned the precise "matter pending before the jury," viz., the proper penalty verdict. See id. The third party at issue was not a stranger to the juror, but rather someone she sought to speak to specifically because she perceived him to be an authority figure on moral questions implicated by the penalty verdict. See Parker, 385 U.S. at 365; Mattox, 146 U.S. at 150-51. Finally, the content of the conversation "tend[ed] . . . [to be] injurious to the defendant," see Mattox, 146 U.S. at 150, because the priest's comments contradicted the courts' instructions in a manner favorable to the prosecutor, as the priest reportedly advised the juror that the penalty verdict reflected only a condemnation of petitioner's actions, not of him as a person. See 4 CT 737-39 (instructing jury to consider, in determining the penalty verdict, "any . . . aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death"); 4 CT 740 (instructing jury that "it is not only appropriate, but necessary, that the jury weigh the sympathetic elements of defendant's background against those that may offend the conscience" when selecting a penalty verdict); 4 CT 741 (instructing the jury that it is "obliged" to weigh mitigating evidence and "[i]f a mitigating circumstance or an aspect of the defendant's background or his character . . . or [the jury's] observation of the defendant arouses sympathy or compassion such as to persuade the jury that death is not the appropriate penalty," the jury may select a life verdict). In light of the totality of these circumstances, the state court would have been unreasonable if it concluded that the juror's communications with her priest were not presumptively prejudicial under Mattox, 146 U.S. 140, and Remmer, 347 U.S. 227. See Frye v. Warden, No. 2:99-CV-0628 KJM CKD, 2025 WL 2696407, at *11 (E.D. Cal. Sept. 19, 2025), modified No. 2:99-CV-00628-KJM-CKD, 2025 WL 3055174 (E.D. Cal. Oct. 31, 2025) (concluding same, where juror contacted her minister during capital trial proceedings).

The state court would have unreasonably applied clearly established federal law if it concluded that the presumption of prejudice had been rebutted. The Supreme Court made plain in Remmer that, once the petitioner shows there was a communication between a juror and a third party that was presumptively prejudicial, "the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." Remmer, 347 U.S. at 229 (citing Mattox, 146 U.S. at 148-50). To rebut this presumption, the state must present "other, contrary evidence" than that relied on by the defendant. Godoy, 861 F.3d at 959; see Remmer, 347 U.S. at 229 (presumption not rebutted where Government tendered no "answering affidavits" and trial court held no evidentiary hearing). If, at that point, the court finds the record lacks sufficient facts to determine whether the presumptively prejudicial communication was harmless, the court must hold an evidentiary hearing to develop the record. Remmer, 347 U.S. at 229-30. Here, however, respondent raised no opposition to this claim in state court, presenting no evidentiary materials or factual representations tending to rebut the presumption of prejudice, in any manner whatsoever. See In re Cox, S033824 (Cal. Supreme Ct.). The state court, too, permitted petitioner no evidentiary development on this claim, including ordering no evidentiary hearing on it. See id. Given this absence of facts, there could have been no basis for the California Supreme Court to conclude that the presumption of prejudice had been rebutted, consistent with Remmer, 347 U.S. at 229, and Mattox, 146 U.S. at 148-50. If the state court did so conclude, that conclusion reflected an unreasonable application of the clearly established Supreme Court precedents that govern this claim.

In sum, the state court unreasonably applied clearly established federal law if it concluded that petitioner's factual allegations, and materials in support thereof, did not demonstrate that a juror at his capital trial engaged in communications with a third party that were presumptively prejudicial. The state court unreasonably applied clearly established federal law if it concluded that presumption had been rebutted. In light of the record before it, clearly established federal law required the state court to vacate petitioner's death judgment, see Mattox, 146 U.S. at 151, or hold an evidentiary hearing to determine if the communications were harmless. Remmer, 347 U.S. at

229-30. Accordingly, petitioner has shown that the state court's summary denial of this claim is not entitled to deference, under 28 U.S.C. § 2254(d)(1).[6]

**Claims 15, 16, and 17**

In Claims 15, 16, and 17, petitioner alleges that the jury engaged in misconduct in the guilt- and penalty-phase deliberations. In Claims 15 and 16, petitioner alleges that his First, Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated by jurors' consideration, during guilt-phase deliberations, of testimony from prosecution witness Joanna Napoletano that the trial court had admonished them to disregard. (ECF No. 138 at 94-97.) In Claim 17, petitioner alleges that his First, Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated by jurors' consideration, during penalty-phase deliberations, of speculations as to whether a death sentence would be carried out and whether a life sentence would allow for petitioner's release, in contravention of the instructions they had received. (ECF No. 138 at 98-99.) Petitioner raised all three claims in his 1993 habeas corpus petition in the California Supreme Court, which the state court summarily denied. The undersigned concludes those denials are entitled to deference.

Both the due process clause and the Sixth Amendment guarantee a criminal defendant that the jury will base its verdict on the evidence presented at trial. Turner v. Louisiana, 379 U.S. 466, 472-73 (1965); Raley v. Ylst, 470 F.3d 792, 803 (9th Cir. 2006); Lawson v. Borg, 60 F.3d 608, 612 (9th Cir. 1995). Therefore, a juror commits misconduct by considering extrinsic evidence when reaching a verdict. Turner, 379 U.S. at 472-73. Here, however, the state court may have reasonably concluded that petitioner failed to make a prima facie showing that jurors considered extrinsic information in reaching their verdicts, which violated petitioner's constitutional rights under clearly established federal law, even if petitioner's factual allegations were fully credited. In the Supreme Court's cases holding that a defendant's constitutional rights were violated by the jurors' consideration of extraneous or extrinsic information, the Court has considered solely situations where a juror had contact with a person or exposure to information, which was outside

[6] Both parties address the applicability of Brecht to this claim, see ECF No. 192 at 208-210; ECF No. 208 at 143-144; ECF No. 219 at 66-71, but the question of whether petitioner has proven his entitlement to relief in the instant proceedings is not before the court at this time.

of what was presented at trial, e.g., communications with a non-juror third party about the case, see Tanner v. United States, 483 U.S. 107, 117 (1987); Turner, 379 U.S. 466; Remmer, 347 U.S. 227; Mattox, 146 U.S. 140; or exposure to new articles about the defendant or case, Marshall v. United States, 360 U.S. 310, 312 (1959); Holt v. United States, 218 U.S. 245, 251 (1910); Mattox, 146 U.S. at 142-43. Petitioner presents no clearly established law recognizing the kinds of information alleged here—testimony ordered stricken and speculations about the sentence—as being considered "extrinsic" to the trial, such that a juror's consideration of any of them effectuates a deprivation of the defendant's constitutional rights. (See ECF No. 192 at 198-210, 227-232, 237-42, 247-53, 262-68; ECF No. 219 at 77-88.) Relative to Claims 15 and 16, wherein petitioner alleges the jury improperly considered evidence ordered stricken, courts that have considered the issue have held that stricken testimony does not constitute "extrinsic evidence" giving rise to a claim of unconstitutional, prejudicial juror misconduct. See Stults v. Am. Pop Corn Co., 815 F.3d 409, 416 (8th Cir. 2016); Georges v. Gov't of Virgin Islands, 119 F. Supp. 2d 514, 521 (D.V.I. 2000), aff'd sub nom. Gov't of the Virgin Islands v. Georges, 265 F.3d 1055 (3d Cir. 2001); Fernandez v. Long, No. EDCV 16-981-MWF (KK), 2017 WL 6569997, at *18 (C.D. Cal. Sept. 1, 2017), report and recommendation adopted, No. EDCV 16-981-MWF-KK, 2017 WL 6557432 (C.D. Cal. Dec. 20, 2017).[7] Relative to Claim 17, the Court of Appeals has specifically rejected the premise of petitioner's claim, holding that the jury's consideration of sentencing concerns they were instructed to disregard is not "extrinsic evidence," such that a juror's consideration of these concerns does not violate a defendant's constitutional rights. Raley, 470 F.3d at 803; see generally Hard v. Burlington Northern R.R. Co., 870 F.2d 1454, 1461 (9th Cir. 1989) ("[t]he type of after-acquired information that potentially taints a jury verdict should be carefully distinguished from the general knowledge, opinions, feelings and bias that every juror carries into the jury room"). Although the opinions of the Courts of Appeal and district courts do not create or define what law has been clearly established by the Supreme Court, Marshall, 569 U.S. at 64, these opinions do "demonstrat[e] that fairminded jurists" on the California Supreme

[7] The Court of Appeals has reached the same conclusion in an unpublished case. Bradford v. City of Los Angeles, 21 F.3d 1111 (9th Cir. 1994).

Court "could reach the same conclusion that these many courts have," see Fauber, 43 F.4th at 1009, that there is no clearly established United States Supreme Court precedent recognizing the types of information the jury is alleged to have considered in Claims 15, 16, and 17 to be extrinsic information such that that their consideration of it violated petitioner's constitutional rights. See Kessee, 574 F.3d at 679 ("Because the Supreme Court has not given explicit direction and because the state court's interpretation is consistent with many other courts' interpretations, we cannot hold that the state court's interpretation was contrary to, or involved an unreasonable application of, Supreme Court precedent."). On this basis, the California Supreme Court's merits denials of Claims 15, 16, and 17 are entitled to deference under 28 U.S.C. § 2254(d)(1).

**Claim 18**

In Claim 18, petitioner alleges that his First, Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated by jurors' consideration, during guilt-phase deliberations, of petitioner's failure to testify and having been arrested as evidence of his guilt, in contravention of the court's instructions and the jurors' responses during voir dire. (ECF No. 138 at 100-102.) He also alleges that he was denied his right to a fair trial before an impartial jury by jurors' false responses on voir dire that would have indicated their bias towards this prosecution on these issues. (Id.) Petitioner raised this claim in his 1993 supplemental petition for writ of habeas corpus in the California Supreme Court, which that court summarily denied. (July 8, 1993 Supp. Pet. at 36-39; Order, In re Cox, Case No. S033824 (Cal. Sup. Ct. Aug. 11, 1993).) The undersigned concludes that the state court's denial of this claim is entitled to deference under 28 U.S.C § 2254(d)(1).

**1. Relevant Background**

In state habeas corpus proceedings, petitioner alleged that, during trial, members of his jury discussed petitioner's failure to have testified and considered it as evidence of petitioner's guilt. (July 8, 1993 Supp. Pet. at 36-37.) He also alleged that one juror had stated, during deliberations, that petitioner was likely guilty because he had been arrested. (Id. at 38-39.) He supported these allegations with declarations from several jurors. Juror Kurtzman declared that, "[d]uring deliberations, one juror mentioned the fact that Michael Cox did not testify." (Id., Ex. U

(Decl. of David Kurtzman).) Juror Hoyt declared that, "during the guilt phase deliberations one of the jurors voiced some concern that Mr. Cox did not testify in his own defense" and "during guilt phase deliberations one of the jurors stated that Mr. Cox would not have been arrested if he were not guilty." (Id., Ex. X (Decl. of David Hoyt).) Juror Figone declared that,

> during deliberations, the other jurors and I discussed the fact that Mr. Cox did not get up on the stand and defend himself. I thought that this was odd. I believed that if a person were innocent, he would testify on his own behalf and I expressed that opinion to the other jurors.

((Id., Ex. Y (Decl. of Albert Figone).)

**2. The State Court's Denial of Petitioner's Juror Misconduct Allegations Deserves Deference**

In state court, petitioner argued that jurors' consideration of petitioner's failure to have testified and his having been arrested constituted "consideration of extraneous . . . and prejudicial information [which] deprived petitioner of due process of law" and additional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (July 8, 1993 Supp. Pet. at 38-39.) The state court was reasonable if it concluded that these allegations were meritless because petitioner's allegations, even if fully credited, did not demonstrate that the jury considered "extraneous" information during deliberations. See Turner, 379 U.S. at 472-73. In Raley, the Court of Appeals rejected a similar argument that petitioner makes here, explaining, "[t]he fact that Petitioner did not testify in his own defense is not extrinsic evidence. Although the jury's discussion of this issue clearly violated the trial court's instructions, what happened (or did not happen) in the courtroom was a part of the trial, not extrinsic to it." Raley, 470 F.3d at 803 (citing United States v. Rodriquez, 116 F.3d 1225, 1226–27 (8th Cir. 1997)). The state court may have reasonably reached the same conclusion here. As in Raley, the California Supreme Court may have reasonably determined that the Supreme Court's prohibition on jurors' consideration of "extrinsic" information did not extend to information that was known to the jurors via the trial proceedings, viz., that petitioner had not testified and that he had been arrested. See id. Although consideration of these facts violated the trial court's instructions, it would have been reasonable under clearly established federal law for the state court to have concluded that the misconduct did

not meet the standard of having deprived petitioner of his constitutional rights. See id.; see generally Estrada v. Scribner, 512 F.3d 1227, 1237 (9th Cir. 2008) (affirming district court's finding that a juror's mistaken belief about the law did not constitute unlawful extraneous information injected into deliberations); Hard, 870 F.2d at 1461 (holding a juror does not commit misconduct by possessing "the general knowledge, opinions, feelings and bias that every juror carries into the jury room"). The state court's denial of relief on these allegations, therefore, is entitled to deference. See 28 U.S.C. § 2254(d)(1).

**3. The State Court's Denial of Petitioner's Juror Bias Allegations Deserves Deference**

To the extent that petitioner alleged that a juror concealed facts during voir dire that indicate the juror's bias against petitioner (see July 8, 1993 Supp. Pet. at 37-39), the state court reasonably applied clearly established federal law in summarily denying relief on these allegations.

The Sixth Amendment guarantees to a criminal defendant a fair trial by a panel of impartial jurors. Irvin v. Dowd, 366 U.S. 717, 722 (1961); Green v. White, 232 F.3d 671, 676 (9th Cir. 2000). The due process clause of the Fourteenth Amendment also requires that the defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217 (1982); see also United States v. Plache, 913 F.2d 1375, 1377-78 (9th Cir. 1990). These standards are only met where the juror or prospective juror "can lay aside his impression or opinion [of the merits of the case] and render a verdict based on the evidence presented in court." Irvin, 366 U.S. at 722 & n.3. A defendant is denied the right to an impartial jury if even one juror is biased or prejudiced. Fields v. Woodford, 309 F.3d 1095, 1103 (9th Cir. 2002), amended, 315 F.3d 1062 (9th Cir.2002); Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc).

Under clearly established federal law, a juror may evince bias where it is shown that she responded dishonestly to a query on voir dire and, had she answered correctly, the information would have provided a basis for a challenge for cause. McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548 (1984). Even where both of those circumstances are shown, a court

reasonably applies clearly established federal law if it also requires the petitioner to show that the juror at issue possessed an actual bias against him, in order for habeas relied to be merited. Scott v. Arnold, 962 F.3d 1128, 1130-33 (9th Cir. 2020); see Williams v. Taylor, 529 U.S. 420, 444 (2000); Smith v. Phillips, 455 U.S. 209, 215 (1982); Remmer v. United States, 347 U.S. 227, 230 (1954); Clark v. United States, 289 U.S. 1, 10 (1933). Actual bias simply reflects "'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality.'" United States v. Gonzalez, 214 F.3d 1109, 1111-13 (9th Cir. 2000) (quoting United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997)); see also Fields v. Brown, 503 F.3d 755, 766 (9th Cir. 2007) (en banc) (describing "actual bias" as reflecting the juror's "preset disposition not to decide an issue impartially").

The state court reasonably applied clearly established federal law if it concluded that petitioner had failed to show that a juror was biased against him, depriving him of his constitutional rights. In state court, petitioner argued that at least one juror had concealed material facts on voir dire and gave misleading responses on voir dire, because that juror possessed a bias against a defendant who did not testify. (July 8, 1993 Supp. Pet. at 36-39; see also ECF No. 192 at 264-67.) Petitioner also argued that a juror had concealed during voir dire his bias against a defendant who has been arrested. (Id.) In his state court pleadings, however, petitioner failed to identify which juror had answered which voir dire questions untruthfully or misleadingly, and failed to identify which question, had it been answered truthfully, would have given rise to excusing the juror for cause. (See July 8, 1993 Supp. Pet..) As such, the state court may have reasonably concluded that petitioner failed to demonstrate, even as a prima facie matter, that a juror at his trial was actually biased against him. See McDonough, 464 U.S. 548; United States v. Brugnara, 856 F.3d 1198, 1211 (9th Cir. 2017) (describing the McDonough test as a two-pronged test, both prongs of which the defendant has to show in order to obtain a new trial).

In this proceeding, petitioner argues that the record indicates Juror Figone lied during voir dire, when, in response to questioning, he stated that he understood that the defendant had no obligation to present evidence and the prosecution bore the burden of proof. (ECF No. 192 at 257-58 (citing 3 RT 618-19, 622, 624). Petitioner, however, had not directed the state court to the

purported evidentiary support for his claim, and the state court was not required to scour the record to meet petitioner's pleading burden on his behalf. See Duvall, 9 Cal.4th at 474; see generally Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996). Even if it had, the state court may have reasonably determined that the factual materials on which petitioner relies did not make a prima facie showing of Juror Figone's bias against him. On voir dire, Juror Figone stated that he felt that, "if the Defendant doesn't say anything, somebody has to prove something to somebody" (3 RT 622), but that he understood the instructions that the defendant did not have to testify and that the prosecutor bore the burden of proof. (3 RT 618-19, 622-24). In his post-trial declaration, Juror Figone stated he "thought that [it] was odd" that petitioner did not testify and he "believed that if a person were innocent, he would testify in his own behalf," an opinion which he shared with other jurors. (July 8, 1993 Supp. Pet., Ex. Y (Decl. of Albert Figone).) This statement, however, does not appear to contradict any of the responses he gave on voir dire. Moreover, it does not indicate he was lying on voir dire when he said he understood the instructions he would receive on this issue; at most, it indicates that Juror Figone expected petitioner to testify, but it does not suggest that Juror Figone could not or did not set aside that expectation and hold the prosecution to its burden. See generally Patton v. Yount, 467 U.S. 1025, 1037 n.12 (1984) (an impartial juror is not one who possesses no problematic opinions, but one who can "lay aside his opinion and render a verdict based on the evidence presented in court"). Petitioner fails to show that, on this basis, the state court's decision was contrary to, or an unreasonable application of, federal law, or was premised on an unreasonable factual determination. See 28 U.S.C. § 2254(d).

Accordingly, petitioner has failed to show that the state court's merits denial of Claim 18 should not be afforded deference, 28 U.S.C. § 2254(d), and the undersigned recommends this claim be dismissed.

**Claim 19**

In Claim 19, petitioner alleges that his First, Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated by jurors' consideration of the contents of a newspaper article during the trial, and by their concealment on voir dire of their biases against petitioner. (ECF No. 138 at 103-104.) Petitioner raised this claim in his 1993 supplemental petition for writ of habeas

corpus in the California Supreme Court, which that court denied summarily. (July 8, 1993 Supp. Pet. at 39-42; Order, In re Cox, Case No. S033824 (Cal. Sup. Ct. Aug. 11, 1993).) The undersigned concludes that that denial is entitled to deference as a reasonable application of clearly established federal law.

In his state habeas corpus proceedings, petitioner alleged "a juror had a newspaper in the jury room during the trial that contained an article or letter to the editor which conclude that criminals 'get[] off too easily.' This juror expressed his view to the other jurors that that was what was wrong with the criminal justice system." (July 8, 1993 Supp. Pet. at 39.) In support of this allegation, petitioner tendered a declaration from Juror Kurtzman, in which he declared,

> I recall that during the trial (not during deliberations) a juror commented on a newspaper article or letter to the editor (the newspaper was in the jury room) about criminals getting off too easily and related that fact to problems with the criminal justice system.

(Id., Ex. U (Decl. of David Kurtzman).) Per petitioner, the jurors' reading of and discussion about the newspaper article reflected consideration of prejudicial extraneous information that deprived him of his right to due process, confrontation, and other constitutional rights. (Id. at 40.) Petitioner also alleges that the jurors' discussion about the article demonstrated that they had "concealed their bias towards Mr. Cox and concealed their inability to fairly judge him." (ECF No. 192 at 272 (citing July 8, 1993 Supp. Pet. at 7).

The state court may have reasonably concluded that petitioner's factual allegations, even if fully credited, did not make a prima facie showing that jurors committed misconduct or concealed a bias against him, which had deprived him of his constitutional rights. As discussed ante, a defendant's Sixth Amendment and due process rights are violated by jurors' consideration extraneous factual information relating to the trial. This limitation, however, only encompasses extraneous information or contact that is "about the matter pending before the jury." Remmer, 347 U.S. at 229; see also Marshall, 360 U.S. 310, 312 (recognizing that defendant may be entitled to a new trial due to the unconstitutional misconduct of "reading by jurors of news articles concerning the trial"). Here, the allegations and supporting materials presented by petitioner did not indicate that a juror had considered extraneous facts about petitioner's case or about

petitioner; rather, they only indicated that a juror had encountered a news article expressing opinions about the criminal justice system broadly. As such, the state court may have reasonably concluded that this was not misconduct, let alone the type that has been recognized by the Supreme Court as violative of a defendant's due process and Sixth Amendment rights. See generally Hard, 870 F.2d at 1461 (explaining it is not misconduct for a juror to possess "the general . . . opinions, feelings and bias that every juror carries into the jury room"). In light of the record before it, the state court was reasonable in concluding that petitioner had not made a prima facie showing on this basis that any juror had committed misconduct that had deprived him of his constitutional rights. See 28 U.S.C. § 2254(d)(1).

To the extent petitioner alleged in state court that a juror's reading and consideration of the newspaper article in the jury room indicate he or she had concealed a bias against petitioner during voir dire (see July 8, 1993 Supp. Pet. at 7-8; ECF No. 192 at 272), the state court was reasonable in concluding petitioner had not made a prima facie showing of such bias. Principally, the allegations before the state court failed to specify which juror had read the newspaper article, thus petitioner was unable to show that that juror had misrepresented him- or herself during voir dire, so as to demonstrate his or her bias. See McDonough Power Equip., 464 U.S. at 556. Additionally, given that the text of the declaration petitioner offered in support of this allegation did not indicate that the juror who had discussed the article had indicated in any way that he or she shared the opinions of the author, the factual materials before the state court failed to demonstrate even as a prima facie matter that the juror who had read the article possessed an actual bias against petitioner. See Remmer, 347 U.S. at 229. For these reasons, the state court may have reasonably concluded, consistent with clearly established federal law, that petitioner had not made a prima facie showing of his entitlement to relief on these allegations.

The undersigned therefore recommends Claim 19 be denied pursuant to 28 U.S.C. § 2254(d)(1).

**Claim 21**

In Claim 21, petitioner alleges that the cumulative effect of the juror misconduct alleged in Claims 14, 15, 16, 17, 18, 19, and 20 violated his rights to a fair trial before an impartial jury

under the First, Fifth, Sixth, Eighth and Fourteenth Amendments. (ECF No. 138 at 107-108.) Petitioner raised this claim in his 1993 supplemental petition for writ of habeas corpus in state court, which the California Supreme Court summarily denied. (July 8, 1993 Supp. Pet. at 7-8; Order, In re Cox, Case No. S033824 (Cal. Sup. Ct. Aug. 11, 1993).) The undersigned recommends that this claim be dismissed.

The combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. Chambers v. Mississippi, 410 U.S. 284, 298, 302-03 (1973) (combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial"); see also Taylor v. Kentucky, 436 U.S. 478, 487 n. 15 (1978) ("[T]he cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness. . . "). A petitioner is entitled to habeas corpus relief when, although no single error independently warrants reversal or rises to the level of a constitutional violation, the effect of multiple errors caused the litigant to suffer undue prejudice. Chambers, 410 U.S. at 290 n. 3; see also United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996). These rules are "clearly established" within the meaning of 28 U.S.C. § 2254(d)(1). Parle v. Runnels, 505 F.3d 922, 927-28 (9th Cir. 2007).

Here, as a preliminary matter, although petitioner's claim is premised in part on juror misconduct alleged in Claim 20, in his briefing before the court on this claim he fails to address those allegations, let alone demonstrate that any error or misconduct occurred. See generally ECF No. 192. Petitioner therefore fails to demonstrate that the state court's denial of this claim is undeserving of deference, to the extent it relies on allegations raised in Claim 20.

Relative to petitioner's remaining allegations comprising this claim, the record before the court indicates that petitioner cannot prove his entitlement to relief due to evidentiary restrictions, and thus the undersigned recommends the claim be dismissed in the interest of judicial economy. See generally Shinn, 596 U.S. at 390 ("a federal habeas court may *never* 'needlessly prolong' a habeas case") (quoting Pinholster, 563 U.S. at 209 (Sotomayor, J., dissenting) (italics in original)). The factual allegations comprising Claims 15, 16, 17, 18, and 19, which petitioner

incorporates in Claim 21, rely on evidence that is inadmissible under the Federal Rules of Evidence. Federal Rule of Evidence 606(b) provides,

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.
> **(2) Exceptions.** A juror may testify about whether:
> **(A)** extraneous prejudicial information was improperly brought to the jury's attention;
> **(B)** an outside influence was improperly brought to bear on any juror; or
> **(C)** a mistake was made in entering the verdict on the verdict form.

Fed. R. Evid. 606(b). This rule "flatly prohibit[s]" the admission of juror testimony to impeach a verdict except where an "extraneous influence" affected the verdict, Tanner v. United States, 483 U.S. 107, 117 (1987), or where there was a mistake on the verdict form. Roberts v. Broomfield, 637 F. Supp. 3d 872, 968 (E.D. Cal. 2022). Under Rule 606(b), an "extraneous influence" is construed narrowly to only encompass information or pressure brought to the jurors outside of the trial or outside of the deliberation process; it does not include jurors' speculations, misunderstandings, beliefs, or opinions about the evidence, instructions, or argument they received during the trial. See Estrada, 512 F.3d at 1237; United States v. Decoud, 456 F.3d 996, 1019 n.11 (9th Cir. 2006); United States v. Bussell, 414 F.3d 1048, 1055 (9th Cir. 2005); Hard, 870 F.2d 1454, 1461 (9th Cir. 1989). It also does not encompass any juror's disclosures of their own subjective reasoning processes concerning their verdict, nor does it make admissible jurors' discussions with one another forming deliberations. Estrada, 512 F.3d at 1237-38.

Here, none of the juror declarations on which petitioner relies to demonstrate the factual allegations of Claims 15, 16, 17, 18, and 19, which he incorporates into Claim 21, meets the admissibility standard set forth in Rule 606(b). As discussed ante, the jurors' statements that they considered stricken testimony, the fact of petitioner not having testified, and the fact that petitioner was arrested do not reflect that they considered information that was extraneous to the trial, because those facts emerged from the trial proceedings themselves. As also discussed ante, jurors' speculations about the ramifications of the sentencing verdict does not reflect their consideration of extraneous information, but rather "the product of normal human curiosity, part

of the 'general knowledge, opinions, feelings, and bias,'" which does not constitute the type of "extraneous information" that is admissible under Rule 606(b). United States v. Bussell, 414 F.3d 1048, 1055 (9th Cir. 2005) (quoting Hard, 870 F.2d at 1461). Thus, under Rule 606(b), the court cannot hear testimony from a juror about, nor "receive [the] juror's affidavit or evidence of a juror's statement on," these factual allegations, and, as such, petitioner cannot prove the merit of his allegations claim. For this reason, it serves judicial economy for the court to deny relief on Claim 21 at this stage. See, e.g., Roberts v. Broomfield, 637 F. Supp. 3d 872, 971-72 (E.D. Cal. 2022); Fernandez v. Long, No. EDCV 16-981-MWF (KK), 2017 WL 6569997, at *18 (C.D. Cal. Sept. 1, 2017), report and recommendation adopted, No. EDCV 16-981-MWF-KK, 2017 WL 6557432 (C.D. Cal. Dec. 20, 2017); Ochoa v. Davis, No. CV 99-11129 DSF, 2016 WL 3577593, at *142 (C.D. Cal. June 30, 2016), judgment entered, No. CV 99-11129 DSF, 2016 WL 3574006 (C.D. Cal. June 30, 2016), and aff'd, 16 F.4th 1314 (9th Cir. 2021). The undersigned therefore recommends Claim 21 be denied.

**Claims 22 and 23**

In Claims 22 and 23, petitioner alleges that his convictions and sentences were obtained in violation of his Fifth, Sixth, and Fourteenth Amendment rights by the prosecutor's misconduct during the guilt phase. In Claim 22, he alleges the prosecutor improperly referenced a polygraph examination during his direct examination of witness Joanna Napoletano, prejudicing him. (ECF No. 138 at 109-10.) In Claim 23, he alleges that during the examination of witness William Wilson, the prosecutor made improper references to, and elicited improper testimony about, Joanna Napoletano being in protective custody. (ECF No. 138 at 111-12.) Petitioner raised both claims on direct appeal (AOB at 43-85, 126-36; March 7, 2002 Letter Br. at 5-8), which the California Supreme Court denied on the merits.[8] Cox, 30 Cal.4th at 951-54, 959-60. The undersigned concludes those denials are entitled to deference and recommends both claims be denied in this proceeding.

/ / /

[8] As noted ante, respondent asserts that the Fifth Amendment allegations of Claim 22 are procedurally barred and thus the undersigned defers resolution of those particular allegations.

**1. Governing Legal Standard**

Under clearly established federal law, prosecutorial misconduct merits reversal of a criminal conviction only if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process," Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks and citation omitted). Where the misconduct takes the form of improper comments by the prosecutor, the jury is also presumed to follow a curative instruction unless there is an "overwhelming probability that [it] will be unable" to do so and "a strong likelihood that the effect of the evidence would be devastating to the defendant." Greer v. Miller, 483 U.S. 756, 767 n.8 (1987). In Darden, for example, in closing argument the prosecutor described the defendant as an "animal," opined that the defendant should only be allowed out of a jail cell if he were on a leash, and shared his wish that the defendant was "sitting here with no face, blown away by a shotgun." 477 U.S. at 181-83 nn.11 & 12. The Court held that these statements – although improper – did not deprive the defendant of a fair trial, in light of the instruction by the court that the arguments made by counsel were not evidence and in light of the substantial evidence of the defendant's culpability. Id. at 181-83; see also Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974) (holding no due process violation by prosecutor's improper closing argument, because court instructed the jury that the remark was not evidence and in light of the substantial evidence of guilt).

**2. The State Court's Denial of Claim 22 Is Entitled to Deference**

During the prosecutor's direct examination of Joanna Napoletano, he asked her, "Did someone come along from the District Attorney's Office and talk to you, a man that gave you a polygraph?" and Ms. Napoletano replied affirmatively. (10 RT 2576-77.) The prosecutor then asked if she told the man what happened, and defense counsel objected and moved for a mistrial (Id.; 3 CT 586.) At a bench conference outside the presence of the jury, the trial court found that the prosecutor's question had been error, and that "the evil of the question" was that "because of your position, it would seem . . . a logical inference for the jury to conclude is that the District Attorney had a polygraph given to this lady, he's an honorable man, and she didn't pass it, so he wouldn't be here seeking her testimony in the court." (10 RT 2578-90.) The court then struck the

question and Ms. Napoletano's response and admonished the jury to disregard them. (10 RT 2589-90.) Subsequently, the prosecutor elicited testimony from Ms. Napoletano that she had been untruthful when questioned by agents of the District Attorney's Office and law enforcement. (10 RT 2590-98.) Defense counsel again moved for a mistrial, which was denied. (3 CT 589.)

The state court reasonably applied clearly established federal law in holding that petitioner had not shown that his due process rights had been violated by the prosecutor's question. In denying this claim, the California Supreme Court held that the prosecutor's question was improper under state statute, Evidence Code 351.1(a), but that it did not infect the trial with unfairness so as to have deprived petitioner of his due process rights. Cox, 30 Cal.4th at 951-54. This was an apt application of Darden, 477 U.S. 168, and Donnelly, 416 U.S. 637. The questions at issue were brief, in the context of Ms. Napoletano's lengthy testimony (see 3 CT 586-90) and in the context of the extensive guilt-phase presentation by the prosecution as a whole. (See 3 CT 558-63, 567-70, 586-90, 600-27.) The court immediately struck the question and responsive testimony and instructed the jury to disregard them. (9 RT 2589-90.) Finally, the fact suggested by the prosecutor's improper question—that Ms. Napoletano had been untruthful in her early statements to investigators—was amply established with other, unchallenged evidence. See generally Cox, 30 Cal.4th at 928-32. Given the totality of these factual circumstances, the state court was reasonable under clearly established federal law in concluding that petitioner had not demonstrated his due process rights had been violated so as to merit habeas corpus relief. See Darden, 477 U.S. at 181-83; Donnelly, 416 U.S. at 647; Mancebo v. Adams, 435 F.3d 977, 979-80 (9th Cir. 2006) (collecting cases); see also Middleton v. Cupp, 768 F.2d 1083, 1086 (9th Cir. 1985) (holding that witness's improper testimony about his polygraph examination, and prosecutor's elicitation of same, did not per se violate defendant's due process rights). The undersigned therefore recommends Claim 22 be denied. See 28 U.S.C. § 2254(d)(1).

**3. The State Court's Denial of Claim 23 Is Entitled to Deference**

During the guilt phase of the trial, the prosecutor called as a witness Sergeant William Wilson, and elicited testimony from him that Ms. Napoletano had been placed in protective custody before trial. (12 RT 3281-82.) The trial court interrupted and admonished the prosecutor

that the question was improper. (Id.) The prosecutor then elicited testimony from Sergeant Wilson that the "predominant reason" Ms. Napoletano had been placed in protective custody was out of concern she might harm herself. (12 RT 3282-84.) Defense counsel objected to the question's suggestion that there had been secondary reasons for Ms. Napoletano to have been placed in protective custody, and the court sustained the objection and struck the response to that question. (12 RT 3284-85.) The prosecutor then asked Sergeant Wilson if the reason Ms. Napoletano had been placed in protective custody was to protect her from self-harm, and Sergeant Wilson replied, "That was one of the reasons." (12 RT 3285.) Defense counsel again objected and the court struck that question, but the court denied the defense's request that Sergeant Wilson's entire testimony be stricken. (12 RT 3285-88.) The prosecutor then asked Sergeant Wilson the additional reason for placing Ms. Napoletano into protective custody and Sergeant Wilson replied that he had thought she had possibly been the witness to a homicide. (12 RT 3288.)

On direct appeal, petitioner argued that the prosecutor's questioning constituted misconduct that deprived him of a fair trial. (AOB at 126-36.) The state court rejected this on the merits, holding that the prosecutor's questions were not misconduct. Cox, 30 Cal.4th at 959-60. This conclusion was a reasonable application of clearly established federal law. Under Darden, 477 U.S. at 179-83, to merit habeas corpus relief, the petitioner must show that the prosecutor's statements, first, were misconduct and, second, were so egregious or inflammatory as to have deprived the defendant of his due process rights. Here, the state court was reasonable in concluding that the questions at issue were not misconduct, and therefore that petitioner had not shown a violation of his due process rights. As the state court correctly observed, the questions at issue occurred in the context of the jury having heard extensive testimony concerning Ms. Napoletano's unreliability as a witness, including her drug and alcohol abuse, and her reluctance to participate in law enforcement's investigation of the crimes, including her having left the state after Denise's disappearance. See generally Cox, 30 Cal.4th at 928-32; 10 RT 2512-2761; 12 RT 3167-3319. Although Sergeant Wilson testified, in response to the prosecutor's question, that one reason Ms. Napoletano had been placed in custody was because she had been a witness to a homicide, there was nothing else in his testimony—or in the prosecutor's questions eliciting it—

implying that she was perceived to be in danger from petitioner by virtue of being a witness. Rather, the jury would have reasonably understood the questions and responses to indicate that law enforcement officers believed Ms. Napoletano to be a critical prosecution witness because she purported to be an eyewitness to one of the murders and they did not want her to depart the area again or harm herself before testifying. See Cox, 30 Cal.4th at 959-60. Given the totality of evidence before the jury, it was reasonable for the state court to conclude that no misconduct had occurred. See Parker v. Matthews, 567 U.S. 37, 47 (2012) (holding that whether a prosecutor's comments constitute misconduct relies on the entire record before the jury); see, e.g., Tak Sun Tan v. Runnels, 413 F.3d 1101, 1113-14 (9th Cir. 2005) (holding it was reasonable for state court to find no misconduct where the prosecutor's comments were a fair inference from the evidence presented). Accordingly, the undersigned recommends Claim 23 be denied pursuant to § 2254(d)(1).

**Claims 25, 26, 27, and 28**

In Claims 25, 26, 27, and 28, petitioner alleges that his convictions and sentences were obtained in violation of his Fifth and Fourteenth Amendment rights by the wrongful admission of certain prosecution evidence at the guilt phase of his trial. (ECF No. 138 at 116-26.) Petitioner raised these claims on direct appeal (AOB at 86-128, 144-63, 179-82; ARB at 16-24, 32-37, 43-46), which the California Supreme Court denied on the merits in a reasoned opinion. Cox, 30 Cal.4th at 955-59, 961-63. The undersigned concludes those denials are entitled to deference.

**1. Governing Legal Standard**

A criminal defendant's due process rights are violated by his conviction or sentencing through a proceeding that is fundamentally unfair. Lisenba v. California, 314 U.S. 219, 236 (1941); see also Gonzalez v. Wong, 667 F.3d 965, 995 (9th Cir. 2011); Pike v. Dickson, 323 F.2d 856, 860 (9th Cir. 1963); Palakiko v. Territory of Hawaii, 188 F.2d 54, 60-61 (9th Cir. 1951). The Supreme Court has held that a criminal defendant's due process rights may be violated by the State's transgression of state-law procedures in securing his conviction or sentence. Hicks v. Oklahoma, 447 U.S. 343 (1980); see also Gonzalez, 667 F.3d at 995. Alternatively, a defendant's due process rights may be violated where the state court's ruling complied with relevant state law,

but nevertheless resulted in a trial proceeding that was fundamentally unfair towards the defendant in some manner. Estelle v. McGuire, 502 U.S. 62, 69-70 (1991); Lisenba, 314 U.S. at 236; see also Payne v. Tennessee, 501 U.S. 808, 825 (1991); Moore v. Illinois, 408 U.S. 786, 799-800 (1972); Smith v. Ryan, 823 F.3d 1270, 1283 (9th Cir. 2016); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

**2. Discussion**

In state court, petitioner appeared to argue that he was deprived of his due process rights because the specified evidence was inadmissible under state law (AOB at 179-80; see also ECF No. 192 at 317, 324-25, 331-35, 339-40), and, alternatively, because the specified evidence, even if admissible under state law, was irrelevant and therefore its admission, particularly when considered cumulatively and cumulatively with other errors, deprived petitioner of a fundamentally fair trial. (See AOB at 179-82 & n.39 (citing Moore v. Illinois, 408 U.S. 786, 798-800).)

To the extent that petitioner's claims of due process violation are premised on the trial court's erroneous application of state law (see AOB at 86-128, 144-63), these allegations fail as a matter of law. The Supreme Court has explained, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76, (2005) (citing Estelle, 502 U.S. at 67-68, and Mullaney v. Wilbur, 421 U.S. 684, 691 (1975)). As such, this court cannot revisit the question of whether the evidence at issue was properly admitted as a matter of state law. Here, the California Supreme Court held that the trial court had not erred under California evidentiary law in admitting the evidence at issue in Claims 25, 26, 27, and 28. Cox, 30 Cal.4th at 955-59, 961-63. Therefore, to the extent petitioner's allegations of a due process violation in those claims are premised on evidence having been wrongly admitted under state law, these allegations necessarily fail. See Bradshaw, 546 U.S. at 76; Estelle, 502 U.S. at 67-70; see, e.g., Reno v. Davis, 46 F.4th 821, 833-35 (9th Cir. 2022).

To the extent petitioner's alleged that his due process rights were violated because, irrespective of whether the evidence was properly admitted under state law, the specified

evidence was irrelevant and prejudicial and therefore its admission deprived him of a fundamentally fair trial, the state court reasonably applied clearly established federal law in finding petitioner had not shown constitutional error. See 28 U.S.C. § 2254(d)(1). The undersigned considers the allegations of each claim, in turn.

**i. Claim 25**

At trial, the prosecution presented testimony from petitioner's wife, Darlene Sindle, that she observed petitioner to have had loaded guns in his car. (7 RT 1978-79.) Upon the defense's objection, the court admonished the jury to disregard Ms. Sindle's testimony on this point "save and except for the fact that on the camping trips they would target practice with a weapon or some type." (8 RT 1994-1995.) The prosecution also elicited testimony from a law enforcement officer that, at the time petitioner was arrested, ammunition and loaded firearms were found in the car in which he had been sleeping. (11 RT 2869-75.) Over the defense's objection, the court ruled the evidence admissible. (9 RT 2316-27.)

On direct appeal, the California Supreme Court rejected petitioner's argument that the trial court's admission of this evidence had violated both the state evidence code and petitioner's rights to due process. Cox, 30 Cal.4th at 955-57, 963. (See AOB at 86-102.) The court found the evidence of petitioner's possession of loaded guns in his car relevant, first, because the evidence had not established how any of the victims had been killed and the jury could reasonably conclude at least one of the victims had been shot. Id. at 956. The evidence was also relevant, the court concluded, because the jury could reasonably infer that petitioner had used one of his guns to coerce Lynda Burrill or Denise Galston into his car as part of his plan to murder them. Id. at 956-57.

The Supreme Court has held that the admission of irrelevant evidence may deprive a criminal defendant of his due process right to a fair trial. Estelle, 502 U.S. at 68-70; see also Moore, 408 U.S. at 799-800 (recognizing same, in dicta). The Court of Appeals has explained that a defendant's due process rights are violated by the admission of prosecution evidence "[o]nly if there are *no* permissible inferences the jury may draw from the evidence" and, if so, the evidence is also "of such quality as necessarily prevents a fair trial." Jammal, 926 F.2d at 920

(citing Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986)) (italics in original); see also Windham v. Merkle, 163 F.3d 1092, 1104 (9th Cir. 1998).

The Court of Appeals applied this principle in Alcala v. Woodford, 334 F.3d 862, 886-88 (9th Cir. 2003), which petitioner urges is indistinguishable from the instant case. (See ECF No. 219 at 107.) In Alcala, the defendant was charged with murder and the prosecution theorized that a knife found near the victim's body had been the murder weapon. 334 F.3d at 886. The prosecution introduced into evidence "two complete, unused sets of kitchen knives" seized from the home where the defendant lived with his parents. Id. Petitioner's mother testified that there were no knives missing from the sets and, upon examining the knife sets, the trial court found that they had no features in common with the murder weapon save that they were manufactured by the same company, and further found that, "[t]here's no way that [the purported murder] weapon could be tied in . . . the remotest to any of these particular sets [seized from Alcala's home]." Id. In light of these findings and the evidence, the Court of Appeals concluded that there were no permissible inferences the jury could draw from the seized knife sets and they were not relevant to any issue at trial or element of the charged crimes. Id. at 887-88. Consequently, their admission violated the petitioner's due process rights. Id.

Here, the state court's determination that the firearms evidence was relevant, such that its admission did not deprive petitioner of his right to due process, reflected a reasonable application of clearly established federal law. See Estelle, 502 U.S. at 68-70; Payne, 501 U.S. at 825; Lisenba, 314 U.S. at 236. The prosecution's theory was that the firearms found in petitioner's car, which Officer Dannaker's testimony described and which the jury could infer was referenced by Ms. Sindle's testimony, may have been the very items petitioner had used to kill one or more of his victims and/or that he had used to coerce Debbie or Lynda to enter his car. (See 9 RT 2313-2328, 2393-2413.) The testimony, therefore, was relevant to the prosecution's theory of the manner in which the homicides occurred and how petitioner effectuated them, as the state court aptly found. See Cox, 30 Cal. 4th at 956-57. Under Estelle, 502 U.S. at 68-70, the admission of this evidence was not irrelevant so as to violate petitioner's right to due process, because the evidence was probative of elements of the charged crimes that the prosecutor was required to

prove, viz., the actus reus of the murder counts. On this basis, petitioner's case is plainly distinguishable from Alcala, where the knife sets at issue were not theorized to be the murder weapon nor to have been utilized in any manner to effectuate the charged crimes; rather, they were, even under the prosecutor's theory, entirely unrelated to the events comprising the crimes. See Alcala, 334 F.3d at 886-88; see also Walker v. United States, 490 F.2d 683 (8th Cir. 1974) (holding it was reversible error for trial court to admit evidence of firearm seized from defendant, where that firearm was not the one the prosecutor theorized the defendant had used to commit the crime). Given the totality of the evidence that was properly before the jury, the state court reasonably applied clearly established federal law in concluding that petitioner failed to show that the admission of this testimony violated his rights to due process. The undersigned therefore recommends that Claim 25 be dismissed.

**ii. Claim 26**

At the guilt phase, the prosecutor elicited testimony from Scott Philpott, a friend of Debbie Galston, wherein Mr. Philpott briefly described three incidents in which Ms. Galston appeared to hide from petitioner when they encountered him in Placerville. (17 RT 4493-96; see ECF No. 138 at 119 (citing same).) On direct appeal, petitioner argued that the introduction of this evidence violated his rights to due process because it was irrelevant and unduly inflammatory. (AOB at 103-16, 179-82.) The California Supreme Court rejected this, holding that the "circumstances surrounding Debbie's entry into defendant's car—whether she would enter the car voluntarily or whether defendant may have overcome any resistance by force—were at issue" and therefore "evidence that Debbie had acted as though she feared defendant was admissible to show that she would not have voluntarily entered defendant's car and thus he may have forced her into his vehicle the night she disappeared." Cox, 30 Cal. 4th at 958. Additionally, the court held that any error in admitting Mr. Philpott's testimony on this point was harmless under People v. Watson, 46 Cal.2d 818, 836 (1956), given that Joanna Napoletano had also testified that Debbie had feared petitioner. Id.

The state court's rejection of this claim reflected a reasonable application of clearly established federal law. First, the state court was reasonable in concluding that the evidence was

relevant to the disputed issue of how Debbie arrived at the location where her remains were found. During the guilt phase, the defense called as a witness Sergeant William Scholz and elicited from him testimony that Ms. Napoletano had told him, during an interview, that Debbie would have gotten into a car with a stranger. (15 RT 4051-52.) The testimony of which petitioner complains in this claim was offered in rebuttal to Sergeant Scholz's testimony, as it indicated that petitioner was not a stranger to Debbie, because she apparently had a reaction to seeing him, and that she felt fearful of petitioner, ergo corroborating the prosecutor's theory that petitioner had in some way threatened her to effectuate her traveling with him to another location. As such, the California Supreme Court reasonably concluded the Mr. Philpott's testimony was relevant to substantiate the prosecution's theory that Debbie had been coerced into a car by petitioner, who then killed her, which the prosecution presented in opposition to the defense's theory that a stranger had approached Debbie and she voluntarily got into the car with that person, who later killed her. On this basis, it was reasonable for the state court to conclude that the admission of the testimony did not deprive petitioner of his due process rights. See Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991) (holding that "[o]nly if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process") (emphasis in original). Moreover, the state court was also reasonable in concluding that petitioner's due process rights had not been violated by the introduction of Mr. Philpott's testimony, given that the jury had already heard testimony from Ms. Napoletano, unobjected to by the defense, that Debbie had seemed fearful of petitioner. (10 RT 2756.) See generally McKinney v. Rees, 993 F.2d 1378, 1384 (9th Cir. 1993), as amended (June 10, 1993) (holding that whether erroneous admission of evidence violated defendant's due process rights depends on entire evidentiary picture before the jury); see also People v. Frye, 18 Cal. 4th 894, 966 (1998) (the California Supreme Court's finding of no prejudice under Watson necessarily means it found no federal due process violation); People v. Arias, 13 Cal. 4th 92, 143, 913 P.2d 980 (1996) (same).

For these reasons, the state court's merits denial of Claim 26 is entitled to deference and the undersigned recommends it be dismissed.

/ / /

**iii. Claim 27**

At the guilt phase, the prosecution introduced testimony from Officer Phillip Dannaker that, on August 12, 1984, Darlene Sindle told him that "she was afraid that if [petitioner] found out that she had been talking to the police about him that she might be hurt by him." (11 RT 2929; see ECF No. 138 at 121.) The prosecution also introduced the testimony of Barbara Rugg that, shortly after Ms. Sindle spoke to Officer Dannaker, she told Ms. Rugg "[a] couple of times" that "she was afraid [petitioner] would find out about her talking to the police." (12 RT 3088; see ECF No. 138 at 121-22.) On direct appeal petitioner argued that the admission of both statements violated his rights to due process. (AOB at 117-28, 179-82.) The California Supreme Court denied on the claim on the merits, finding that the both pieces of testimony were probative to the issue of Ms. Sindle's credibility, which had been placed at issue by the defense, and therefore there was no constitutional error in their admission. Cox, 30 Cal.4th at 957-59, 963.

The California Supreme Court's denial of relief on this claim reflects a reasonable application of clearly established federal law. See 28 U.S.C. § 2254(d)(1). As the state court observed, the prosecutor elicited both of the pieces of testimony at issue after defense counsel had cross-examined Ms. Sindle, during which defense counsel elicited testimony from Ms. Sindle that petitioner had ended their relationship shortly after they were married and that Ms. Napoletano had spoken to Ms. Sindle about the former's statements inculpating petitioner. Cox, 30 Cal.4th at 957-58; see 8 RT 2122-25]. The apparent purpose of eliciting this testimony was to suggest that Ms. Sindle had lied to police when she eventually inculpated petitioner. See Cox, 30 Cal.4th at 957-58; see 18 RT 4740-4783 (defense's guilt phase closing argument). In light of this, it was reasonable for the state court to conclude that the testimony at issue was relevant insofar as it suggested an alternative reason for Ms. Sindle's failure to have inculpated petitioner to the police sooner and that, for this reason, its admission did not deprive the petitioner of a fundamentally fair trial. See Estelle, 502 U.S. at 68-70; see generally Castillo v. McFadden, 399 F.3d 993, 1001 (9th Cir. 2005). The undersigned therefore recommends Claim 27 be dismissed. See 28 U.S.C. § 2254(d)(1).

/ / /

**iv. Claim 28**

In Claim 28, petitioner alleges that his convictions and sentences were obtained in violation of his Fifth and Fourteenth Amendment rights by the wrongful admission of evidence that Joanna Napoletano had attempted to direct law enforcement multiple times to the location of Denise Galston's homicide. (ECF No. 138 at 123-26.) Petitioner raised this claim on direct appeal (AOB at 144-63), which the California Supreme Court denied on the merits in a reasoned opinion. Cox, 30 Cal.4th at 961-63. The undersigned concludes that denial is entitled to deference.

At trial, the prosecution elicited testimony from Sergeant Wilson that, on November 2, 1984, he and other law enforcement agents accompanied Ms. Napoletano on a drive to the area where the victims' remains had been found. (RT 3302-3322.) In his testimony, he described Ms. Napoletano's agitated demeanor and reactions as they approached the area. (Id.) Sergeant Wilson also testified that he went with Ms. Napoletano to the area again on November 6, 1984, and he described her having a similar demeanor on that trip, as well. (RT 3224-3231, 3272-81.) Sergeant Wilson testified that, on June 22, 1985, he again brought Ms. Napoletano to the area and asked her to point out locations she had described in her report of having seen petitioner kill Denise. (RT 3971-80.) In his testimony, he described her as having an upset and tearful demeanor during this trip. (Id.) The prosecution also presented the testimony of Detective Harnage, who testified that he was present on the November 1984 trips and observed Ms. Napoletano's agitated demeanor when they approached Ferrari Mill Road, as well. (RT 3932-34.)

The defense objected to the admission of this evidence as containing inadmissible hearsay from Ms. Napoletano. (RT 3207-12, 3229-30, 3232-71, 3825-51, 3946-53.) The court overruled the objections and admonished the jury that Sergeant Wilson's testimony relaying statements made by Ms. Napoletano could only be considered as proof of Ms. Napoletano's "knowledge of locations, places, or sites." (RT 3272.)

On direct appeal, petitioner argued that the evidence was inadmissible under California statute and was irrelevant and thus its admission deprived him of a fundamentally fair trial, particularly when considered cumulatively with other errors. (AOB at 144-63, 179-82.) The

California Supreme Court denied this on the merits, holding that the evidence was properly admitted under the state Evidence Code and was plainly relevant, as Ms. Napoletano's state of mind was a material issue at trial. Cox, 30 Cal.4th at 961-63. The court also held that the admission of this evidence did not deprive petitioner of a fair trial in violation of his due process rights. Id.

The state court's decision reflects a reasonable application of clearly established federal law. Petitioner argues that the evidence at issue was inadmissible pursuant to Mutual Life Insurance Company v. Hillmon, 145 U.S. 285 (1892), and Shepard v. United States, 290 U.S. 96 (1933). (ECF No. 192 at 340-44.) Neither of these cases purported to limit the admissibility of evidence in order to ensure a criminal defendant's due process right to a fundamentally fair trial; rather, both discussed the common law rules concerning the admission of hearsay evidence against a criminal defendant. Shepard, 290 U.S. 96; Hillmon, 145 U.S. 285. Although neither case grounded its discussion in constitutional principles, see id., the admission of hearsay evidence against a criminal defendant implicates the defendant's Sixth Amendment rights, not his Fourteenth Amendment due process rights. See, e.g., Casey v. Moore, 386 F.3d 896, 915 (9th Cir. 2004) (identifying Shepard as a case implicating the Sixth Amendment confrontation right); Terrovona v. Kincheloe, 852 F.2d 424, 427 (9th Cir. 1988) (same, as to Hillmon). The state court was not unreasonable in failing to extend these precedents in a novel way to encompass the due process challenge that petitioner posited. See generally Williams v. Taylor, 529 U.S. 362, 407 (2000).

Moreover, the state court was reasonable in finding that the evidence at issue was relevant, such that its admission did not violate petitioner's right to due process. As the trial court correctly observed, Ms. Napoletano's credibility was a central issue before the jury at the guilt phase and a substantial amount of testimony concerned her failure to have reported her eyewitness account to law enforcement officers earlier. The evidence at issue in this claim was relevant to the specific questions of whether Ms. Napoletano had actually been present at the homicide of Denise Galston, as she had claimed, and why she had not come forward earlier. See Cox, 30 Cal. 4th at 963. On this particular record, therefore, the state court was reasonable in

concluding that the evidence's admission did not deprive petitioner of a fundamentally fair trial. See Estelle, 502 U.S. at 68-70. The state court's denial of this claim is entitled to deference. 28 U.S.C. § 2254(d)(1).

**Claim 29**

In Claim 29, petitioner alleges that the trial court violated his rights under the Eighth and Fourteenth Amendments by instructing the jury at the close of the guilt phase, per CALJIC 17.10, that, "If the jury is not satisfied beyond a reasonable doubt that the defendant is guilty of the offense charged and it unanimously so finds, it may convict him of any lesser offense if the jury is convinced beyond a reasonable doubt that he is guilty of such lesser offense." (ECF No. 138 at 127 (citing 4 CT 674, 18 RT 4820).) Petitioner argues that this instruction required the jury to determine whether the defendant was guilty of first-degree murder first, before turning to the question of whether he was guilty of lesser-included offenses; per petitioner, this violates his Eighth and Fourteenth Amendment rights, as set forth in Beck v. Alabama, 447 U.S. 625 (1980). (ECF No. 219 at 114; see also ECF No. 192 at 345-50.) Petitioner argues that the instruction additionally violated his rights to due process under the Fourteenth Amendment, by giving an unfair advantage to the prosecution. (ECF No. 192 at 349.) Petitioner raised this claim on direct appeal (Supp. AOB at 23-29), which the California Supreme Court denied on the merits. Cox, 30 Cal. 4th at 967. The undersigned finds that denial deserving of deference under § 2254(d).

**1. Relevant Background**

At the close of the guilt phase, the court instructed the jury on the elements of the charged offense of first-degree murder. 4 CT 672. The court then instructed the jury with CALJIC 17.10, that, if the jury unanimously found that petitioner was not guilty of the charged offense, it may convict him of a lesser offense if the jury found beyond a reasonable doubt that he was guilty of the lesser offense. 4 CT 674; 18 RT 4820. The court subsequently instructed the jury on the lesser-included offenses of second-degree murder and voluntary manslaughter and the distinctions between these offenses. 4 CT 676-82. The jury was then instructed with CALJIC 8.70, that "if you should find the defendant guilty of murder, it will be your duty to determine and state in your verdict whether you find the murder to be in the first or second degree," 4 CT 684,

and with CALJIC 8.71, that

> If you are convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant, but you have a reasonable doubt whether such murder was of the first or of the second degree, you must give the defendant the benefit of the doubt and return a verdict fixing the murder as of the second degree.

4 CT 685. The jury was then instructed with CALJIC 8.72, that, "If you are satisfied beyond a reasonable doubt that the killing was unlawful, but you have a reasonable doubt whether the crime is murder or manslaughter, you must give the defendant the benefit of the doubt and find it to be manslaughter rather than murder." 4 CT 686.

On direct appeal, petitioner argued that the instruction violated his rights under the Eighth and Fourteenth Amendments by circumscribing jurors' abilities to consider lesser included offenses and his rights to Fourteenth Amendment due process by giving an unfair advantage to the prosecution. (Supp. AOB at 23-34.) The California Supreme Court denied the claim, stating that it had previously rejected a similar argument in other cases. Cox, 30 Cal. 4th at 967 (citing People v. Dennis, 17 Cal.4th 468, 535-537 (1998), and People v. Fields, 13 Cal.4th 289, 303-305 (1996)).

**2. Governing Law**

Under the Eighth Amendment and the due process clause of the Fourteenth Amendment, in a capital case, a lesser-included offense instruction must be given to the homicide charges "when the evidence warrants such an instruction," Hopper v. Evans, 456 U.S. 605, 611-12 (1982), citing Beck, 447 U.S. at 635, i.e., "if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater." Keeble v. United States, 412 U.S. 205, 208 (1973); see also Bobby v. Mitts, 563 U.S. 395, 397 (2011). The purpose of the rule is to address those situations where "the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense"; in such a situation, "the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction," thereby violating both the defendant's due process rights and the Eighth Amendment. Beck, 447 U.S. at 637.

A jury instruction may additionally violate the defendant's due process rights where "'there is a reasonable likelihood' that the jury . . . interpreted the instruction" in a manner contrary to law. Calderon v. Coleman, 525 U.S. 141, 146 (1998) (per curiam) (quoting Boyde, 494 U.S. at 380); see also McGuire, 502 U.S. at 72 (reviewing court must determine "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution"). In making this evaluation, the reviewing court considers the instructions as a whole, in light of "all that has taken place at the trial" and through the lens of common sense. Johnson v. Texas, 509 U.S. 350, 368 (1993) (quoting Boyde, 494 U.S. at 381).

With both forms of instructional error, reversal is required unless the reviewing court determines the error was harmless beyond a reasonable doubt under Chapman. Hopper, 456 U.S. at 613-14; see Arizona v. Fulminante, 499 U.S. 279, 306 (1991); Rose v. Clark, 478 U.S. 570, 576-77 (1986).

**3. The State Court's Denial of Claim 29 Was a Reasonable Application of Clearly Established Federal Law**

Petitioner fails to show that the California Supreme Court's denial of this claim on the merits was contrary to, or reflected an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d)(1). In denying the claim, the state court relied on the reasoning set forth in People v. Dennis, 17 Cal.4th 468, 535-37 (1998), and People v. Fields, 13 Cal.4th 289, 303-305 (1996). Cox, 30 Cal. 4th at 967. In Dennis, the California Supreme Court had rejected a similar challenge to the jury having been instructed with CALJIC 17.10 at the guilt phase of the defendant's capital murder trial, holding that the instruction simply informed the jurors "how to return the verdicts and findings after completing deliberations," but that the instructions as a whole did not preclude the jurors from considering or deliberating about the lesser-included offenses before acquitting the defendant of the greater offense. Dennis, 17 Cal.4th at 535-37. In Fields, the California Supreme Court had reached a similar conclusion when describing California's "acquittal-first rule," explaining that the language of CALJIC 17.10 only informed jurors of the order in which to return their verdict, not the order in which they must consider or deliberate about greater and lesser-included offenses. Fields, 13 Cal.4th at 303-305.

It was not an unreasonable application of, nor contrary to, clearly established federal law for the California Supreme Court to reject petitioner's challenge on this basis. First, it was not unreasonable for the state court to fail to extend Beck in the manner petitioner urges and, instead, to find that the instructions at issue satisfied the Eighth Amendment and requirements of due process under Beck because they gave the jury the option of convicting petitioner on a lesser-included offense, consistent with the holding of Beck. See Beck, 447 U.S. at 637; see generally Carey, 549 U.S. at 74 (explaining that "clearly established federal law" reflects the holdings of Supreme Court cases). Second, given the totality of the instructions that the jury received, it was reasonable for the state court to conclude that they did not coerce the jury into voting for a greater offense, circumscribe jurors' consideration of lesser offenses, or improperly favor the prosecution. Rather, the instructions accounted for and endorsed the possibility that the jurors would be deliberating about the lesser and greater offenses simultaneously, and instructed them that, if struggling between a verdict on the lesser and greater offenses, they should give the defendant the benefit of the doubt and select the lesser verdict. See 4 CT 685-86. In light of the entire body of instructions at the guilt phase, the state court's rejection of this claim was not an unreasonable application of, or contrary to, clearly established federal law.

**4. The State Court's Denial Deserves Deference Under 2254(d)(2)**

Petitioner also fails to demonstrate that the state court's opinion was based on an unreasonable determination of the facts that is undeserving of deference under 28 U.S.C. § 2254(d)(2). (ECF No. 192 at 349-50.) In making this argument, petitioner relies on evidence adduced at the reference hearing in state habeas corpus proceedings. (Id.) The claim at issue, however, was raised on direct appeal and the state court's ruling on it was therefore limited to the appellate record. See, e.g., People By & Through Dep't of Pub. Works v. Keligian, 182 Cal. App. 2d 771, 774 (1960) ("In reviewing the cause we are confined to the record of the proceedings which took place in the court below and are brought up for review in a properly prepared record on appeal . . . . It is improper to set forth in briefs facts, events, or other matters not included in the record on appeal.") The California Supreme Court did not act unreasonably, within the meaning of either 2254(d)(1) or (d)(2), by failing to consider extra-record allegations

and evidence in deciding the issues raised on direct appeal. See Harrington v. Richter, 562 U.S. 86, 100 (2011); Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004). Petitioner therefore fails to show that the state court's denial of this claim was based on an unreasonable factual determination. See 28 U.S.C. § 2254(d)(2).

For these reasons, the state court's denial of Claim 29 on the merits is entitled to deference and the undersigned recommends it be dismissed.

**Claim 30**

In Claim 30, petitioner alleges that his rights under the Eighth and Fourteenth Amendments were violated by the trial court's failure to instruct the jury at the guilt phase that they could consider the charges, including lesser-included offenses, in any order. (ECF No. 138 at 129-30.) Petitioner raised this claim on direct appeal, arguing that the failure to explicitly inform the jurors that they could discuss the charges in any order deprived him of his rights to due process, to a reliable sentencing determination, to present a defense, and to a trial by jury, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (Supp. AOB at 29-32.) He also argued that the failure to give the instruction violated state law, thereby violating his federal due process rights under Hicks, 447 U.S. at 346. (Id. at 31-32.) The California Supreme Court rejected this claim on the merits, together with Claim 29. Cox, 30 Cal. 4th at 967. (See ECF No. 192 at 352.)

The state court's rejection of this claim was a reasonable application of clearly established federal law. Petitioner argues that, under clearly established federal law, "[f]ailure to instruct that the jury may discuss lesser offenses at any time and in any sequence places the jury in virtually the same position as if no lesser offense instructions had been given at all," citing Beck, 447 U.S. 625, and Keeble v. United States, 412 U.S. 205 (1973). Such a rule, however, is not articulated or even implied in either case, and the undersigned is aware of no lower court that has applied either case to encompass the broad interpretation that petitioner urges. As such, the state court's failure to extend Beck or Keeble in this manner was not an unreasonable application of clearly established federal law. See generally Williams, 529 U.S. at 407-08. Moreover, for the reasons described relative to Claim 29, ante, the totality of the instructions the jury received did not limit

their consideration of lesser included offenses and, in fact, instructed the jury to give the defendant the benefit of the doubt if torn between convicting him of lesser and greater offenses. For this reason, it was reasonable for the state court to conclude that petitioner's constitutional rights had not been violated by the instructions the jury received. Finally, for the reasons set forth ante, the state court's reliance on the trial record in lieu of evidence developed in habeas corpus proceedings, when adjudicating a claim raised on direct appeal, was not an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(2). Accordingly, petitioner has not shown that the state court's denial of this claim is undeserving of deference and the undersigned recommends it be dismissed.

**Claim 31**

In Claim 31, petitioner alleges that his convictions and sentences are unlawful under the Fifth, Sixth, and Fourteenth Amendments by petitioner's, defense counsel's, and the trial court's absence from proceedings in which trial testimony was read back to the jury. (ECF No. 138 at 131.) Petitioner raised this claim on direct appeal (AOB at 164-78; March 7, 2002 Letter Br. at 8), which the California Supreme Court denied on the merits. Cox, 30 Cal.4th at 963. The undersigned concludes that the state court's denial is entitled to deference and recommends the claim be dismissed.

**1. Relevant Background**

During guilt phase deliberations, the jury requested readbacks of the testimonies of several prosecution witnesses. (18 RT 4841-4842, 4873-75.) The court informed petitioner, defense counsel, and the prosecutor of the request and defense counsel volunteered to stipulate to allowing the court reporters to read the requested testimony to the jury in the jury room. (18 RT 4842.) The court expressed a concern that the court reporters may inadvertently read statements that were off the record; defense counsel replied that they did not share that concern, given the reporters' experience. (18 RT 4843.) The court, counsel, and the court reporters engaged in a discussion, in the presence of petitioner, of how the readback would occur and how the reporters would catch any errors. (18 RT 4844.) The court then engaged in a colloquy with petitioner concerning the waiver:

THE COURT: Next going to ask the Defendant if he personally waives a right to be present while that is being reread to the jury, number one.
Do you personally waive your right to be present while that is reread?
THE DEFENDANT: Yes, Your Honor.
THE COURT: You personally stipulate that could be read to the jury out of the presence of your counsel and out of the presence of the Court by the court reporters?
THE DEFENDANT: I do.
[DEFENSE COUNSEL]: The record should also reflect I have discussed this with my client and that it's agreeable with me.

(18 RT 4844-4845.) The court then brought the jury back into the courtroom and explained the readback process to them, in defendant's presence. (18 RT 4846-4848.) The reporters then read to the jury the testimonies of Darlene Sindle, Joanna Napoletano, Linda Crespin, Joseph Crespin, Phillip Dannaker, James Streeter, and Brenda Hartman, excepting those proceedings held at the bench or otherwise outside of the presence of the jury. (18 RT 4849-4853. 4873-76.)

**2. Governing Legal Standard**

The Sixth Amendment's Confrontation Clause and the Fourteenth Amendment's Due Process Clause both establish the defendant's right to be present at all critical stages of a criminal trial. United States v. Gagnon, 470 U.S. 522, 526 (1985) (per curiam); Illinois v. Allen, 397 U.S. 337, 338 (1970); Gardner v. Fla., 430 U.S. 349, 358 (1977). This right may be waived. Snyder v. Massachusetts, 291 U.S. 97, 106 (1934). In order to be constitutionally sound, any waiver must be knowing, intelligent, and voluntary, and all presumptions are drawn against finding that the defendant has waived these fundamental constitutional rights. Johnson v. Zerbst, 304 U.S. 458, 464 (1938) ("[C]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights and . . . we do not presume acquiescence in the loss of fundamental rights. A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.") (internal quotation marks and citation omitted); see also Brookhart v. Janis, 384 U.S. 1, 4 (1966) (holding that a waiver of constitutional confrontation rights must be knowing and voluntary, citing Zerbst).

/ / /

**3. The State Court's Denial of This Claim Is Entitled to Deference**

On direct appeal, the California Supreme Court denied this claim on the merits on two alternative grounds. Cox, 30 Cal.4th at 963. First, the Court held that the readback of testimony did not constitute a critical stage of the trial proceedings, at which petitioner had a constitutional right to be present. Id. Second, the Court held the claim was meritless because petitioner and his counsel had waived their presence at the readback. Id. Both of these conclusions are entitled to deference under 28 U.S.C. § 2254(d).

Petitioner argues that the state court's denial was contrary to, or an unreasonable application of, clearly established federal law because the readback of testimony constitutes a critical stage of the proceedings in a criminal case, such that petitioner's exclusion from it deprived him of due process. (ECF No. 192 at 358-59.) This argument is unpersuasive. At the Court of Appeals has explained, at the time of the state court adjudication in petitioner's case, the Supreme Court "ha[d] never addressed whether readback of testimony to a jury is a 'critical stage[] of the trial' triggering a criminal defendant's fundamental right to be present." La Crosse v. Kernan, 244 F.3d 702, 708 (9th Cir. 2001). Consequently, in light of "the lack of clear guidance from the United States Supreme Court," on the issue, petitioner fails to demonstrate that there existed clearly established federal law recognizing the readback of testimony as a critical stage of a criminal proceeding and, thus, that the state court acted contrary to or unreasonably applied such law. See id.; see also Fisher v. Roe, 263 F.3d 906, 915 (9th Cir. 2001), overruled on other grounds by Payton v. Woodford, 346 F.3d 1204 (9th Cir. 2003) ("Because the Supreme Court has never specifically addressed the question of whether a defendant has a right to participate in a readback of testimony, the California Supreme Court's disposition of this case cannot be precisely 'contrary to' Supreme Court precedent."); La Crosse, 244 F.3d at 708 (observing that "other courts have declined to recognize" that a criminal defendant has a constitutional right to be present at the readback of testimony); see generally Kessee, 574 F.3d at 679 ("Because the Supreme Court has not given explicit direction and because the state court's interpretation is consistent with many other courts' interpretations, we cannot hold that the state court's interpretation was contrary to, or involved an unreasonable application of, Supreme Court

precedent.”). Accordingly, petitioner fails to show that the state court’s decision does not deserve deference under § 2254(d)(1) on this basis.

Petitioner also argues that the state court’s decision reflected an unreasonable factual determination, under § 2254(d)(2), because petitioner’s waiver of his presence was legally inadequate. (ECF No. 192 at 359.) This argument also is unpersuasive. The record supports the state court’s conclusion that petitioner’s waiver of his right to be present was knowing, intelligent, and voluntary. See United States v. Olano, 507 U.S. 725, 733 (1993); Johnson, 304 U.S. at 464; Campbell v. Wood, 18 F.3d 662, 672 (9th Cir. 1994). The record indicates that, prior to and during its colloquy with petitioner, the court informed petitioner of his right to be present for the readback of testimony and the effect that his waiver would have. (18 RT 4842-44.) On the latter point, the court detailed how the readback would occur to ensure accuracy in petitioner’s and counsel’s absence. (Id.) Defense counsel also stated that he had discussed the decision with petitioner prior to the waiver being taken and agreed with it. (18 RT 4845.) During his colloquy with the court, petitioner answered straightforwardly and unequivocally that he waived his right to be present. (18 RT 4844-4845.) Nothing in the record suggests petitioner did not understand the explanations given to him by the court in open court or by his counsel in their conversation about the issue, and nothing in the record suggests that his waiver was not voluntary. (See 18 RT 4842-45.) Consequently, the state court was reasonable in concluding that, even if petitioner had possessed a constitutional right to be present at the readback, the record demonstrated he had lawfully waived that right. See, e.g., Amaya-Ruiz v. Stewart, 121 F.3d 486, 496 (9th Cir. 1997), overruled on other grounds by United States v. Preston, 751 F.3d 1008 (9th Cir. 2014) (holding defendant’s waiver of his presence was knowing, intelligent, and voluntary where “state trial court told Amaya-Ruiz that he had a right to be present during the hearing and explained the nature of the proceeding” and defense counsel had discussed the issue with the defendant prior to his entering the waiver); Brewer v. Raines, 670 F.2d 117, 119 (9th Cir. 1982) (holding that defendant’s colloquy with trial court in which court described what would occur if defendant absented himself from trial sufficed to show defendant’s waiver of his presence was knowing, intelligent, and voluntary); see also Taylor v. United States, 414 U.S. 17, 19 n.2 (1973) (waiver

was proper where "an independent review of the transcripts from the trial and sentencing hearing" demonstrated that "petitioner knew that he was entitled to be present in court during every stage of his trial and that his absence was a product of his voluntary choice"); United States v. Houtchens, 926 F.2d 824, 826-27 (9th Cir. 1991) (same). Petitioner fails to show that the state court's denial on this alternative basis was premised on an unreasonable factual determination. See 28 U.S.C. § 2254(d)(2).

For these reasons, petitioner has not shown that the state court's denial of Claim 31 should not be afforded deference under 28 U.S.C. § 2254(d) and the undersigned recommends the claim be denied.

**Claim 36**

In Claim 36, petitioner alleges that his death sentence was unlawfully imposed under the Eighth and Fourteenth Amendments by the trial court's failure to properly instruct the jury as to the scope of their sentencing discretion. (ECF No. 138 at 138-39.) Petitioner raised this claim on direct appeal (AOB at 190-96), which the California Supreme Court denied in the merits in a reasoned opinion. Cox, 30 Cal. 4th at 965. The undersigned finds that denial to reflect a reasonable application of clearly established federal law, such that it is entitled to deference under § 2254(d).

**1. Relevant Background**

At the close of the penalty phase, the jury was instructed with CALJIC No. 8.84.2 (1979 revision) as follows:

> It is now your duty to determine which of two penalties, death or confinement in a state prison for life without possibility of parole shall be imposed on the Defendant.
>
> After having heard all of the evidence and after having heard and considered the arguments of counsel you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.
>
> If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in State Prison for life without the possibility of parole.

(20 RT 5321-22.) The court also instructed the jurors that "the weighing process is not

mechanical," (20 RT 5322), and that,

> If a mitigating circumstance or an aspect of the Defendant's background or his character called to the attention of the jury by the evidence or its observation of the Defendant arouses sympathy or compassion such as to persuade the jury that death is not the appropriate penalty, the jury may act in response thereto and opt instead for life without the possibility of parole.

(20 RT 5322.)

In his closing argument, the prosecutor argued to the jury that the penalty phase verdict was not to be reached in a "a cold and mechanistic manner" but rather "in a manner that will give [the jury] an opportunity to use a series of factors and to weigh and consider a number of points to try and reach a decision." (20 RT 5299.) The prosecutor then described the statutory aggravating and mitigating factors, then concluded by reminding the jury that they were "commanded by the law to take these eleven factors and weigh and consider them, not in a mechanistic sense, but in a sense that gives true value and weight to each of the factors as you, the jury, may determine them to be." (20 RT 5300-02.) In the defense's closing argument at the penalty phase, defense counsel also argued to the jury that they must "carefully consider and weigh the [statutory] factors" (20 RT 5308), and, later, that they "must weigh each of the factors as given to you by the Court and if you find the aggravating factors outweigh mitigating then you must sentence him to death. And if you find the contrary, then you will sentence him to life without the possibility of parole." (20 RT 5310.) Defense counsel then discussed the statutory aggravating and mitigating factors and evidence that had been presented relative to them. (Id.) He ended his argument by urging the jury that, when they weigh all of the mitigating factors in the case, "those factors will prevail," and that they should "weigh and consider all factors in this case" to arrive at a life verdict. (20 RT 5318.)

On direct appeal, petitioner argued that the court's instruction that, "[i]f you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death" misled the jury as to the scope of their sentencing discretion, violating petitioner's rights under the Eighth and Fourteenth Amendments. (AOB at 190-96.) The California Supreme Court rejected petitioner's claim, concluding that the totality of the penalty phase instructions and counsels' arguments rendered it unlikely that the jurors had misunderstood

the scope of their sentencing discretion. Cox, 30 Cal. 4th at 965. The Court explained,

> We are satisfied, on this record, that the jury understood its duty to carefully and properly weigh its decision. The prosecutor correctly pointed out to the jury that "you are commanded by the law to take these eleven factors and weigh and consider them, not in a mechanistic sense, but in a sense that gives true value and weight to each of the factors, as you, the jury, determine them to be."
>
> Although defense counsel stated, in one instance, that "if the aggravating factors outweigh the mitigating then you must sentence [defendant to death]," his next statement was, "And if you find to the contrary, then you will sentence him to life without the possibility of parole." He then argued that "when you weigh [the mitigating factors] those factors will prevail."
>
> The jury was also instructed that it was "obliged to weigh mitigating evidence against aggravating evidence in exercising its sentencing discretion. Although the law seeks to ensure that this discretion is not weighed arbitrarily, i.e., without regard to the evidence, the weighing process is not mechanical."

Cox, 30 Cal. 4th at 965.

**2. The State Court's Decision Is Entitled to Deference**

The state court's merits denial of this claim reflects a reasonable application of clearly established federal law, deserving of deference under § 2254(d)(1). In Boyde v. California, 494 U.S. 370 (1990), the Supreme Court specifically considered the language of CALJIC 8.84.2 that petitioner challenges here, and held that it did not mislead the jury as to the scope of their sentencing discretion, so as to violate the Eighth Amendment or the defendant's rights to due process. 494 U.S. at 376-77 (citing Blystone v. Pennsylvania, 494 U.S. 299 (1990)). Thus, to the extent that petitioner, in this claim, argued that the instruction facially violated the Eighth and Fourteenth Amendments, the state court reasonably applied Boyde in rejecting such an argument. See Turner v. Calderon, 281 F.3d 851, 887 (9th Cir. 2002) (holding that "Boyde forecloses [petitioner's] constitutional argument" challenging CALJIC 8.84.2); Bonin v. Calderon, 59 F.3d 815, 849 (9th Cir. 1995) (holding facial challenge to CALJIC 8.84.2 on these grounds was foreclosed by Boyde, 494 U.S. 370, and Blystone, 494 U.S. 299).

To the extent petitioner argued in state court that the totality of the court's instructions, including CALJIC 8.84.2, along with counsel's arguments, violated petitioner's Eighth and Fourteenth Amendment rights, the state court also reasonably applied clearly established federal law in rejecting this argument. See Cox, 30 Cal. 4th at 965. In Boyde, the Supreme Court held

that that language of CALJIC 8.84.2 did not itself mislead the jury about the scope of its sentencing discretion, but also recognized that there could be circumstances where the instruction, combined with counsel's argument, could mislead the jury in this manner. Boyde, 494 U.S. at 384. Here, the state court was reasonable in concluding that the record did not support such a finding. As the state court accurately observed, the arguments of counsel did not encourage the jury to discount mitigation evidence or suggest that the death penalty was the inevitable verdict if the aggravating factors were particularly weighty. Although defense counsel, at one point, reiterated the "shall" language of the instruction, his argument on the whole urged the jury to consider all of the statutory aggravating and mitigating factors, weigh them non-mechanistically, and, ultimately, render a life verdict due to the strength of the mitigating evidence. (20 RT 5310-5318.) Additionally, as the state court found, the "shall" instruction was not given to the jury in isolation, but in the context of additional instructions that urged the jury to give full consideration to the mitigation evidence and to weigh the evidence relating to penalty is a non-mechanistic fashion. See Cox, 30 Cal. 4th at 965; 20 RT 5322. Under Boyde, it was reasonable for the state court to conclude that the totality of instructions and argument to the jury did not mislead them as to the scope of their sentencing discretion, so as to have effectuated a violation of petitioner's Eighth Amendment or due process rights. See Boyde, 494 U.S. at 384; see also Allen v. Woodford, 366 F.3d 823, 854 (9th Cir. 2004), opinion amended and superseded on denial of reh'g, 395 F.3d 979 (9th Cir. 2005); Turner v. Calderon, 281 F.3d 851, 887 (9th Cir. 2002); Siripongs v. Calderon, 35 F.3d 1308, 1323 (9th Cir. 1994), as amended on denial of reh'g and reh'g en banc (Oct. 13, 1994). The state court's denial of this claim, therefore, is entitled to deference and the undersigned recommends it be dismissed.

**Claim 37**

In Claim 37, petitioner alleges that his death sentence is unlawful under the Eighth and Fourteenth Amendments because the trial court failed to properly instruct the jury concerning their consideration of mitigation evidence, specifically that the jurors were instructed they could consider, inter alia, "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." (ECF No. 138 at 140-41, citing 4 CT

737-38; 20 RT 5319-21.) Petitioner raised this claim on direct appeal (AOB at 197-201; March 7, 2002 Letter Br. at 9), which the California Supreme Court denied in a reasoned opinion. Cox, 30 Cal. 4th at 965-66. The undersigned concludes that denial is entitled to deference.

**3. Relevant Background**

The jury was instructed at the close of the penalty phase with CALJIC 8.84.1, which provided, in relevant part,

> In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, if applicable:
>
> […]
>
> (d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
>
> […]
>
> (k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime [and any other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death].

4 CT 737-38; 20 RT 5319-21.[9] On direct appeal, petitioner argued that this instruction unconstitutionally limited the jury's consideration of relevant mitigating evidence, namely, evidence that petitioner exhibited mild brain damage. (AOB at 197-201; March 7, 2002 Letter Br. at 9]).) The California Supreme Court denied this claim, holding that factor (k) in the instruction allowed the jury to consider as mitigating whether the offense was committed while the defendant was under the influence of mental or emotional disturbance that was not "extreme," and thus satisfied the Eighth Amendment. Cox, 30 Cal. 4th at 965-66 (citing, inter alia, People v. Clark, 3 Cal. 4th 41, 163 (1992), and People v. Ghent, 43 Cal. 3d 739, 776 (1987)).

---

[9] The written version of the instructions was redacted using brackets, as quoted herein, 4 CT 737-38, but the oral version of the instructions included the language contained within the brackets. 20 RT 5319-21. This discrepancy is immaterial to the analysis of the instant claim.

**4. The State Court's Denial of this Claim Is Entitled to Deference**

In his briefing, petitioner both asserts that the California Supreme Court adjudicated the claim on the merits (ECF No. 192 at 382) and did not adjudicate the claim on the merits (ECF No. 192 at 383-84). If the former, petitioner must satisfy 28 U.S.C § 2254(d), but if the latter, the claim receives de novo review. See 28 U.S.C. § 2254(d). Respondent argues both that the claim is meritless and that petitioner has not shown that the state court's denial of the claim is contrary to, or an unreasonable application of, clearly established federal law under § 2254(d)(1). (ECF No. 208 at 202-04.) The undersigned concludes that the state court denied the claim on the merits and that denial is deserving of deference.

The state court's denial of a constitutional claim is presumed to be on the merits, unless the petitioner can demonstrate that the presumption is not warranted for a particular claim. Johnson v. Williams, 568 U.S. 289, 298-300 (2013). Here, petitioner has not rebutted that presumption. In its opinion, the California Supreme Court addressed this claim specifically ("Emotional Disturbance as a Mitigating Factor") and held that it was meritless, because the instructions as a whole "'allow[] consideration of any mental or emotional condition, even if it is not 'extreme.''" Cox, 30 Cal. 4th at 965-66 (quoting Clark, 3 Cal. 4th at 163). In support of its conclusion, the Court cited several of its prior cases, where it had rejected similar instructional error claims on the basis that the instructions did not violate the Eighth Amendment. Id.; see People v. Burgener, 29 Cal. 4th 833, 885 (2003), as modified (Apr. 9, 2003); People v. Roybal, 19 Cal. 4th 481 (1998), as modified (Jan. 13, 1999); People v. Jones, 15 Cal. 4th 119, 190 (1997), as modified on denial of reh'g (Apr. 30, 1997); People v. Ray, 13 Cal. 4th 313, 359 (1996); Clark, 3 Cal. 4th at 163; People v. Ghent, 43 Cal. 3d 739, 776 (1987). Petitioner is correct that the Court, at the outset of its analysis, erroneously described this claim as asserting that "Penal Code section 190.3, factor (d), . . . unduly limited the kinds of evidence admissible at the penalty phase." See Cox, 30 Cal. 4th at 965-66. The entirety of the Court's analysis, however, makes clear it considered, and rejected on the merits, petitioner's argument that the instruction unduly limited the kinds of evidence the jury could consider when determining their verdict at the penalty phase, not a claim that the statute unduly limited the admissibility of certain evidence. See id. For this

reason, petitioner has not rebutted the presumption that the state court's denial was on the merits of the substance of his claim 37.

Petitioner also has not shown that the state court's denial of this claim was contrary to or an unreasonable application of clearly established federal law. (See ECF No. 192 at 382-86.) In order to comport with the Eighth and Fourteenth Amendments, "a death penalty statute must not preclude consideration of relevant mitigating factors." Lockett v. Ohio, 438 U.S. 586, 608 (1978). In Blystone v. Pennsylvania, 494 U.S. 299 (1990), the Supreme Court applied this principle to capital sentencing instructions that had informed the jurors they could consider as a mitigating factor evidence that defendant suffered "extreme" mental or emotional disturbance, and also instructed they could consider "any other mitigating matter." 494 U.S. at 308. In habeas corpus, the petitioner argued that the instructions violated the Eighth Amendment because they impeded the jury from giving mitigating effect to evidence of a mental disturbance the jurors found was not "extreme." Id. The Supreme Court rejected this argument, holding that, taken as a whole, the instructions permitted the jury "to consider and give effect to all relevant mitigating evidence," including evidence of non-extreme mental disturbance, so as to satisfy the Eighth Amendment. Id. at 305.

Subsequently, the Court of Appeals considered the California penalty phase instructions at issue here in light of Blystone and held that they did not violate the Eighth Amendment. Hendricks v. Vasquez, 974 F.2d 1099, 1109 (9th Cir. 1992), as amended on denial of reh'g (Oct. 29, 1992). The court observed that California's statutory language, as contained in the relevant instruction, was "functionally identical to" the instructions at issue in Blystone, and thus, as in Blystone, the instructions as a whole did not prevent the jury from considering relevant mitigating evidence. Id.

In light of these precedents, the California Supreme Court did not unreasonably apply clearly established federal law in concluding that the instructions at issue here failed to offend the Eighth Amendment in the manner alleged by petitioner. Like the Court of Appeals, the California Supreme Court could have reasonably concluded that the instructions the jury received here were "functionally identical" to those considered in Blystone, see Hendricks, 974 F.2d at 1109,

because, when considered as a whole, the instructions permitted the jury to give full mitigating effect to evidence of petitioner's mild brain damage. See Blystone, 494 U.S. at 305, 308.[10] Petitioner has not shown that the California Supreme Court's denial of this claim was contrary to or an unreasonable application of governing United States Supreme Court precedent. See Price, 538 U.S. at 640; Bell, 535 U.S. at 694.

Accordingly, the undersigned finds the state court's denial of claim 37 is deserving of deference under 28 U.S.C. § 2254(d) and recommends the claim be dismissed.

**Claim 38**

In Claim 38, petitioner alleges that his death sentence was imposed in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by the trial court's failure to instruct the jury on the burden of proof at the penalty phase. (ECF No. 138 at 142.) Petitioner raised this claim on direct appeal (AOB at 215-19), which the California Supreme Court denied on the merits in a reasoned opinion. Cox, 30 Cal. 4th at 971. The undersigned finds that denial deserving of deference.

**1. Relevant Background**

At the close of the penalty phase, the jury was instructed on how to make their sentencing determination, including, per California Penal Code section 190.3, that they could only impose a death sentence if they found that the aggravating circumstances outweighed the mitigating circumstances. 4 CT 739-41. On direct appeal, petitioner argued that these instructions deprived him of due process of law because the instructions did not require that the jury find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances and that death is the appropriate penalty. (AOB at 215-19; March 7, 2002 Letter Br. at 11-16; Jan. 8. 2003 Letter Br.; Feb. 13, 2003 Letter Br.)

On direct appeal, the California Supreme Court denied the claim on the merits, holding

---

[10] In his brief on 28 U.S.C. § 2254, petitioner appears to briefly argue that the word "extreme" in factor (d) renders the instruction unconstitutionally vague. (See ECF No. 192 at 383, 386.) This allegation is not included in claim 37 of the operative petition (see ECF No. 138 at 140-41), and thus to the extent it alleges a distinct legal basis for relief, this allegation is not properly before the court. See, e.g., Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994).

that "'[t]he Constitution does not require the jury to find beyond a reasonable doubt that a particular factor in aggravation exists, that the aggravating factors outweighed the mitigating factors, or that death was the appropriate penalty.'" Cox, 30 Cal. 4th at 971-72 (quoting People v. Burgener, 29 Cal. 4th 833, 884 (2003)). The court rejected petitioner's argument that Apprendi and Ring mandated a different conclusion, holding that the jury's special circumstance verdict obviated, in California capital cases, the constitutional errors present in the sentencing schemes at issue in Apprendi and Ring. Id. (citing People v. Snow, 30 Cal. 4th 43, 126 n.32 (2003)).

**2. The State Court's Rejection of this Claim Was a Reasonable Application of Clearly Established Federal Law**

Petitioner argues that the California Supreme Court's rejection of this claim was contrary to clearly established federal law, see 28 U.S.C. § 2254(d)(1), particularly Apprendi, 530 U.S. 466, and Ring, 536 U.S. 584. (ECF No. 192 at 390-96; see also ECF No. 219 at 125-26.) Petitioner, however, identifies no clearly established federal law holding that a capital sentencing jury must find the aggravating factors or the defendant's death-worthiness beyond a reasonable doubt, whether as a matter of due process, equal protection, the Sixth Amendment, the Eighth Amendment, or any other constitutional provision. (See ECF No. 192 at 390-96.) Petitioner's position appears at odds with the Supreme Court's precedent upholding California's capital sentencing statutes as providing sufficient guidance to the penalty phase jury, notwithstanding the absence of the instruction of which petitioner complains here. Tuilaepa v. California, 512 U.S. 967, 978 (1994); Boyde v. California, 494 U.S. 370 (1990); see also Pulley v. Harris, 465 U.S. 37, 53 (1984); Williams v. Calderon, 52 F.3d 1465, 1485 (9th Cir. 1995). It also appears at odds with the Court's repeated holdings that, so long as the sentencing jury is given "some framework" for how to consider the evidence relevant to the penalty phase determination and so long as the jury's consideration of relevant mitigating evidence is not impeded, the Court has "never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." Franklin v. Lynaugh, 487 U.S. 164, 179 (1988) (citing Zant v. Stephens, 462 U.S. 862, 875-876, n.13 (1983)); see Kansas v. Marsh, 548 U.S. 163, 175 (2006) (quoting same); Buchanan v. Angelone, 522 U.S. 269, 276 (1998) (holding same); Harris

v. Alabama, 513 U.S. 504, 512 (1995) (quoting same).

Petitioner has failed to show that, notwithstanding these precedents, the California Supreme Court was unreasonable in failing to apply Apprendi or Ring to require a jury to make certain findings beyond a reasonable doubt at the penalty phase. Both cases are inapposite to California's capital sentencing scheme. In Apprendi, 530 U.S. at 490, the Court held a state's sentencing scheme violated the defendant's Sixth Amendment right to a jury, where the statutes allowed a judge to impose a particular sentencing enhancement without a jury having found true beyond a reasonable doubt the facts that formed the basis for the enhancement. The Court explained that, "when the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict," and the Sixth Amendment requires that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490, 494. In Ring, 536 U.S. 584, the Court applied this rule to Arizona's capital sentencing scheme. It held that the Arizona scheme violated the Sixth Amendment because, after the jury returned a guilty verdict at the guilt phase, a judge alone determined whether aggravating factors were present that would make the defendant eligible for the death penalty. Ring, 536 U.S. at 598-609. In other words, the jury's findings only supported a sentence of life imprisonment; the judge's findings exposed the defendant to the possibility of a greater punishment—the death penalty—and, as such, the statutory scheme violated the Sixth Amendment as articulated in Apprendi and related authority. Id. at 602-04, 609.

As the California Supreme Court correctly observed, the critical difference between the statutes at issue in Ring and Apprendi and the California capital sentencing scheme is that, in the latter, the defendant is only exposed to the possibility of the death penalty through the jury's finding of the truth of the special circumstance beyond a reasonable doubt. See Cox, 30 Cal. 4th at 971-72; Cal. Penal Code § 190.4. Thus, unlike the petitioners in Ring and Apprendi, here, petitioner was not subject to the possibility of a greater punishment without the requisite jury finding, but rather was subject to the possibility of the death penalty as a punishment because the

jury delivered a verdict finding true, beyond a reasonable doubt, the charged special circumstance. See Webster v. Woodford, 369 F.3d 1062, 1068 (9th Cir. 2004) (explaining that, in California, "[s]pecial circumstances that make a criminal defendant eligible for the death penalty operate as 'the functional equivalent of an element of a greater offense'" quoting Ring, 536 U.S. at 609). Once a defendant has been made eligible for a particular range of punishments by a jury's verdict, the Sixth Amendment does not require that a punishment within that range only be selected by a jury beyond a reasonable doubt. See Ring, 536 U.S. at 603-04; Apprendi, 530 U.S. at 490. It therefore did not offend the Sixth Amendment for the jury to fail to find any particular aggravating circumstance true beyond a reasonable doubt at the penalty phase, or death to be the appropriate penalty beyond a reasonable doubt. See Ring, 536 U.S. at 598-609; Apprendi, 530 U.S. at 490. The California Supreme Court's refusal to extend Ring and Apprendi to implicate such requirements was reasonable. See, e.g., Floyd v. Filson, 949 F.3d 1128, 1144 (9th Cir. 2020) (rejecting similar argument arising from petitioner's California capital trial, observing that "[t]he federal courts of appeals that have considered this argument have uniformly rejected it," collecting cases); see generally Kessee v. Mendoza-Powers, 574 F.3d 675, 679 (9th Cir. 2009) ("Because the Supreme Court has not given explicit direction and because the state court's interpretation is consistent with many other courts' interpretations, we cannot hold that the state court's interpretation was contrary to, or involved an unreasonable application of, Supreme Court precedent.").

For these reasons, the undersigned finds the state court's denial of claim 38 is entitled to deference under 28 U.S.C § 2254(d), and recommends it be denied.

**Claim 42**

In Claim 42, petitioner alleges that the California capital sentencing system is unconstitutional for a variety of reasons, which he sets forth as seven subclaims. (ECF No. 138 at 248.) Petitioner asserts that he raised the subclaims comprising this claim at various stages in his state-court post-trial proceedings, all of which the state court denied on the merits. (See ECF No. 192 at 529.) The undersigned concludes that the state court's denial of relief on these subclaims, i.e., on the entirety of Claim 42, is entitled to deference under § 2254(d).

**1. Unitary List of Vague Aggravating and Mitigating Factors**

As subclaim (A)(1) to Claim 42, petitioner alleges that the California capital sentencing scheme violates the Eighth and Fourteenth Amendments by including aggravating and mitigating factors that are vague. (ECF No. 138 at 248.) In subclaim (A)(4) of Claim 42, petitioner alleges that his Eighth and Fourteenth Amendment rights were violated by the California capital sentencing statute including "[a] unitary list of sentencing factors, with no specific and objective enumeration of the factors." (Id.) Petitioner presented these subclaims to the California Supreme Court on direct appeal (AOB at 240-41),[11] which the California Supreme Court denied on the merits. Cox, 30 Cal. 4th at 969. (See ECF No. 192 at 536.) That denial is entitled to deference.

The Supreme Court has held that California's capital sentencing scheme, including its use of a unitary list of aggravating and mitigating factors at the penalty phase and the definitions provided for them in the jury instructions, is constitutional. Pulley v. Harris, 465 U.S. 37, 51-54 & n.14 (1984); Tuilaepa, 512 U.S. at 977-79. In Harris, the Court held that California's statutory list of aggravating and mitigating factors "'provide[s] jury guidance and lessen[s] the chance of arbitrary application of the death penalty,' 'guarantee[ing] that the jury's discretion will be guided and its consideration deliberate,'" and thus, "[t]he jury's 'discretion is suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.'" Harris, 465 U.S. at 53 (1984) (quoting Gregg, 428 U.S. at 189, and Harris v. Pulley, 692 F.2d 1189, 1194 (9th Cir. 1982)); see also Williams v. Calderon, 52 F.3d 1465, 1484 (9th Cir. 1995) (holding California's "death penalty statute's failure to label aggravating and mitigating factors is constitutional"). In Tuilaepa, 512 U.S. at 977-79, the Court specifically rejected a vagueness challenge to the factors codified at California Penal Code § 190.3(a), (b), and (i), and held that California's scheme provided sufficient guidance to the sentencing jury to satisfy the requirements of the Eighth and

---

[11] In his briefing in this court, petitioner does not indicate in what pleading he presented these subclaims to the state court, nor what the state court did in rejecting them. (See ECF No. 192 at 529.) Upon thorough review of the record, the undersigned concludes that these allegations were raised in petitioner's Opening Brief on direct appeal, wherein he argued that California's capital sentencing statute was unconstitutional for a variety of reasons, including its lack of "specific and objective enumeration of aggravating and mitigating factors to guide the penalty jury." (AOB at 240.)

Fourteenth Amendments. In state court, petitioner made no argument distinguishing these precedents and, in this court, fails to demonstrate that the state court's rejection of this claim reflected an unreasonable application of, or was contrary to, these governing precedents. (See ECF No. 192 at 530-32.) On the record before the court, therefore, petitioner has failed to show that the state court's merits denial of these subclaims does not deserve deference under 28 U.S.C. § 2254(d)(1).

**2. No Requirement That Aggravating Factors Be Proven Beyond a Reasonable Doubt**

In subclaim (A)(2) of Claim 42, petitioner alleges that California's capital sentencing statute violates his Eighth and Fourteenth Amendment rights by failing to require that the jury find the aggravating factors true beyond a reasonable doubt. (ECF No. 138 at 248.) Petitioner argues that this subclaim also encompasses an allegation that the jury should have been required to find that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. (ECF No. 192 at 531-32.) For the reasons explained in the discussion of claim 38, ante, the state court was reasonable in concluding that petitioner had not shown that such findings were required under the Eighth Amendment or any other constitutional authority. (See claim 38, ante.)

**3. No Requirement of Jury Unanimity on the Aggravating Factors**

In subclaim (A)(3) of Claim 42, petitioner alleges that California's capital sentencing statute violates the Eighth and Fourteenth Amendments by failing to require that the jury be unanimous in finding true the aggravating factors supporting the death sentence. (ECF No. 138 at 248.) Petitioner presented this claim to the California Supreme Court on direct appeal (AOB at 240-41), which the California Supreme Court denied on the merits. Cox, 30 Cal. 4th at 969. (See ECF No. 192 at 536.) That denial is entitled to deference.

Petitioner identifies no clearly established federal law setting forth, or even acknowledging, a rule that the Eighth or Fourteenth Amendment requires a capital sentencing jury to be instructed that they must unanimously agree on the truth of whatever aggravating circumstances they have found justify the death sentence. (See ECF No. 192 at 532-33.) Such a

rule, in fact, appears counter to the holdings of the Supreme Court. The Supreme Court has repeatedly held that California's capital sentencing scheme satisfies the Eighth Amendment and due process clause, irrespective of the scheme's failure to include the instruction that petitioner urges here. Tuilaepa, 512 U.S. at 978; Harris, 465 U.S. at 51-53. More generally, the Court has long held that "in returning general verdicts . . . 'there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.'" Schad v. Arizona, 501 U.S. 624, 631-32 (1991) (quoting McKoy v. North Carolina, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring)), overruled on other grounds by Ramos v. Louisiana, 590 U.S. 83 (2020). Petitioner fails to demonstrate, therefore, that the state court's rejection of this subclaim reflected an unreasonable application of, or was contrary to, the clearly established federal law extant at the time of the state court's adjudication, or that it relied on an unreasonable factual determination. See 28 U.S.C. § 2254(d).

**4. Lack of Comparative Appellate Review**

In subclaim (A)(5) of Claim 42, petitioner alleges that the California capital sentencing system violates the Eighth and Fourteenth Amendments by failing to require intercase review on appeal. (ECF No. 138 at 248.) Petitioner argues that this provision is particularly necessary given the California statute's failure to effectively narrow the class of offenders eligible for the death penalty. (ECF No. 192 at 533, 537.) For the reasons explained in the discussion of claim 43, post, the state court was reasonable in concluding that clearly established federal law did not require the California courts to undertake a comparative appellate review in capital cases, nor did the other features of California's statutory scheme that comprise the remaining allegations of this claim render such a review constitutionally required. (See claim 43, post.)

**5. Inadequate Statutory Narrowing**

In subclaim (A)(6) of Claim 42, petitioner alleges that the California capital sentencing system violates the Eighth and Fourteenth Amendments by failing to adequately narrow the class of eligible offenders and crimes. (ECF No. 138 at 248.) In arguing that the state court's denial of this subclaim was unreasonable, petitioner relies on the same arguments he makes in support of claim 45. (See ECF No. 192 at 534, 537.) For the reasons set forth in the court's discussion of

claim 45, post, the state court was reasonable in concluding that California's statutory scheme adequately narrows the class of death-eligible offenders under clearly established federal law. (See claim 45, post.)

**6. Dependence on Extensive Prosecutorial Discretion**

In subclaim (A)(7) of Claim 42, petitioner alleges that the degree of prosecutorial discretion in capital charging decisions renders the California capital sentencing system unconstitutional under the Eighth and Fourteenth Amendments. (ECF No. 138 at 248.) In arguing that the denial of this subclaim was unreasonable, petitioner relies on the arguments he presents in support of claim 46. (See ECF No. 192 at 534-35, 537.) For the reasons explained in the discussion of claim 46, post, the state court did not unreasonably apply clearly established federal law in concluding that the breadth of prosecutorial discretion in capital cases is inoffensive to the Eighth and Fourteenth Amendments. (See claim 46, post.)

In sum, petitioner fails to demonstrate that the state court's merits denial of Claim 42, or any of the subclaims comprising it, was contrary to or reflected an unreasonable application of clearly established federal law, or that the denial was premised on an unreasonable factual determination. See 28 U.S.C. § 2254(d). The undersigned recommends Claim 42 be denied in toto.

**Claim 43**

In Claim 43, petitioner alleges that his death sentence violates the Eighth and Fourteenth Amendments because it is arbitrary, discriminatory, and disproportionate. (ECF No. 138 at 249.) Petitioner raised this claim on direct appeal (AOB at 242-43), which the California Supreme Court denied on the merits in a reasoned opinion. Cox, 30 Cal. 4th at 969-70. The undersigned concludes that denial is entitled to deference.

**1. Relevant Background**

On direct appeal, petitioner argued that the death penalty was "arbitrary, discriminatory, and disproportionate" to his personal characteristics and the severity of the crimes for which he was convicted. (AOB at 242-43.) He urged the court to compare his sentence to other defendants' as a means of establishing that his sentence was arbitrary, discriminatory, and disproportionate.

(Id.) Although he principally presented this argument as arising under state constitutional law, he also relied on California cases that had, themselves, applied the Eighth Amendment. (Id. at 242, citing People v. Wingo, 14 Cal.3d 169 (1975), and In re Rodriguez, 14 Cal.3d 639 (1975).) The California Supreme Court rejected the claim, holding that neither the Eighth Amendment nor equal protection clause require the appellate court to conduct a comparative review of sentences across capital cases to determine if any particular sentence was disproportionate. Cox, 30 Cal. 4th at 969-70. It further held that petitioner's death sentence was not disproportionate to him, in light of petitioner's having been convicted of having, "with premeditation and deliberation, brutally murdered three teenage girls, on three separate occasions, and left their unclothed bodies in the woods"; petitioner had "[n]ever . . . expressed remorse for the murders"; and there was "no evidence to suggest that these three cold-blooded murders were committed under any emotional disturbance." Id. at 970.

**2. Governing Legal Standard**

The Eighth Amendment forbids punishments that are "'excessive' in relation to the crime committed." Coker v. Georgia, 433 U.S. 584, 592 (1977). The Supreme Court has held that the death penalty is not per se excessive as a punishment for certain homicides. Id.; Pulley, 465 U.S. at 52-53. Nonetheless, depending on the facts of the particular case, the imposition of the death penalty "is 'excessive' and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime." Coker, 433 U.S. at 592 (quoting Gregg v. Georgia, 433 U.S. 584, 592 (1977)).

**3. The State Court's Denial of Claim 43 Is Entitled to Deference**

The California Supreme Court's denial of this claim is entitled to deference. In the present proceeding, petitioner argues that the state court's denial was an unreasonable application of clearly established federal law, per 28 U.S.C. § 2254(d)(1), and was premised on unreasonable factual determinations, per § 2254(d)(2). None of petitioner's arguments have merit.

First, the state court was reasonable in holding that the constitution does not require California courts to undertake a comparative proportionality review as part of the appellate

review process in cases where the appellant had been sentenced to death. (See AOB at 243.) In Pulley, 465 U.S. 37, the Supreme Court rejected the same argument on indistinguishable facts. There, the respondent argued that the 1977 California statutory scheme failed to adequately narrow the class of death-eligible offenders, such that the appellate courts should be required to conduct a proportionality review to ensure the death penalty was properly applied to the appellant. The Court held squarely that its cases "do not establish proportionality review as a constitutional requirement." Pulley, 465 U.S. at 45. The Court then held that, given other features of the California statutory scheme, appellate proportionality review was not required to ensure the non-arbitrary imposition of the death penalty. Id. at 51, 53. These features were intrinsic to the same statutory scheme under which petitioner was sentenced to death: the jury was required to find a special circumstance beyond a reasonable doubt to render the defendant death eligible, the just was instructed to consider aggravating and mitigating circumstances at the penalty phase, and death sentences were automatically reviewed by the trial court and California Supreme Court. See id. at 53; see claim 45, post. (See ECF No. 192 at 540-45.) In light of this, the California Supreme Court was reasonable in concluding that the Eighth Amendment was, similarly, not offended by the lack of an intercase proportionality review as part of the appellate review process to which petitioner was subject. See Pulley, 465 U.S. at 53; see also Hampton v. Shinn, 143 F.4th 1047, 1094 (9th Cir. 2025) (holding, "[n]o reasonable jurist would disagree . . . that 'proportionality review is not constitutionally required' where 'the statutory procedures adequately channel the sentencer's discretion'" in a capital sentencing scheme).

Next, the state court was reasonable in concluding that petitioner's sentence was proportionate to the offenses for which he was convicted and his personal characteristics, under the Supreme Court's clearly established law interpreting the Eighth Amendment. (See ECF No. 192 at 545-47.) In reaching its conclusion, the state court relied on the fact of petitioner having been convicted of multiple murders that occurred at separate times, the apparent degradation of the victims by leaving them unclothed, petitioner's failure to have expressed remorse, and the lack of evidence that petitioner was experiencing any form of emotional disturbance at the time he committed the homicides. Cox, 30 Cal. 4th at 969-70. These features are, generally, proper for

a court to consider when determining whether a defendant's punishment offends the Eighth Amendment. See Gregg, 428 U.S. at 206 (explaining the proportionality is considered relative to "the particularized nature of the crime and the particularized characteristics of the individual defendant"). It was not improper for the state court to consider the fact that petitioner had not expressed remorse when considering whether a death sentence was disproportionate to him. (See ECF No. 192 at 545-46.) At the time of petitioner's trial, the defendant's lack of remorse was not an aggravating factor under California statute, but the jury could consider the defendant's remorse as a mitigating factor. Cal. Penal Code § 190.3; People v. Walker, 47 Cal. 3d 605, 650 (1988). In this light, there is no constitutional infirmity to the state court's analysis, as it can be read to convey that the state court simply observed that certain mitigation evidence was absent in this case, militating against petitioner's proportionality argument. See Tuilaepa v. California, 512 U.S. 967, 975-78 (1994) (holding it was not improper for prosecutor to argue, at penalty phase, that certain mitigating factors had not been shown to apply to the case). The state court's analysis also does not reflect an unconstitutional negative inference being drawn from petitioner's decision not to testify, in violation of petitioner's Fifth Amendment rights. See generally White v. Woodall, 572 U.S. 415, 422-23 (2014) (holding that clearly established federal law would permit some negative inferences from capital defendant's failure to testify at the penalty phase).

For these reasons, petitioner fails to show that the state court's denial of this claim is not entitled to deference under § 2254(d), and the undersigned recommends the claim be dismissed.

**Claim 44**

In Claim 44, petitioner alleges that his Eighth and Fourteenth Amendment rights were violated by the trial court's errors in denying petitioner's motion to modify the sentence under California Penal Code section 190.4. (ECF No. 138 at 250.) Petitioner raised this claim on direct appeal (AOB at 244-72), which the California Supreme Court denied on the merits in a reasoned opinion. Cox, 30 Cal. 4th at 972-73. The undersigned recommends the claim be denied.

**1. Relevant Background**

At the time of petitioner's trial, California statute provided that, in every case where a death verdict is returned, the defendant was deemed to have made a motion to modify the death

verdict to the trial court. Cal. Pen. Code § 190.4(e); see Cox, 40 Cal.4th at 972. In adjudicating the motion, "the trial court [was] obligated to review the evidence, independently reweigh any aggravating and mitigating circumstances [in § 190.3], and determine whether the weight of the evidence supports the verdict." People v. Landry, 2 Cal. 5th 52, 123-24 (2016). The court ruled on petitioner's motion to modify the death verdict on November 26, 1985. 4 CT 805-810, 827-838; 20 RT 5341-64. The trial court made extensive findings as to the evidence under the factors set forth in Penal Code section 190.3 and ultimately denied the motion, ruling that "the jury's findings and verdicts are not only supported by the weight of the evidence, but the court in its independent review of all the evidence" found that "the aggravating circumstances overwhelmingly outweigh the mitigating factors." 4 CT 837; 20 RT 5364;

On direct appeal, petitioner argued that the trial court's ruling reflected error under state law and the Eighth Amendment. (AOB at 244-72.) Specifically, petitioner argued that the trial court erroneously considered as aggravating under Penal Code sections 190.3(a) and 190.3(b) evidence that defendant possessed firearms and knives; double-counted aggravating evidence under both sections; and failed to consider mitigating evidence, including evidence of petitioner's brain damage. Id. The California Supreme Court denied the claim in a reasoned opinion. Cox, 30 Cal. 4th at 972-73. It held, inter alia, that the record indicated the trial court had not erred in its consideration of evidence of petitioner's brain damage because it "properly could have accepted the testimony of the neuropsychologist, Dr. Vogt, that there was no evidence of brain damage." Id. The court agreed with petitioner that the trial court had erred in two respects, first, by erroneously considering evidence of the circumstances of the capital crime under § 190.3(b) (as well as properly considering such evidence under § 190.3(a)), and, second, by erroneously stating that possession of firearms is a crime of violence under California law. Id. The court held these errors harmless, however, in light of the evidence that petitioner had committed "willful, premeditated, deliberate murder of the three teenage girls." Id.

**2. Discussion**

In the instant proceeding, petitioner raises two claims of constitutional error. First, he argues that he errors of state law he identified rendered his death sentence arbitrary, in violation

of his rights under the Eighth Amendment. (ECF No. 138 at 250.) Second, he argues that these errors constituted an unlawful deprivation of a state-law entitlement, depriving him of due process of law under the Fourteenth Amendment. (Id.) In his brief addressing 28 U.S.C. § 2254(d), petitioner argues that the California Supreme Court's denial of this claim is not entitled to deference under either 28 U.S.C. § 2254(d)(1) or § 2254(d)(2), and that the claim has merit. (ECF No. 192 at 550-70; see also ECF No. 219 at 180-84.) Respondent counters that the state court's denial is entitled to deference under § 2254(d) and that, regardless, the claim should be dismissed as meritless and non-cognizable. (ECF No. 208 at 261-63.) The undersigned concludes that claim 44 is meritless and, in the interest of judicial economy, recommends it be dismissed. See generally Shinn, 596 U.S. at 390 ("a federal habeas court may *never* 'needlessly prolong' a habeas case") (quoting Pinholster, 563 U.S. at 209 (Sotomayor, J., dissenting) (italics in original)).

Petitioner's claim arising under the Eighth Amendment fails as meritless. In Turner v. Calderon, 281 F.3d 851, 871 (9th Cir. 2002), the Court of Appeals considered a similar claim and observed that the petitioner had made no showing that a trial court's errors under state law in adjudicating a motion to modify the verdict served to deprive him of his Eighth Amendment rights. The Court observed that petitioner had not identified any case law establishing that the alleged errors implicated his constitutional rights at all, and, "because the trial court made an individualized determination of whether death was the proper punishment," the Eighth Amendment was satisfied and, "at most the [trial court's] error would be one of state law." Turner, 281 F.3d at 871. Since then, the courts that have considered the issue have held that a claim alleging the trial court committed errors in adjudicating a motion to modify the verdict under California Penal Code § 190.4 is not cognizable as an Eighth Amendment violation. See Vieira v. Chappell, No. 1:05-CV-01492-AWI, 2015 WL 641433, at *171 (E.D. Cal. Feb. 5, 2015); Webster v. Chappell, No. CIV S-93-306 LKK DAD, 2014 WL 2526857, at *75 (E.D. Cal. June 4, 2014), report and recommendation adopted sub nom. Webster v. Warden, San Quentin State Prison, No. CIV. S-93-0306 LKK D, 2014 WL 4211115 (E.D. Cal. Aug. 26, 2014); cf. Weaver v. Chappell, No. 1:02-CV-05583-AWI-SAB, 2021 WL 4264070, at *109 (E.D. Cal. Sept.

20, 2021) (holding no clearly established federal law existed establishing that such a claim is cognizable in federal habeas corpus). Here, petitioner has provided no basis to distinguish his case from that before the Court in Turner. (See ECF No. 192 at 550-70; ECF No. 219 at 180-84.) As in Turner, he has presented no authority that cognizes the errors of which he complains as violative of the Eighth Amendment, see id., and the undersigned is aware of none. As in Turner, here the record indicates that, despite the errors petitioner identified, the trial court did make an individualized determination that death was the proper punishment, based on the evidence presented at trial. See Turner, 281 F.3d at 871; 20 RT 5341-5363. In light of this, petitioner fails to show his entitlement to relief on the theory that the trial court's errors violated his rights under the Eighth Amendment, entitling him to habeas corpus relief.

To the extent this claim alleges that the trial court's errors deprive him of due process of law under the Fourteenth Amendment, it is also meritless. Petitioner argues that "[t]he inadequate, erroneous, and improper sentence review constituted an arbitrary deprivation of a state law entitlement in violation of Petitioner's federal constitutional right to due process." (ECF No. 192 at 561.) The Supreme Court has recognized that a state court may apply state law in a manner so arbitrary and capricious as to deprive the defendant of due process of law under the Fourteenth Amendment. Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 642, 643 (1974)); see Williams v. Vasquez, 817 F. Supp. 1443, 1469 (E.D. Cal. 1993), aff'd sub nom. Williams v. Calderon, 52 F.3d 1465 (9th Cir. 1995). Here, the state court found that the trial court had committed two errors under state law in adjudicating the motion to modify the verdict: it erred in finding that possession of firearms was a crime of violence and erred in considering evidence concerning the capital crime under § 190.3(b), although it properly considered such evidence under § 190.3(a). Cox, 30 Cal. 4th at 972-73. The court is bound by this finding in determining whether the cumulation of these errors violated petitioner's right to due process. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005). The record does not support the conclusion that petitioner's due process rights were violated by the trial court's commission of these errors. Although the trial court made the errors identified by the California Supreme Court, the trial court otherwise hewed to the statute's requirements and

considered the evidence that had been presented, with deliberateness, depth, and carefulness (see 4 CT 827-838; 20 RT 5341-5364); the trial court's approach in no way resembles the wholly arbitrary acts the Supreme Court has indicated would violate due process. See, e.g., Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272, 289 (1998) (O'Connor, J., concurring); Lewis, 497 U.S. at 783. Moreover, although the trial court erred by considering the evidence of petitioner having possessed firearms as a crime of violence and, then, by considering this evidence under § 190.3(b), the evidence of petitioner's possession of firearms was properly admitted at the guilt phase and therefore it was proper for the trial court to have considered under § 190.3(a). See Cox, 30 Cal. 4th at 941, 973. Thus, it is not the case that the trial court had considered and given weight to evidence that had not been admitted or that was otherwise outside of the factual scope of the motion to modify inquiry. Finally, the trial court's adjudication of the motion to modify was lengthy and detailed, with its consideration of the firearms evidence comprising only a very small proportion, 4 CT 827-838; 20 RT 5341-64, further indicating that the trial court's errors about that evidence did not infect the ruling, on the whole, with arbitrariness. For all of these reasons, petitioner fails to demonstrate that the trial court's errors under state law deprived him of his rights to due process of law under the Fourteenth Amendment. See Williams, 817 F. Supp. at 1491. Accordingly, the undersigned recommends claim 44 be dismissed.

**Claim 45**

In Claim 45, petitioner alleges that his Eighth and Fourteenth Amendment rights were violated by the imposition of a death sentence against him, as California's statutory capital sentencing scheme, facially, fails to meaningfully narrow the class of death-eligible offenders. (ECF No. 138 at 251.) The undersigned concludes the state court's denial of this claim is entitled to deference.

In state court, petitioner alleged that California Penal Code section 190.2 violated the Eighth Amendment as established in Furman, 408 U.S. 238; Gregg, 428 U.S. 153; and their progeny because there is such substantial overlap between the elements of first-degree murder and the statutory special circumstances that render a defendant eligible for the death penalty, so as to fail to meaningfully narrow the class of offenders eligible for the death penalty. (Supp. AOB at

1-13.) The California Supreme Court denied the claim on the merits in a reasoned decision. Cox, 30 Cal. 4th at 971. The court incorporated its analysis from prior cases rejecting similar challenges, in which the court held that the statutory scheme as a whole satisfied the narrowing requirements established by the Supreme Court. Id. (citing, inter alia, "People v. Barnett (1998) 17 Cal.4th 1044, 1179 [74 Cal.Rptr.2d 121, 954 P.2d 384], and cases cited"); Barnett, 17 Cal.4th at 1179 (citing People v. Crittenden, 9 Cal. 4th 83, 154-56 (1994), as modified on denial of reh'g (Feb. 16, 1995)); Crittenden, 9 Cal.4th at 154-56 (holding California statutory scheme adequately narrowed the class of death-eligible offenders required by the Eighth Amendment).

The California Supreme Court's rejection of this claim reflected a reasonable application of clearly established federal law. At the time of the state court's adjudication of petitioner's direct appeal in 2003, the United States Supreme Court had clearly established the Eighth Amendment's requirements for imposition of the death penalty:

> To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983); cf. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Under the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death. Id., at 162-164, 96 S.Ct., at (reviewing Georgia sentencing scheme); Proffitt v. Florida, 428 U.S. 242, 247-250, 96 S.Ct. 2960, 2964-2965, 49 L.Ed.2d 913 (1976) (reviewing Florida sentencing scheme). By doing so, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition. Zant, supra, 462 U.S., at 878, 103 S.Ct., at 2743 ("[S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty").

Lowenfield v. Phelps, 484 U.S. 231, 244 (1988); see also Arave v. Creech, 507 U.S. 463, 747 (1993) ("If the sentence fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm").

At the time of petitioner's trial, California statute contained several provisions that limited the class of persons against whom the death penalty may be imposed. A defendant became eligible for the death penalty when the factfinder finds him guilty of first-degree murder and finds

true beyond a reasonable doubt one of the special circumstances set forth in Penal Code section 190.2. Cal. Pen. Code § 190.4. Once this threshold was met, the case proceeds to a penalty phase, where the jury was instructed to consider numerous aggravating or mitigating factors listed in Penal Code section 190.3 in deciding whether to impose the death penalty on the defendant. See Tuilaepa, 512 U.S. at 975. If the jury returned a death verdict, the trial court considered an automatic motion to modify the verdict, wherein the court reviewed the evidence in light of the statutory aggravating and mitigating circumstances and determines "whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented," stating on the record the reasons for his findings. Cal. Pen. Code § 190.4(e). If the trial court declines to modify the verdict, the case was automatically appealed to the California Supreme Court. Cal. Pen. Code §§ 190.4(e), 1239; Pulley, 465 U.S. at 53.

In Pulley, 465 U.S. 37, the Supreme Court rejected an Eighth Amendment challenge to California's 1977 statute on similar grounds for which petitioner challenges the statute's 1978 amendment. As described ante, the respondent argued that the California scheme fails under the Eighth Amendment for failing to adequately narrow, including failing to include an appellate intercase proportionality review of capital cases. The Court acknowledged that there might, hypothetically, "be a capital sentencing system so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review," but "the 1977 California statute is not of that sort." Pulley, 465 U.S. at 51. Rather, because the law required "the jury to find at least one special circumstance beyond a reasonable doubt, the statute limits the death sentence to a small sub-class of capital-eligible cases," and then allowed the jury, in the penalty phase, to consider a list of relevant aggravating and mitigating factors, the statute minimizes the risk of arbitrary application of the death penalty. Id. at 53. This goal was further effectuated by California statute providing that death verdicts are reviewed automatically by the trial court and by the Supreme Court. See id. Based on all of these factors, the Court concluded, "on its face, this system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under Furman and our subsequent cases." Id.

Here, the California Supreme Court may have reasonably found that the statute under which petitioner was sentenced satisfied the narrowing requirement of the Eighth Amendment for the same reasons the Supreme Court upheld the statute in Pulley. As in Pulley, the statute governing petitioner's death sentence required the jury to find true at least one special circumstance beyond a reasonable doubt; required the jury to consider relevant aggravating and mitigating factors at the penalty phase; and required the trial court and state Supreme Court to automatically review the sentence. See Pulley, 465 at 51-53. Thus, the California Supreme Court was reasonable in concluding that the California statutory scheme to which petitioner was subject, as in Pulley, could not "be successfully challenged under Furman and [the Supreme Court's] subsequent cases." See id. at 53; see also Crittenden, 9 Cal.4th at 154-55; see generally Karis v. Calderon, 283 F.3d 1117, 1141 n.11 (9th Cir. 2002) (rejecting a narrowing challenge to California's capital sentencing scheme, concluding, "California has identified a subclass of defendants deserving of death and by doing so, it has 'narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed'" so as to satisfy the Eighth Amendment); Mayfield v. Woodford, 270 F.3d 915, 924 (9th Cir. 2001) (holding that, based on the features of California's death penalty scheme described herein, "[a] reasonable jurist could not debate, therefore, that the . . . California statute . . . narrowed the class of death-eligible defendants at both the guilt and penalty phases, [and therefore] was constitutional").

As such, the California Supreme Court's denial of this claim is deserving of deference as a reasonable application of clearly established federal law, 28 U.S.C. § 2254(d)(1), and the undersigned recommends the claim be dismissed.

**Claim 46**

In Claim 46, petitioner alleges that the extent to which California's capital sentencing scheme allows prosecutorial discretion in capital charging decisions violated his rights under the Eighth and Fourteenth Amendments. (ECF No. 138 at 252.) Petitioner raised this claim in his Supplemental Opening Brief on appeal, filed July 7, 1998. (Supp. AOB at 14-22.) The California Supreme Court denied the claim on the merits, stating,

> Defendant also asserts that the prosecutorial discretion permitted under our statutes renders California's death eligibility process unconstitutional. Again, we have rejected this claim in numerous decisions and decline to reconsider them now. (See, e.g., Hughes, supra, 27 Cal.4th at p. 404; Bolin, supra, 18 Cal.4th at p. 345; Barnett, supra, 17 Cal.4th at p. 1179, and cases cited; Scott, supra,15 Cal.4th at p. 1228.

Cox, 30 Cal. 4th at 971. The undersigned finds that denial entitled to deference.

The Supreme Court has held repeatedly that there is no constitutional violation in prosecutors possessing broad discretion to decide whether to seek the death penalty in a particular case. Gregg, 428 U.S. at 199; Proffitt, 428 U.S. at 254; Jurek, 428 U.S. at 274; see McCleskey v. Kemp, 481 U.S. 279, 296-97 (1987); see also Campbell v. Kincheloe, 829 F.2d 1453, 1465 (9th Cir. 1987) (affirming denial of relief on similar claim, collecting cases and holding that this "argument has been explicitly rejected by the Supreme Court"). Instead, the Constitution forbids only "purposeful discrimination" in the exercise of prosecutorial discretion, McCleskey, 481 U.S. at 292-93, and in order to prevail in that showing, the Supreme Court emphasized that "we would demand exceptionally clear proof before we would infer that the discretion has been abused." Id. at 297. Specifically, the petitioner must show both that the prosecutor labored under a discriminatory animus and that his decisions had a discriminatory effect. United States v. Armstrong, 517 U.S. 456, 465 (1996).

Here, petitioner did not argue nor show that he suffered purposeful discrimination in the prosecutor's decision to seek the death penalty against him. (Supp. AOB at 14-22; see ECF No. 192 at 584-88; ECF No. 219 at 184-86.) Instead, he argued that the unfettered discretion granted to individual county prosecutors in seeking the death penalty itself renders the penalty arbitrary in violation of the Eighth Amendment. (See Supp. AOB at 14-22.) Given, however, that this argument is directly at odds with governing Supreme Court precedent, see Gregg, 428 U.S. at 199; Proffitt, 428 U.S. at 254; Jurek, 428 U.S. at 274, the California Supreme Court reasonably applied clearly established federal law when it denied petitioner's claim on the merits. See 28 U.S.C. § 2254(d)(1). Accordingly, the state court's denial of this claim is entitled to deference and the undersigned recommends it be dismissed.

/ / /

**Claim 47**

In Claim 47, petitioner alleges that his death sentence violates international law, as well as the Eighth and Fourteenth Amendments of the Constitution. (ECF No. 138 at 253-56.) Petitioner raised this claim in his 2005 state habeas corpus petition (June 30, 2005 Pet. at 233-39 (claim 8)), which the California Supreme Court denied summarily on the merits. (ECF No. 79-1.) The undersigned concludes that denial is entitled to deference.

Preliminarily, the undersigned finds that the California Supreme Court denied this claim on the merits. Petitioner argues that the California Supreme Court did not reach the merits of similar claims when raised by other capital appellants, therefore "this Court may presume that the state court resolved Mr. Cox's claim in the same manner." (ECF No. 192 at 591.) This approach, however, would contradict the Supreme Court's holding in Richter, that a state court's summary denial of a claim for relief in a petition for writ of habeas corpus is presumed to be a denial on the merits, unless there are state procedural principals indicating the contrary, or unless the state court expressly indicated the denial was not on the merits. Richter, 562 U.S. at 99. Here, the California Supreme Court articulated that it denied this claim "on the merits" (ECF No. 79-1), and this court, therefore, presumes that to be the case. See Richter, 562 U.S. at 99 ("There is no merit either in Richter's argument that § 2254(d) is inapplicable because the California Supreme Court did not say it was adjudicating his claim 'on the merits.' The state court did not say it was denying the claim for any other reason."). Although petitioner points to other cases where the California Supreme Court did not reach the merits of this claim when raised by other appellants, the text of the California Supreme Court's opinion in petitioner's case does not cite to or rely on those cases, nor does it otherwise suggest it engaged in the same analysis when considering petitioner's claim (see ECF No. 79-1); petitioner's position is "pure speculation" insufficient to rebut the presumption that the California Supreme Court denied this claim on the merits. See Richter, 562 U.S. at 99-100.

As such, this court must defer to the state court's denial of petitioner's claim on the merits unless petitioner can show that there was no reasonable basis for the California Supreme Court to have denied relief. See Richter, 562 U.S. at 98. Here, petitioner fails to make such showing. In

his petition in state court, petitioner alleged that various aspects of his death sentence and the proceedings to which he has been subject, including delays in post-judgment review, violated his rights under the International Covenant on Civil and Political Rights, the Universal Declaration of Human Rights, the American Declaration of the Rights and Duties of Man, and customary international law. (June 30, 2005 Pet. at 236.) Petitioner requested that habeas corpus relief be granted and his death sentence be vacated, as a remedy. (*Id*. at 238-39.) There are several reasons why the state court may have reasonably denied this claim on the merits, in accordance with clearly established federal law.

First, the California Supreme Court may have reasonably denied relief on this claim on the basis that petitioner had failed to show that habeas corpus relief could be granted for violations of the forms of international law he identified. The Supreme Court has never held that violation of a treaty to which the United States is a party, or violation of customary international law, gives rise to habeas corpus relief. See Medellin v. Dretke, 544 U.S. 660, 664 (2005) (Vienna Convention did not create individual judicially enforceable rights); Sosa v. Alvarez-Machain, 542 U.S. 692, 734-35 (2004) (UN Charter and Universal Declaration of Human Rights do not create obligations enforceable in federal court); Buell, 274 F.3d at 376 (application of customary international law to a American state's criminal justice administration is a question that is reserved to the executive and legislative branches of the United States government); Serra v. Lappin, 600 F.3d 1191, 1197 (9th Cir. 2010) ("customary international law is not a source of judicially enforceable private rights in the absence of a statute conferring jurisdiction over such claims"); see also Estate of Ferdinand Marcos, 25 F.3d 1467, 1475 (9th Cir. 1994) ("International law does not require any particular reaction to violations of law. . . . Whether and how the United States wishes to react to such violations are domestic questions."); Rowland v. Chappell, 902 F. Supp. 2d 1296, 1339 (N.D. Cal. 2012) (holding, "[p]etitioner cannot demonstrate that any claim of a violation of international law is even cognizable on federal habeas review, given that such review is designed to address claims that a petitioner is in custody in violation of the Constitution or laws or treaties of the United States"). Petitioner relies on Medellin v. Texas, 552 U.S. 491, 505-06 n.2 (2008), for his argument that the violations of his rights under the ICCPR, in particular, give

rise to habeas corpus relief. (ECF No. 192 at 592-93). The state court, however, could have reasonably rejected this. Both the Supreme Court and Court of Appeals have held that the ICCPR is not enforceable in the federal courts. Sosa, 542 U.S. at 735; Serra, 600 F.3d at 1197. Moreover, the passage of Medellin on which petitioner relies simply defines "self-executing" treaties, but does not recognize a right to habeas corpus relief pursuant to the ICCPR specifically nor to a self-executing treaty more generally. See Medellin, 552 U.S. at 505-06 n.2. For these reasons, the California Supreme Court may have reasonably denied relief on this claim on the merits, on the basis that there was no clearly established federal law setting forth petitioner's right to relief for the violations of international law that he alleged.

The state court also could have reasonably rejected this claim on the merits on the basis that petitioner had not shown that international law was violated in his case. His allegations that his death sentence per se violates the ICCPR are meritless, as the United States ratified the ICCPR subject to reservation of the right to impose capital punishment subject only constitutional constraints. See 138 Cong. Rec. S-4781-01, S4783 (1992); see also Buell v. Mitchell, 274 F.3d 337, 376 (6th Cir. 2001) (collecting cases and explaining, "courts that have considered the question of whether international law bars capital punishment in the United States have uniformly concluded that it does not"). Although petitioner alleged in state court that his death sentence also violated other forms of international law, these allegations were so sparse and conclusory that the state court could have reasonably concluded petitioner had failed to demonstrate his entitlement to relief. (See June 30, 2005 Pet. at 233-39.)

For all of these reasons, the undersigned concludes that the state court's denial of claim 47 on the merits was a reasonable application of clearly established federal law and is entitled to deference. Claim 47 is recommended to be dismissed.

**Claim 48**

In Claim 48, petitioner alleges that, as an empirical matter, California's capital sentencing scheme fails to narrow the class of death-eligible offenders, thereby violating his rights under the Eighth and Fourteenth Amendments. (ECF No. 138 at 257-59.) Petitioner raised this claim in his 2005 state habeas corpus petitioner (June 30, 2005 Pet. at 298-301 (claim 18)), which the

California Supreme Court denied summarily on the merits. (ECF No. 79-1.) The undersigned concludes that that denial is entitled to deference.

As explained ante, "[t]o pass constitutional muster," under the Eighth Amendment, "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Lowenfield, 484 U.S. at 244 (quoting Zant, 462 U.S. at 877). In state court, petitioner presented numerical data indicating that, because of the nature of California's capital sentencing scheme, large percentages of homicide offenders could be eligible for the death penalty, demonstrating that the scheme fails to adequately perform the narrowing function required by the Eighth Amendment. (June 30, 2005 Pet. at 298-301.)

The state court was reasonable in concluding that petitioner had not shown, even as a prima facie matter, that the death sentence to which he was subject violated the Eighth Amendment under clearly established federal law. Primarily, there was no clearly established precedent that the data petitioner presented could, alone, demonstrate that the Eighth Amendment was violated. To be sure, the United States Supreme Court has recognized the import of the actual application of a jurisdiction's death penalty in assessing whether it constitutes cruel and unusual punishment under the Eighth Amendment. In Furman, several of the justices whose opinions comprise the majority relied on the manner in which the death penalty empirically had been imposed in concluding that Georgia's capital sentencing scheme was unconstitutional. Furman v. Georgia, 408 U.S. 238, 256-57 (1972) (con. opn. of Douglas, J.) (racial and economic discrimination in application of death penalty relevant in concluding statute violated the Eighth Amendment); id. at 309-10 (conc. opn. of Stewart, J.) (rare application of death penalty relevant to Eighth Amendment analysis); id. at 313 (conc. opn. of White, J.) (actual administration of death penalty relevant to Eighth Amendment analysis). The Supreme Court, however, has never held that such empirical observations alone can render a state's death penalty scheme constitutionally defective. Rather, determinative to all of the Court's considerations of the Eighth Amendment challenges to a death penalty statute on narrowing grounds has been the plain language of the operative statutes. See Gregg, 428 U.S. at 189 (joint opinion of Stewart, Powell,

and Stevens, JJ.) (holding Furman "mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action"); see, e.g., Pulley, 465 U.S. at 53 (analyzing only statutory provisions when considering whether California capital sentencing scheme violates Eighth Amendment); Maynard v. Cartwright, 486 U.S. 356, 362 (1988) (Furman requires that statute "channel[s] and limit[s] ... the sentencer's discretion in imposing the death penalty"); Godfrey, 446 U.S. at 428 (to satisfy Eighth Amendment, statute must provide "sentencer with 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death'"). In other words, the Court has never held that a state's death penalty was unconstitutional based on its empirical failure to narrow, where the relevant statute facially narrowed the class of death-eligible offenders (as the state court could have reasonably found here, for the reasons set forth in the discussion of claim 45, ante).

Moreover, even if the California Supreme Court considered clearly established federal law to allow for the possibility that empirical data alone could demonstrate an Eighth Amendment violation, the state court could nevertheless have concluded that petitioner failed to show that the data he presented met that standard. In state court, petitioner analogized the data in his case to that presented in Furman (see June 30, 2005 Pet. at 298-301), but the state court may have reasonably found that comparison unavailing, given that the data at issue in Furman did not address the particular issue petitioner raised, viz., that the state's statute renders the pool of death-eligible defendants so large as to violate the Eighth Amendment. See Cornwell v. Warden, San Quentin State Prison, No. 2:06-CV-00705-TLN-KJN, 2018 WL 934542, at *119–22 (E.D. Cal. Feb. 15, 2018), report and recommendation adopted, No. 2:06-CV-00705-TLN-KJN, 2019 WL 12117105 (E.D. Cal. Mar. 19, 2019) (rejecting a similar argument under Furman, given the "apples-to-oranges comparison" to the data at issue). On the record before it, the state court may have reasonably concluded that petitioner failed to show that the statistical disparities he identified were so great as to constitute an Eighth Amendment violation, let alone a showing grounded in the Supreme Court's clearly established federal law. (99 June 30, 2005 Pet. at 298-301.) Put

differently, the state court could have reasonably concluded that there was no authority for concluding that the data petitioner presented indicated the Eighth Amendment had been violated, even if petitioner's legal theory was cognizable.

Thus, because the California capital sentencing scheme to which petitioner was subject facially accords with the narrowing requirement of the Eighth Amendment, the state court was not unreasonable under clearly established federal law in finding the statutory scheme constitutional. See Claim 45, ante; Pulley, 465 U.S. at 53. There was no clearly established federal law recognizing that the type of data proffered to the state court concerning the application of this system would, alone, impugn that conclusion. See Pulley, 465 U.S. at 53; Maynard, 486 U.S. at 362; Godfrey, 446 U.S. at 428; Gregg, 428 U.S. at 189. The state court's denial of claim 48 on the merits, therefore, was a reasonable application of clearly established federal law, deserving of deference under § 2254(d), and the undersigned recommends the claim be dismissed.

**CONCLUSION**

Accordingly, IT IS HEREBY RECOMMENDED that Claims 1, 3, 12, 15, 16, 17, 18, 19, 20, 21, 22 (except insofar as it alleges violations of petitioner's Fifth Amendment rights), 23, 24, 25, 26, 27, 28, 29, 30, 31, 33, 34, 35, 36, 37, 38, 39, 42, 43, 44, 45, 46, 47, and 48 of the Petition for Writ of Habeas Corpus (ECF No. 138) be DISMISSED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within sixty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: September 26, 2026

Carolyn K. Delaney

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE